No. 20-6267

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
_____

BRISTOL REGIONAL WOMEN'S CENTER, P.C., et al.,
*Plaintiffs-Appellees*

v.

HERBERT H. SLATERY III, Attorney General and Reporter of the State of Tennessee, et al.,
*Defendants-Appellants*
_____

On Appeal from the United States District Court for the
Middle District of Tennessee
(No. 3:15-cv-00705)

---

## PETITION FOR INITIAL HEARING EN BANC OR ALTERNATIVELY REHEARING EN BANC OF THE PANEL'S STAY ORDER

---

HERBERT H. SLATERY III
  Attorney General and Reporter
  of the State of Tennessee

ANDRÉE S. BLUMSTEIN
  Solicitor General

SARAH K. CAMPBELL
  Associate Solicitor General
  *Counsel of Record*

MARK ALEXANDER CARVER
  Honors Fellow, Office of the
  Solicitor General

  P.O. Box 20207
  Nashville, TN 37202
  (615) 532-6026
  Sarah.Campbell@ag.tn.gov

# TABLE OF CONTENTS

Table of Authorities ................................................................................... ii

Rule 35(b) Statement .................................................................................1

Introduction ...............................................................................................1

Statement ...................................................................................................3

Reasons for Granting En Banc Review .....................................................8

    I.     The Stay Order Defies Binding Precedent. ...............................8

    II.    The Stay Order Sows Confusion About the Standard for Evaluating Abortion Regulations...............................................................13

    III.   This Case Involves a Question of Exceptional Importance. ....................14

Conclusion ...............................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Woman's Choice-E. Side Women's Clinic v. Newman*,
305 F.3d 684 (7th Cir. 2002) ...............................................................9

*Adams & Boyle, P.C. v. Slatery*,
956 F.3d 913 (6th Cir. 2020), *cert. granted, judgment vacated sub nom. Att'y Gen. of Tenn. v. Adams & Boyle, P.C.*, No. 20-482,
2021 WL 231544 (U.S. Jan. 25, 2021) ...............................................11

*Barnes v. Moore*,
970 F.2d 12 (5th Cir. 1992) ...............................................................10

*California ex rel. Becerra v. Azar*,
927 F.3d 1045 (9th Cir. 2019) (en banc) ............................................2

*California ex rel. Becerra v. Azar*,
928 F.3d 1153 (9th Cir. 2019) (en banc) ............................................2

*California ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) (en banc) ............................................8

*Bristol Reg'l Women's Ctr. v. Slatery*,
No. 20-6267, slip op. (6th Cir. Feb. 19, 2021) ...........................*passim*

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam)......................................................15

*Cincinnati Women's Services, Inc. v. Taft*,
468 F.3d 361 (6th Cir. 2006) ...............................................1, 5, 9, 14

*EMW Women's Surgical Center, P.S.C. v. Friedlander*,
978 F.3d 418 (6th Cir. 2020) ....................................................*passim*

*Fargo Women's Health Org. v. Schafer*,
18 F.3d 526 (8th Cir. 1994) ...............................................................10

*Garza v. Hargan*,
874 F.3d 735 (D.C. Cir. 2017) (en banc), *cert. granted, judgment vacated sub nom. Azar v. Garza*, 138 S. Ct. 1790 (2018)
(per curiam)...........................................................................................9

*George v. Hargett*,
879 F.3d 711 (6th Cir. 2018) ...............................................................3

*Hodgson v. Minnesota*,
497 U.S. 417 (1990)...............................................................................9

*Jones v. Governor of Fla.*,
975 F.3d 1016 (11th Cir. 2020) (en banc) ........................................2

*June Med. Servs. L.L.C. v. Russo*,
140 S. Ct. 2103 (2020)..............................................................*passim*

*Karlin v. Foust*,
188 F.3d 446 (7th Cir. 1999) ..............................................................10

*Marks v. United States*,
430 U.S. 188 (1977)..............................................................................13

*Maryland v. King*,
567 U.S. 1301 (2012) ..........................................................................11

*Memphis Planned Parenthood, Inc. v. Sundquist*,
175 F.3d 456 (6th Cir. 1999) ................................................................9

*Montgomery v. Rosen*,
No. 21-5001 (D.C. Cir. Jan. 11, 2021) (en banc) .........................2, 12

*Ohio v. Akron Ctr. for Reprod. Health*,
497 U.S. 502 (1990)...............................................................................9

*Planned Parenthood of Middle Tenn. v. Sundquist*,
38 S.W.3d 1 (Tenn. 2000).....................................................................3

*Planned Parenthood of Middle Tenn. v. Sundquist*,
No. 01A01-9601-CV-00052, 1998 WL 467110
(Tenn. Ct. App. Aug. 12, 1998).........................................................3

*Planned Parenthood, Sioux Falls Clinic v. Miller*,
    63 F.3d 1452 (8th Cir. 1995) ...............................................................10

*Planned Parenthood of Se. Penn. v. Casey*,
    505 U.S. 833 (1992)....................................................................*passim*

*Wearry v. Cain*,
    136 S. Ct. 1002 (2016) (per curiam)..............................................15

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016)......................................................................14

**Constitutional Provisions and Statutes**

28 U.S.C. § 46(c) .....................................................................................8

Ariz. Rev. Stat. Ann. § 36-2153(A) .....................................................10

Ark. Code Ann. § 20-16-1703(b).........................................................10

Fla. Stat. Ann. § 390.0111(3)(a)(1)......................................................10

Ind. Code Ann. § 16-34-2-1.1(a) .........................................................10

Iowa Code Ann. § 146A.1(1)...............................................................10

Ky. Rev. Stat. Ann. § 311.725(1) .........................................................10

La. Stat. Ann. § 40:1061.16(B)-(C) ......................................................10

Miss. Code Ann. § 41-41-33(1) ...........................................................10

Mo. Ann. Stat. § 188.027 .....................................................................10

Ohio Rev. Code Ann. § 2317.56(B)(1)................................................10

S.D. Codified Laws § 34-23A-56 ........................................................10

Tenn. Code Ann. § 39-15-202(a)-(f).....................................................15

Tenn. Code Ann. § 39-15-202(a)-(h).......................................................3

Tenn. Code Ann. § 39-15-202(b)............................................................4

Tenn. Code Ann. § 39-15-202(b)-(d).......................................................4

Tenn. Code Ann. § 39-15-202(d)(1) ...................................................4

Tenn. Code Ann. § 39-15-202(d)(2) ...................................................4

Tenn. Const. art. I, § 36 .....................................................................3

Tex. Health & Safety Code Ann. § 171.012(a)(4), (b) .....................10

Utah Code Ann. § 76-7-305(2) .........................................................10

Wis. Stat. Ann. § 253.10(3)(c)(1) .....................................................10

**Other Authorities**

6th Cir. I.O.P. 34(b)(2) .....................................................................11

6th Cir. I.O.P. 35(a) ..........................................................................10

1978 Tenn. Pub. Acts, ch. 847, § 1 ....................................................3

2015 Tenn. Pub. Acts, ch. 473, § 4 ....................................................5

Fed. R. App. P. 2 .................................................................................8

Fed. R. App. P. 35(a)(1) ....................................................................10

Fed. R. App. P. 35(a)(2) ....................................................................14

Fed. R. App. P. 35(a)-(b) ....................................................................8

Fed. R. App. P. 35(b) ......................................................................1, 8

Fed. R. App. P. 35(b)(1)(A) ...........................................................1, 10

Fed. R. App. P. 35(b)(1)(B) .................................................................1

Fed. R. App. P. 47(a)(1) ......................................................................8

Fed. R. App. P. 47(a)(1) ......................................................................8

## RULE 35(b) STATEMENT

En banc review is necessary because the panel's ruling that Tennessee's abortion waiting period is likely unconstitutional conflicts with the following decisions of the Supreme Court and this Court: *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992); *Cincinnati Women's Services, Inc. v. Taft*, 468 F.3d 361 (6th Cir. 2006); and *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020). Fed. R. App. P. 35(b)(1)(A). That ruling also conflicts with the authoritative decisions of every other federal court of appeals to address the lawfulness of abortion waiting periods since *Casey*, *see* p. 10 n.2, *infra*. Fed. R. App. P. 35(b)(1)(B). And this case presents a question of exceptional importance: whether a three-judge panel may functionally overrule Supreme Court and Circuit precedent. *See id.*

## INTRODUCTION

A divided panel of this Court refused to stay an injunction forbidding the enforcement of Tennessee's abortion waiting period because it concluded the law is likely unconstitutional. Never mind that Tennessee's law and its effects are materially indistinguishable from similar waiting periods upheld by the Supreme Court in *Casey*, this Court in *Taft*, and every other relevant decision of the federal appellate courts since *Casey* was decided. Tennessee is now the only State in the Nation that cannot enforce its abortion waiting period because of a federal judicial

decree. And the panel's published, precedential decision threatens not only Tennessee's sovereign authority to regulate abortion, but also the waiting periods of two other States in this Circuit and many others across the country. That decision warrants "immediate correction." *Bristol Reg'l Women's Ctr. v. Slatery*, No. 20-6267, slip op. at 20 (6th Cir. Feb. 19, 2021) (Thapar, J., dissenting) (hereinafter "Stay Op.").

There are two ways this Court can immediately correct the panel's grave error. First, the full Court should grant this petition for initial hearing en banc and the State's simultaneously filed motion for reconsideration of the stay order; it should then stay the district court's judgment and injunction pending merits review by the full Court. *Id.* at 20 n.1; *see also Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020) (en banc) (granting initial hearing en banc and staying permanent injunction pending disposition by the full Court); *Montgomery v. Rosen*, No. 21-5001 (D.C. Cir. Jan. 11, 2021) (en banc) (granting en banc reconsideration of an order denying a stay and granting initial hearing en banc). Alternatively, the Court should at least grant rehearing en banc of the stay order and stay the district court's judgment and injunction while a three-judge panel considers the merits. Stay Op. at 20 n.1 (Thapar, J., dissenting); *cf. California ex rel. Becerra v. Azar*, 928 F.3d 1153, 1155 (9th Cir. 2019) (mem.) (en banc); *California ex rel. Becerra v. Azar*, 927 F.3d 1045, 1046 (9th Cir. 2019) (mem.) (en banc).

In either event, the Court should immediately grant the State's simultaneously filed motion for an administrative stay while it considers this en banc petition and accompanying motion for reconsideration.

## STATEMENT

Tennessee first enacted a 48-hour waiting period for abortions in 1978, 1978 Tenn. Pub. Acts, ch. 847, § 1, but a federal court soon enjoined it from enforcing the law based on precedent that predated *Casey*. *See Planned Parenthood of Middle Tenn. v. Sundquist*, No. 01A01-9601-CV-00052, 1998 WL 467110, at *2-3 (Tenn. Ct. App. Aug. 12, 1998) (discussing preliminary and permanent injunctions by the federal court). After *Casey*, the Tennessee Supreme Court held Tennessee's waiting period unconstitutional under *state law*, and the State was again enjoined from enforcing it. *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 25 (Tenn. 2000).

In 2014, Tennesseans amended their state constitution to make clear that it does not protect a right to abortion. Tenn. Const. art. I, § 36; *see also George v. Hargett*, 879 F.3d 711 (6th Cir. 2018). The following year, in direct response to that historic amendment, the legislature enacted a new waiting-period law modeled after Tennessee's earlier law and the Pennsylvania law that *Casey* upheld. 2015 Tenn. Pub. Acts, ch. 473, § 1 (codified at Tenn. Code Ann. § 39-15-202(a)-(h)); *see also*

Final Order, R.275, PageID#6515; Defs.' Proposed Findings and Conclusions, R.227, PageID#5635.

The 2015 law requires abortion providers to give their patients important information about abortion and its alternatives at least 48 hours before performing an abortion, except in a medical emergency. Tenn. Code Ann. § 39-15-202(d)(1). The information must be provided orally and in person by a physician. *Id.* § 39-15-202(b)-(d). After 48 hours have passed, the provider must obtain the patient's informed consent to perform an abortion. *Id.* The law also provides that if any court enjoins enforcement of the 48-hour waiting period, a 24-hour waiting period will apply instead. *Id.* § 39-15-202(d)(2).

As in *Casey*, the information abortion providers must disclose under Tennessee's law ensures that women are fully informed about the decision to have an abortion. Among other things, abortion providers must inform women of the health risks of abortion and childbirth, the gestational age of the unborn child, and the availability of public and private support services for women who choose to carry their pregnancies to term. *Id.* § 39-15-202(b); *cf. Casey*, 505 U.S. at 881 (joint opinion).

In June 2015, a group of abortion providers sued to challenge the law shortly before it was scheduled to take effect. Compl., R.1, PageID#3-5, 7, 18-19. Plaintiffs did not seek a preliminary injunction against enforcement of the waiting period. *Id.*

at PageID#20-21. The waiting period took effect about a week later, 2015 Tenn. Pub. Acts, ch. 473, § 4, and it remained in effect for five years while the litigation was pending in the district court.

After a bench trial—and more than five years after the waiting period took effect—the district court declared Tennessee's waiting period unconstitutional and permanently enjoined the State from enforcing a 24- or 48-hour waiting period. Final Order, R.275, PageID#6644. The court assessed whether the law imposed an undue burden by "weighing its asserted benefits against the burdens it imposes on abortion access." *Id.* at PageID#6635 (quotation marks omitted). Because it believed the law's burdens outweighed its benefits, the court held the law facially unconstitutional. *Id.* at PageID#6635-36, 6644. The court did not find that a large fraction of affected women "would effectively be barred from exercising their constitutional right to obtain an abortion." *Taft*, 468 F.3d at 373. It instead concluded that this question was "irrelevant" to the law's validity, and it held that the law constitutes an undue burden because it delays abortions and makes it more "time-consuming, costly, and inconvenient" for low-income women to obtain them. Final Order, R.275, PageID#6636, 6638.

The district court acknowledged that the Supreme Court and this Court have previously upheld waiting periods similar to Tennessee's. *Id.* at PageID#6636-37. But it made no effort at all to distinguish this case from *Taft*, and its attempt to

distinguish *Casey* consisted of only a single paragraph. *Id.* at PageID#6638. It maintained that *Casey* was not controlling because the record in this case was more "fully developed" than in *Casey* and because Tennessee has fewer abortion providers than Pennsylvania had when *Casey* was decided. *Id.* Yet the record conclusively established that, notwithstanding the difficulties purportedly created by the law, Tennessee's eight abortion providers performed more than 10,000 abortions each year both before and after the waiting period took effect. Stay Motion at 20.

Tennessee appealed and simultaneously moved the district court for a stay pending appeal. Notice of Appeal, R.279, PageID#6651-53; Mot. for Stay Pending Appeal, R.280, PageID#6654-58. Two days after the district court denied that motion, Order Denying Stay, R.287, PageID#6718-23, Tennessee sought a stay from this Court.

Last Friday, more than two months after Tennessee filed its stay motion, a divided panel of this Court denied the motion because it concluded that Tennessee's law is likely unconstitutional. The majority acknowledged that the district court applied the benefits-and-burdens balancing test that was disapproved by the Chief Justice in *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020), and by this Court in *EMW Women's Surgical Ctr.*, 978 F.3d at 433. Stay Op. at 8. But it surmised that *EMW*'s decision to apply the Chief Justice's opinion from *June Medical Services* may have been "dicta" with limited "precedential value." *Id.* at 9-

6

11. And it concluded in any event that Tennessee's law is likely unconstitutional "with or without balancing" because it imposes "logistical, financial, and medical hurdles" to abortion access. *Id.* at 11, 13. The panel further held that the law is likely facially unconstitutional under the large-fraction test because these hurdles amounted to an undue burden for at least the 60 to 80 percent of women seeking an abortion who "qualify as low income." *Id.* at 18.

Judge Thapar dissented. *Id.* at 20. He explained that the district court made three errors, each of which independently entitles Tennessee to a stay. *Id.* at 22. *First*, the district court applied the wrong legal standard when it balanced the benefits and burdens of Tennessee's waiting period—an approach rejected by the Supreme Court in *June Medical Services* and this Court in *EMW*. *Id.* at 22-25. *Second*, the district court erroneously concluded that Tennessee's waiting period serves no legitimate purpose, "contraven[ing] . . . key principles of rational basis review" and binding precedent. *Id.* at 26-27. *Third*, the district court wrongly concluded that the law poses a substantial obstacle to abortion for a large fraction of women, even though the burdens the district court identified either were "the same as those rejected as insufficient in *Casey*" or fell "well short of being a substantial obstacle to abortion." *Id.* at 28-29. Judge Thapar stressed that the majority's decision warrants "immediate correction" by this Court because it "calls into question waiting-period laws in fourteen States" and "suggests that district courts (and

appellate panels) have free rein to disregard controlling precedent." *Id.* at 20, 32-33.

## REASONS FOR GRANTING EN BANC REVIEW

For three reasons, the Court should grant initial en banc review or, alternatively and at a minimum, grant rehearing en banc to review the panel's stay order. Fed. R. App. P. 35(a)-(b).[1]

## I. The Stay Order Defies Binding Precedent.

The Supreme Court has consistently upheld waiting periods and other laws that serve legitimate state interests but have the effect of delaying abortions and

---

[1] The panel majority argued that Tennessee cannot seek en banc review of a stay order. Stay Op. at 3 n.3. Not so. *Id.* at 20 n.1 (Thapar, J., dissenting). The governing federal statute permits "a case or controversy" to be "heard or reheard" en banc. 28 U.S.C. § 46(c). The Federal Rules of Appellate Procedure likewise provide that "an appeal *or other proceeding*" may "be heard or reheard by the court of appeals en banc" and that any party "may petition for a hearing or rehearing en banc." Fed. R. App. P. 35(a)-(b) (emphasis added); *see also California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1082 & n.10 (9th Cir. 2020) (en banc) (granting rehearing en banc of a stay proceeding and subsequently resolving the merits of the appeal en banc). This Court's internal operating procedures do not contradict those rules, nor could they. Fed. R. App. P. 47(a)(1), (b) (mandating that local rules of practice be "consistent with" federal statutes and rules); *id.* advisory committee's note (1995 Amendments) ("It is the intent of this rule that a local rule may not bar any practice that these rules explicitly or implicitly permit."). In any event, this Court may for good cause "suspend any provision" of the Federal Rules "in a particular case." Fed. R. App. P. 2. If the Court may suspend the Federal Rules for good cause, it follows *a fortiori* that it may suspend its own internal operating procedures for good cause. Fed. R. App. P. 47(a)(1) (granting courts of appeals authority to make local rules and internal operating procedures). As explained below, good cause exists to grant en banc review of the panel's stay order.

8

making them more difficult and costly to obtain. *Casey*, 505 U.S. at 874 (joint opinion) (collecting cases); *id.* at 881-87 (joint opinion) (24-hour waiting period); *Hodgson v. Minnesota*, 497 U.S. 417, 448-49 (1990) (opinion of Stevens, J.); *id.* at 496-97 (Kennedy, J., concurring in the judgment in relevant part) (48-hour waiting period for minors); *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990) (holding that a delay of three weeks was "plainly insufficient to invalidate the statute on its face"); *see also Garza v. Hargan*, 874 F.3d 735, 755-56 (D.C. Cir. 2017) (en banc) (Kavanaugh, J., dissenting) (collecting cases), *cert. granted, judgment vacated sub nom. Azar v. Garza*, 138 S. Ct. 1790 (2018) (per curiam).

So has this Court. It upheld Ohio's waiting period even though it "could . . . delay[] abortions up to two weeks" and deterred a small percentage of women from obtaining abortions altogether. *Taft*, 468 F.3d at 366, 373. And it similarly upheld Tennessee's judicial bypass procedure despite evidence that it could take weeks to successfully navigate the procedure and that the law made it more expensive and difficult to obtain abortions. *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 459-60, 463 n.3 (6th Cir. 1999); *id.* at 472-73, 479-80 (Keith, J., dissenting).

Every authoritative decision of the federal courts of appeals to consider an abortion waiting period since *Casey* has likewise upheld the law. *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 691 (7th Cir. 2002);

*Karlin v. Foust*, 188 F.3d 446, 486 (7th Cir. 1999); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1467 (8th Cir. 1995); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 533 (8th Cir. 1994); *Barnes v. Moore*, 970 F.2d 12, 14-15 (5th Cir. 1992).

Tennessee and 14 other States—including two in this Circuit—reasonably relied on this mountain of precedent when they enacted materially identical abortion waiting periods.[2]  But the panel's published, precedential stay order flouted those precedents and injected uncertainty into what was, until that order, a well-settled area of the law.  The panel did no less than "functionally overrule[] *Casey*."  Stay Op. at 32 (Thapar, J., dissenting).

Initial en banc review is urgently needed to "maintain uniformity" of precedent.  Fed. R. App. P. 35(a)(1), (b)(1)(A).  The panel's defiance of binding precedent in a published opinion is precisely the kind of "precedent-setting error of exceptional public importance" that warrants immediate correction by the full Court.  6th Cir. I.O.P. 35(a).

_____

[2] Ariz. Rev. Stat. Ann. § 36-2153(A) (24 hours); Ark. Code Ann. § 20-16-1703(b) (72 hours); Fla. Stat. Ann. § 390.0111(3)(a)(1) (24 hours); Ind. Code Ann. § 16-34-2-1.1(a) (18 hours); Iowa Code Ann. § 146A.1(1) (24 hours); Ky. Rev. Stat. Ann. § 311.725(1) (24 hours); La. Stat. Ann. § 40:1061.16(B)-(C) (72 or 24 hours); Miss. Code Ann. § 41-41-33(1) (24 hours); Mo. Ann. Stat. § 188.027 (72 hours); Ohio Rev. Code Ann. § 2317.56(B)(1) (24 hours); S.D. Codified Laws § 34-23A-56 (72 hours); Tex. Health & Safety Code Ann. § 171.012(a)(4), (b) (24 hours); Utah Code Ann. § 76-7-305(2) (72 hours); Wis. Stat. Ann. § 253.10(3)(c)(1) (24 hours).

There is no sound reason to delay en banc review.  It appears that, if initial en banc review is not granted, the same three-judge panel that decided the stay motion will also decide the merits of this appeal.  Stay Op. at 3 n.3 (expressing hope that Judge Thapar "will keep an open mind" as the case proceeds); *id.* at 20 n.1 (Thapar, J., dissenting) (explaining that "nothing more will be added by an additional panel decision" because the majority "has already concluded that the law appears to be 'unnecessary, unjustified, and unduly burdensome'" (quoting Stay Op. at 2)).[3] Granting initial hearing en banc will allow this Court to both correct the panel's erroneous stay order and ensure that the merits decision in this case complies with binding precedent.

Tennessee and its citizens have suffered irreparable harm for the past four months while the waiting period has been unenforceable, and they will continue to suffer that harm for months if not years more if the permanent injunction remains in place during the pendency of this appeal and is ultimately affirmed on the merits. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  So long

---

[3] The panel that issued the stay order is the same panel that ruled against the State in an earlier appeal arising from a "supplemental complaint" that was filed in the underlying action but involved an unrelated claim.  *See Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020), *cert. granted, judgment vacated sub nom. Att'y Gen. of Tenn. v. Adams & Boyle, P.C.*, No. 20-482, 2021 WL 231544 (U.S. Jan. 25, 2021).  In its stay motion, the State requested that this case be randomly assigned to a motions panel pursuant to this Court's standard procedures because the present appeal is not from any "further proceedings" ordered by the earlier panel.  Stay Motion at 1 (quoting 6th Cir. I.O.P. 34(b)(2)).

as the waiting period is unenforceable, Tennessee will be unable "to implement [its] interest[s] in protecting the life of the unborn" and ensuring that a woman's decision to abort is "informed and deliberate." *Casey*, 505 U.S. at 885 (joint opinion). Courts have frustrated Tennessee's democratic efforts to enforce a lawful waiting period for years. *See* p. 3, *supra*. This Court can end that practice by granting initial hearing en banc and staying the permanent injunction pending resolution of the appeal.

If this Court declines to grant initial hearing en banc, it should at a minimum grant rehearing en banc of the panel's stay order and stay the injunction until the panel issues its merits decision. This Court has authority to review a stay order en banc. *See* p. 8 n.1, *supra*; *Montgomery*, No. 21-5001 (D.C. Cir. Jan. 11, 2021) (en banc). That the Court apparently has not exercised that authority previously does not preclude it from doing so here.[4] Even if this Court believes that this authority should be reserved for the most exceptional circumstances, the stay order here satisfies that demanding standard. The panel majority flouted binding Supreme Court and Circuit precedent in a published opinion. Unless the full Court intervenes now, "[t]he effects of [that] ruling will extend far beyond this case." Stay Op. at 32 (Thapar, J., dissenting). District courts and future panels will have reason to believe they have "free rein to disregard controlling precedent and to substitute their

---

[4] This Court has, however, granted petitions for rehearing en banc of other non-merits rulings such as preliminary injunction decisions. Stay Op. at 20 n.1 (Thapar, J., dissenting) (citing examples).

preferences for the judgment of the Supreme Court." *Id.* at 32-33. The panel's "invitation to defy precedent" erodes the very foundation of our judicial system and warrants "immediate correction." *Id.* at 20, 23.

## II. The Stay Order Sows Confusion About the Standard for Evaluating Abortion Regulations.

This Court recently held that the Chief Justice's separate opinion in *June Medical Services* is controlling under *Marks v. United States*, 430 U.S. 188 (1977), and therefore supplies the governing standard for evaluating abortion regulations. *EMW Women's Surgical Ctr.*, 978 F.3d at 433. Plaintiffs did not dispute what *EMW* held. Plaintiffs' Stay Opposition at 9; Plaintiffs' Stay Opposition, R.285, PageID#6694 & n.3. But the panel majority did, casting doubt on *EMW*'s status as circuit precedent by asserting that this Court's holding may in fact be "dicta" with limited "precedential value." Stay Op. at 9-11.

Initial hearing en banc is needed to eliminate the uncertainty the stay order created regarding the status of *EMW* and the appropriate standard for evaluating the constitutionality of abortion regulations. It is hard to imagine how *EMW*'s holding could have been any clearer. Stay Op. at 24-25 (Thapar, J., dissenting). But as long as the panel's stay order in this case remains in place, it will provide fodder for parties and future panels to disregard that clear holding and to continue applying the benefits-and-burdens balancing test that both the Supreme Court and this Court have now rejected. That risk will be even greater if the panel is permitted to double down

on its erroneous characterization of *EMW* in a merits decision.  The en banc Court should put to rest any doubt about the governing standard for abortion regulations.

## III.    This Case Involves a Question of Exceptional Importance.

Finally, initial hearing en banc is warranted because this case involves a question "of exceptional importance."  Fed. R. App. P. 35(a)(2).  At issue is whether the Supreme Court's decision in *Casey* and this Court's decisions in *Taft* and *EMW* remain good law, or whether they can be "functionally overrule[d]" by a panel of this Court.  Stay Op. at 32 (Thapar, J., dissenting).

The Supreme Court recently considered a similar question when the shoe was on the other foot.  It reversed the Fifth Circuit for upholding an abortion law that was "almost word-for-word identical" to a law the Supreme Court had struck down a few years earlier in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).  *June Med. Servs.*, 140 S. Ct. at 2112 (plurality opinion).  A plurality of the Court explained that the current case was "similar to, nearly identical with, *Whole Woman's Health*," and that "the law must consequently reach a similar conclusion."  *Id.* at 2133.  The Chief Justice agreed and explained that to uphold the law in question would effectively nullify *Whole Woman's Health* and create "arbitrary discretion in the courts."  *Id.* at 2134 (Roberts, C.J., concurring in the judgment) (quoting The Federalist No. 78, p. 529 (J. Cooke ed. 1961) (A. Hamilton)).

The same principles are at stake here. Tennessee's waiting-period law is materially identical to the law upheld in *Casey*. *Compare* Tenn. Code Ann. § 39-15-202(a)-(f), *with Casey*, 505 U.S. at 879 (opinion of the Court); *id.* at 881 (joint opinion). Because "[t]his case is similar to, nearly identical with," *Casey*, this case "must consequently reach a similar conclusion." *June Med. Servs.*, 140 S. Ct. at 2133 (plurality opinion). The panel majority's contrary conclusion effectively nullified *Casey* and created precisely the "arbitrary discretion" that Alexander Hamilton and the Chief Justice warned against. That error warrants the en banc Court's immediate attention.

Notably, the Supreme Court granted review in *June Medical Services* not to resolve a circuit split (there was none), but to ensure that lower courts adhere to its precedents. The Supreme Court has previously summarily reversed a decision that disregarded *Casey*. *Mazurek v. Armstrong*, 520 U.S. 968, 971 (1997) (per curiam) (summarily reversing a lower court's determination that plaintiffs had a "fair chance of success on the merits" because the court's ruling was "inconsistent with . . . *Casey*"). And "the Court has not shied away from summarily deciding fact-intensive cases where, as here, lower courts have egregiously misapplied settled law." *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (per curiam). If the Supreme Court is willing to devote its limited resources to correcting the sort of errors the panel majority committed here, the en banc Court should be willing to do the same.

## CONCLUSION

The Court should grant the petition for initial hearing en banc and stay the district court's judgment and permanent injunction pending disposition of this appeal by the full Court. Alternatively, the Court should grant rehearing en banc of the panel's stay order and stay the judgment and injunction pending disposition by a three-judge panel.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

ANDRÉE S. BLUMSTEIN
Solicitor General

/s/ Sarah K. Campbell
SARAH K. CAMPBELL
Associate Solicitor General

MARK ALEXANDER CARVER
Honors Fellow, Office of the
Solicitor General

P.O. Box 20207
Nashville, TN 37202
(615) 532-6026

*Counsel for Defendants-Appellants*

February 23, 2021

**CERTIFICATE OF COMPLIANCE**

I certify that this petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,899 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This petition also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

/s/ Sarah K. Campbell
SARAH K. CAMPBELL
Associate Solicitor General

February 23, 2021

**CERTIFICATE OF SERVICE**

I, Sarah K. Campbell, counsel for Defendants-Appellants and a member of the Bar of this Court, certify that, on February 23, 2021, a copy of the Petition for Initial Hearing En Banc or Alternatively Rehearing En Banc of the Panel's Stay Order and accompanying attachments was filed electronically through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

/s/ Sarah K. Campbell
SARAH K. CAMPBELL
Associate Solicitor General

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: February 19, 2021

Ms. Sarah Campbell
Mr. Mark Alexander Carver
Office of the Attorney General of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207

Mr. Michael J. Dell
Mr. Jason Michael Moff
Kramer, Levin, Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Ms. Autumn Chandra Katz
Michelle Katz Moriarty
Ms. Rabia Muqaddam
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038

Elizabeth B. Murrill
Office of the Attorney General of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005

Ms. Maithreyi Ratakonda
Planned Parenthood Federation of America
123 William Street, 10th Floor
New York, NY 10038

Mr. Kevin H. Theriot
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Mr. Scott P. Tift
Barrett, Johnston, Martin & Garrison
414 Union Street
Suite 900
Nashville, TN 37219

                    Re:  Case No. 20-6267, *Bristol Regional Women's Center v. Slatery, III, et al*
                           Originating Case No. : 3:15-cv-00705

Dear Counsel,

    The attached order designated for publication was filed today in this case.

                                  Yours very truly,

                                  Deborah S. Hunt, Clerk

                                  Cathryn Lovely, Opinions Deputy

cc:  Ms. Lynda M. Hill

Enclosure

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

BRISTOL REGIONAL WOMEN'S CENTER, P.C.; MEMPHIS
CENTER FOR REPRODUCTIVE HEALTH, on behalf of
itself and its patients, KNOXVILLE CENTER FOR
REPRODUCTIVE HEALTH; PLANNED PARENTHOOD OF
TENNESSEE AND NORTH MISSISSIPPI, formerly known
as Planned Parenthood of Middle and East Tennessee,
and DR. KIMBERLY LOONEY,

> *Plaintiffs-Appellees,*

     *v.*

HERBERT H. SLATERY, III, Attorney General of
Tennessee, GLENN R. FUNK, District Attorney General
of Nashville, Tennessee, AMY P. WEIRICH, District
Attorney General of Shelby County, Tennessee;
BARRY P. STAUBUS, District Attorney General of
Sullivan County, Tennessee, CHARME P. ALLEN, LISA
PIERCEY, Commissioner of the Tennessee Department
of Health, and W. REEVES JOHNSON, JR., M.D.,
President of the Tennessee Board of Medical
Examiners, in their official capacities,

> *Defendants-Appellants.*

No. 20-6267

————————————

On Motion for Stay Pending Appeal

United States District Court for the Middle District of Tennessee at Nashville;
No. 3:15-cv-00705—Bernard A. Friedman, District Judge.

Decided and Filed:  February 19, 2021

Before:  MOORE, WHITE, and THAPAR, Circuit Judges.

————————————

## COUNSEL

**ON MOTION AND REPLY:** Sarah K. Campbell, Mark Alexander Carver, OFFICE OF
THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for  Appellants.

**ON RESPONSE:** Autumn Katz, Michelle Moriarty, Rabia Muqaddam, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, Maithreyi Ratakonda, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, Scott Tift, BARRETT JOHNSTON MARTIN & GARRISON, LLC, Nashville, Tennessee, Michael J. Dell, Jason M. Moff, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York for Appellees.

MOORE, J., delivered the order of the court in which WHITE, J., joined.  THAPAR, J. (pp. 20–33), delivered a separate dissenting opinion.

———————————

**ORDER**

———————————

KAREN NELSON MOORE, Circuit Judge.  "Unfortunately, the teachings of precedent are not always as clear as we might wish."  *Wright v. Spaulding*, 939 F.3d 695, 699 (6th Cir. 2019) (Thapar, J.).  This bit of wisdom rings particularly true for the resolution of the motion to stay pending appeal before us today, which targets the district court's judgment declaring unconstitutional and permanently enjoining a Tennessee statute that imposes a waiting period of 48 or 24 hours on women seeking an abortion in the state.  Defendants[1] argue that a stay is warranted because two precedents, *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), will compel us to vacate the district court's judgment and permanent injunction on appeal.  Our dissenting colleague—in his zeal to uphold what appears to be yet another unnecessary, unjustified, and unduly burdensome state law that stands between women and their right to an abortion—agrees.  We think, however, that this case is not so simple.  Because neither *Casey* nor *EMW* has foreclosed Plaintiffs'[2] arguments, we must decline Defendants' invitation to follow them blindly.  After all, we are bound by "complementary duties: adhering to precedent when an issue has already been decided and considering an issue with an open mind when it has not."  *Wright*, 939 F.3d at 702.  Assessing the parties' preliminary

---

[1] The defendants in this case are various Tennessee officials charged with the enforcement of the state's waiting period law.

[2] Plaintiffs are Tennessee abortion providers.

arguments with the requisite clear eyes, we conclude that a stay is unwarranted.  Accordingly, we **DENY** the motion for a stay pending appeal.[3]

## I. BACKGROUND

At issue in this case is the constitutionality of Tennessee Code Annotated § 39-15-202(a)–(h), which imposes informational and temporal requirements on women seeking an abortion in Tennessee.  These requirements are asserted to "ensure" that the woman's "consent for an abortion is truly informed consent."  Tenn. Code Ann. § 39-15-202(b).

---

[3]Our dissenting colleague calls for "immediate correction" of this order.  Dissent at 20.  Yet we fail to see how en banc review of this stay order is warranted, or even available.  Indeed, despite our dissenting colleague's impressive string citation, he fails to reference a single case where this court has assembled en banc to review a pre-merits stay order.  Rather, each involves en banc review of a panel opinion resolving a direct appeal of a preliminary injunction—something that the court unquestionably has the authority to do, but something that is inapposite in the context of a stay order.  That the dissent fails to reference a case involving en banc review of a stay order—despite the similarity between the standards for addressing a motion to stay and reviewing a preliminary injunction—is unsurprising.  It is one thing for the en banc court to take on a matter once it has run its course with the merits panel; it is something else entirely to burden the court and the parties with en banc proceedings on a pre-merits stay order while the panel and the parties proceed on the merits of the appeal.  Such a course of action would be exceedingly wasteful, especially when the en banc court is able to review the panel's resolution of the appeal itself in due course.  Here, merits briefing is already underway and is scheduled to conclude in short order.  An opinion resolving the merits will follow thereafter.  With the benefit of complete briefing, we may rethink our reasoning and conclusions.  Once an opinion on the merits issues, if either party desires en banc review, they are free to seek it.  Any other approach would be an unwarranted waste of the Parties' and this court's resources, and would raise questions as to why this court was going out of its way to wield en banc review so indiscriminately and unnecessarily.  *See generally* Neal Devins and Allison Orr Larsen, *Weaponizing En Banc* (February 9, 2021) (unpublished manuscript) (on file with authors). Available at SSRN:  https://ssrn.com/abstract=3782576.

In any case, this court's Internal Operating Procedures preclude such a wasteful result.  They specify that only "[p]etitions seeking rehearing en banc from an order that disposes of the case on the merits or on jurisdictional grounds are circulated to the whole court" with limited exceptions that do not apply here.  *See* 6 Cir. I.O.P. 35(g).  Otherwise, "[p]etitions seeking rehearing en banc from other orders will be treated in the same manner as a petition for panel rehearing:  They will be circulated only to the panel judges."  *See* 6 Cir. I.O.P. 35(h).  This is the approach that we have previously followed.  *See* Order, No. 12-4264, *Serv. Emps. Int'l Union Local 1 v. Husted* (6th Cir. Dec. 5, 2012) (treating a petition for rehearing en banc of a stay order as a petition for panel rehearing pursuant to 6th Cir. I.O.P. 35(g), (h)), ECF No. 48.  We see no reason why it should be any different when a judge takes it upon himself to call for en banc rehearing sua sponte.

As for our dissenting colleague's call for Defendants to attempt an end run around this court's ordinary procedures by seeking initial hearing en banc, we think that Defendants are quite capable of making their own strategic decisions without our dissenting colleague's assistance.  Suffice it to say, there are good reasons for leaving our ordinary procedures in place and allowing an appeal to run its course before calling upon the full court to resolve an issue.  The parties soon will have fully briefed the merits, expanding upon their initial arguments here.  With the benefit of more detailed briefing and (if required) oral argument, the resulting opinion(s) will be all the more informed.  Yes, as things stand, we think Defendants are unlikely to succeed on appeal, but that result is not preordained and will depend on the Parties' full arguments.  The same is true—we hope—for our dissenting colleague's opposite conclusion, and we trust that he will keep an open mind.

The informational component of § 39-15-202(a)–(h) prohibits a physician from performing an abortion unless the woman has been informed, "orally and in person by the attending physician who is to perform the abortion, or by the referring physician":  (1) that she is pregnant; (2) of the probable gestational age of the fetus; (3) that the fetus may be viable if enough time has elapsed since the woman's last menstrual cycle or the time of conception; (4) of the "numerous public and private agencies and services [that] are available to assist her during her pregnancy and after the birth of her child, if she chooses not to have the abortion"; and (5) of "[t]he normal and reasonably foreseeable medical benefits, risks, or both of undergoing an abortion or continuing the pregnancy to term."  Tenn. Code Ann. § 39-15-202(b).  At the same time, the attending or referring physician must inform the woman of the "particular risks associated with her pregnancy and continuing the pregnancy to term, . . . as well as the risks of undergoing an abortion," and provide a description of "the method of abortion to be used and the medical instructions to be followed subsequent to the abortion."  Tenn. Code Ann. § 39-15-202(c).

The temporal component of § 39-15-202(a)–(h) establishes a 48-hour waiting period that begins when the woman receives the mandated information described above.  Tenn. Code Ann. § 39-15-202(d)(1).  The statute provides that the waiting period will be reduced to 24 hours in the event of a court order "temporarily, preliminarily, or permanently" enjoining enforcement of the 48-hour waiting period or declaring it unconstitutional.  Tenn. Code Ann. § 39-15-202(d)(2).  After the waiting period has ended, but before having the procedure, the woman must sign a "consent form" acknowledging that she has received the requisite information.  Tenn. Code Ann. § 39-15-202(d)(1).  Because the woman must receive the statutorily mandated information in person, the effect of the waiting period is that a woman seeking an abortion in Tennessee must make at least two visits to the clinic where she will receive abortion care.  The statute's requirements apply to all abortions in Tennessee, except in cases of medical emergency that prevent compliance.  *See* Tenn. Code Ann. § 39-15-202(d).

Plaintiffs—suing on their own behalf and on behalf of their patients—brought suit to challenge, on two grounds, the constitutionality of § 39-15-202(a)–(h).  First, Plaintiffs alleged that the statute imposes an undue burden on the accessibility of abortion in violation of the Due

Process Clause of the Fourteenth Amendment.  Second, they alleged that the statute discriminates against women on the basis of sex and gender stereotypes in violation of the Equal Protection Clause of the Fourteenth Amendment.  To remedy the alleged constitutional violations, Plaintiffs sought declaratory relief and a permanent injunction prohibiting the enforcement of § 39-15-202(a)–(h).

On October 14, 2020, following five years of litigation and a four-day bench trial, the district court issued a comprehensive, 136-page opinion setting forth the findings of fact and conclusions of law that supported its ultimate conclusion that § 39-15-202(a)–(h)'s waiting period (whether 48 or 24 hours) violates the Due Process Clause of the Fourteenth Amendment. *Adams & Boyle, P.C. v. Slatery*, --- F. Supp. 3d ----, No. 3:15-cv-00705, 2020 WL 6063778 (M.D. Tenn. Oct. 14, 2020).[4]  Accordingly, the district court declared the statute's waiting period unconstitutional and permanently enjoined its enforcement.  Because its conclusion as to Plaintiffs' due process claim was sufficient to enjoin the waiting period's enforcement, the district court declined to rule on Plaintiffs' equal protection claim.

Defendants filed their notice of appeal on November 4, 2020.  The same day, Defendants filed in the district court a motion to stay the judgment and the permanent injunction pending appeal.  After the district court denied a stay, R. 287 (Op. & Order) (Page ID #6718–23), Defendants filed a motion for the same relief in this court. *See* Fed. R. App. P. 8(a).

## II. DISCUSSION

The issuance of a stay pending appeal is a matter of our discretion, not a matter of right. *Nken v. Holder*, 556 U.S. 418, 433 (2009).  To determine whether to exercise our discretion, we consider four familiar factors:  (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits"; (2) the likelihood that, absent a stay, "the applicant will be irreparably injured"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) the public interest. *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  However, in constitutional cases like this one, the likelihood of

---

[4]The district court upheld the statute's informational components, a determination that Plaintiffs have not appealed.

success on the merits is typically determinative.  *See Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020) (order) (per curiam).  The party seeking a stay bears the burden of showing that we should exercise our discretion in its favor.  *See Nken*, 556 U.S. at 433–34.  Defendants have not met that burden here.

### A.

Most importantly, Defendants have not persuaded us that they are likely to succeed on the merits.  Various standards of review will govern Defendants' appeal of the district court's grant of a permanent injunction:  "we review factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for abuse of discretion."  *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 546 (6th Cir. 2005).  Yet at this stage, Defendants have not endeavored to demonstrate any clear error in the district court's fact finding, and do not challenge the scope of the injunction except to the extent that they believe no injunction should have issued at all.  Rather, Defendants attribute their likelihood of success entirely to legal error.  Specifically, they contend that:  (1) the district court applied the wrong standard for determining whether a state abortion restriction is invalid because it is an "undue burden" on the right under *Casey*, 505 U.S. at 877 (plurality opinion)[5]; (2) as a matter of law, the district court's factual findings do not establish that the waiting period law unduly burdens the right to abortion; and (3) not enough women are unduly burdened by the waiting period for it to be facially invalid.  None of these arguments are likely to succeed.

### 1.

Defendants' first argument—that they are likely to succeed on appeal because the district court applied the wrong undue burden standard—rests on an overly narrow view of our role as appellate jurists.  Our dissenting colleague here stumbles into the same mistake as Defendants.

To understand Defendants' first argument—and our reasons for rejecting it—a truncated history is in order.  All agree that the "undue burden" standard announced in 1992 by a plurality of the Supreme Court in *Casey* governs the constitutionality of state abortion restrictions under

---

[5]All further references to *Casey* are to the plurality opinion.

the Due Process Clause.  As that plurality held, a state abortion restriction violates the Due Process Clause if it places an "undue burden" on a woman's right to choose to terminate her pregnancy.  505 U.S. at 878.  Under *Casey*, "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."  *Id.*  This standard preserves the state's "interest in potential life" and its interest in protecting the health of the mother, but only to the extent that the restrictions expressing those interests do not run afoul of the undue burden standard.  *Id.*

Fast forward some twenty years and disagreement had arisen as to the proper application of *Casey*'s undue burden standard (as the *Casey* plurality itself predicted that it would, *see id.*).  In *Whole Woman's Health v. Hellerstedt*, a majority of the Court endeavored to remedy that disagreement by clarifying that the undue burden standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."  136 S. Ct. 2292, 2309 (2016) (citing *Casey*, 505 U.S. at 887–901)).  Applying this "balancing" test, *id.*, to Texas laws requiring that an abortion provider have admitting privileges at a hospital within thirty miles of its facility and that its facility meet the minimum standards for surgical centers under state law, the Court held that the laws were invalid.  *Id.* at 2300.  As for the admitting-privileges law, the Court concluded that it unduly burdened abortion access because its burdens—the law would have closed about half of the state's existing abortion facilities, increasing wait time, crowding, and the distance women needed to travel in order to receive an abortion—outweighed its benefits, which were essentially nonexistent given the evidence demonstrating that abortion complications requiring hospitalization are exceedingly rare.  *Id.* at 2313–14.  As for the surgical-center requirement, the Court concluded that it unduly burdened abortion access because it would further reduce the number of abortion providers in the state to the point where the remaining facilities would be unable to meet the existing demand for abortion services, and again offered no meaningful health benefits.  *Id.* at 2314–18.

Despite *Whole Woman's Health*'s offer of clarity, the waters muddied again with the Court's splintered decision in *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020).  Addressing a Louisiana admitting-privileges law that was nearly identical to the Texas law

invalidated in *Whole Woman's Health*, a four-justice plurality balanced the burdens and benefits of the Louisiana law and concluded that it unduly burdened abortion access in violation of the Due Process Clause. *Id.* at 2112–13. The Chief Justice concurred, but on stare decisis grounds, noting the need to "treat like cases alike" and the similarity between the Louisiana law and its burdens and those at issue in *Whole Woman's Health*. *Id.* at 2133–34. He went on, however, to criticize the balancing test employed by the plurality (and the majority in *Whole Woman's Health*) as untethered from *Casey*. *Id.* at 2135–39. According to the Chief Justice, the benefits of a law are irrelevant to a determination of whether a state abortion restriction "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" under *Casey*. *Id.* at 2135–36 (quoting *Casey*, 505 U.S. at 877). To the Chief Justice, "[l]aws that do not pose a substantial obstacle to abortion access are permissible, so long as they are 'reasonably related' to a legitimate state interest." *Id.* at 2135 (quoting *Casey*, 505 U.S. at 878). Four dissenting justices would have held the Louisiana admitting-privileges law constitutional.

A few months after the Supreme Court issued *June Medical*—and before this court had addressed that decision—the district court issued its findings of fact and conclusions of law, declaring Tennessee's waiting period unconstitutional under *Casey* and permanently enjoining its enforcement. *Adams & Boyle*, 2020 WL 6063778, at *67. In doing so, the district court followed the approach taken by the plurality in *June Medical* and the majority in *Whole Woman's Health*, balancing the burdens of the waiting period against its benefits. *Id.* at *63–64. The district court did not address the Chief Justice's concurrence, apparently believing that it did not displace a balancing approach as the appropriate means for determining whether a state abortion restriction constitutes an undue burden under *Casey*. Finding that the waiting period risked women's health and substantially limited access to abortion without any "countervailing benefit," the district court concluded that the waiting period amounted to an undue burden under *Casey* and thus was invalid. *Id.* at *63–64.

Two short days later, this court issued a decision in *EMW*, which involved a Kentucky law requiring that abortion providers obtain transfer and transport agreements with local hospitals and ambulance services. Unlike the district court here, a two-judge majority conducted

a lengthy analysis to determine which of the *June Medical* opinions was controlling given that none had attracted the support of a majority of the Court. 978 F.3d at 430–31. Bemoaning the "'vexing task' of deciding which opinion controls" when the Supreme Court issues a decision without a majority opinion, the *EMW* majority selected the Chief Justice's concurrence (and its rejection of a balancing approach to the undue burden standard), reasoning that it was the narrower opinion and thus controlling under the doctrine set forth in *Marks v. United States*, 430 U.S. 188 (1977). *EMW*, 978 F.3d at 431, 433. That discussion may have been much ado about nothing, however, when the majority concluded that the district court clearly erred in finding that the transfer and transport laws would cause the closure of both of Kentucky's two abortion providers, which had been the plaintiffs' only asserted "basis for concluding that the challenged provisions impose a substantial obstacle" and thus were an undue burden under *Casey*. *Id.* at 440, 446. As Judge Clay pointed out in dissent, the majority's conclusion rendered "apparently unnecessary" its prolonged analysis of the competing opinions in *June Medical* because without a burden supported by the record, the Kentucky transfer and transport law would have been valid under either approach. *Id.* at 454 n.2. For his part, Judge Clay would have followed the *Whole Woman's Health* majority, concluding that even if the Chief Justice's concurrence in *June Medical* were the controlling opinion from that case—a proposition that Judge Clay disputed but deemed unnecessary to resolve, *id.* at 454 n.3—the Chief Justice's critique of the balancing approach was dicta because his opinion was based on stare decisis. *Id.* at 455. Applying this understanding of *Casey* and concluding that the district court's findings were free of clear error, Judge Clay would have held the Kentucky laws unconstitutional because their burdens outweighed their benefits. *Id.* at 470.

Our discussion of *EMW* leads us back to Defendants' argument that they are likely to succeed on the merits because the district court applied the wrong undue burden standard to hold the state's waiting period unconstitutional. According to Defendants, *EMW*—including its endorsement of the Chief Justice's full *June Medical* concurrence—is binding precedent. Because the district court balanced burdens and benefits when it should have considered only the burdens under *EMW*, Defendants argue that we are *required* (at the very least) to vacate the injunction and remand for reconsideration under the correct undue burden standard. Defendants

are wrong. Even assuming that the district court erred in balancing burdens and benefits to hold Tennessee's waiting period unconstitutional, the error would not warrant reversal here.

As a general matter, Defendants are correct that a lower court's application of an incorrect legal standard to grant injunctive relief may be grounds to vacate the injunction and remand for reconsideration. *See Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). However, there is no hard and fast rule that appellate courts *must* remand a case in such circumstances. *See, e.g.*, *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 712 (3d Cir. 2004). Of course, a remand may be the best approach in many cases, for example, where the district court's application of an incorrect legal standard leads to a further failure to make pertinent findings of fact. But in constitutional cases where the issuance of injunctive relief turns largely on the merits and the district court has already made the relevant findings of fact, a remand may well be unnecessary. That is the case here. After all, "whether particular facts amount to an undue burden is a question of law we must review de novo." Dissent at 29–30. That is true whichever articulation of the undue burden standard applies, and no one contends that the district court's factual findings would (or could) change upon remand.[6]

In any event, Defendants may well have overstated the precedential value of *EMW*, drawing into question whether the district court committed any error at all in applying the undue burden standard as the Court explained it in *Whole Woman's Health*. Where a panel of this court is faced with two different standards for addressing a particular issue, but choosing between them would not change the outcome of the case due to the nature of the underlying facts, the panel's choice between the two standards is dicta because it is not "necessary to the determination of the issue on appeal." *United States v. Hardin*, 539 F.3d 404, 410–11, 413 (6th Cir. 2008) (holding an earlier opinion to be dicta insofar as it chose between a probable cause

---

[6]Indeed, a remand would be particularly inappropriate here, where the district court has already stated that it would have resolved the case in the very same way had it applied the undue burden standard as Defendants understand it. When Defendants sought a stay of the district court's declaratory judgment and permanent injunction, they raised essentially the same argument that they do here with respect to the district court's purportedly incorrect legal standard. *See* R. 281 (Mem. at 3–4) (Page ID #6661–62). But the district court rejected that argument in denying a stay, reasoning that "with or without . . . a balancing test, the Tennessee [waiting period] statute constitutes a 'substantial obstacle to a woman seeking an abortion' and, thus, an undue burden." R. 287 (Op. & Order at 4) (Page ID #6721). Even if we assume that the district court applied the wrong standard when it first ruled Tennessee's waiting period unconstitutional, it would make little sense and waste considerable resources to remand for reconsideration when the district court has already said that it would not change anything.

and a "lesser reasonable belief standard" for the quantum of proof needed for police officers to enter a residence and execute a search warrant where the facts of the earlier case were such that either standard would have been satisfied).  That rule would apply here if Judge Clay were correct in his *EMW* dissent that it was unnecessary for the *EMW* majority to choose between the competing *June Medical* opinions and their distinct takes on *Casey*'s undue burden standard. *See EMW*, 978 F.3d at 454 n.2 (Clay, J., dissenting).  At this stage, however, we need not resolve the issue of *EMW*'s precedential value, let alone the questions that would follow as to which understanding of *Casey*'s undue burden standard controls.  As explained above, even if *EMW* were to compel this panel to apply the Chief Justice's *June Medical* concurrence, it would not warrant reversal because the district court's findings of fact enable us to conduct our review.  As we will explain in the next section, we think it likely that, based on the district court's unchallenged findings of fact, Tennessee's waiting period amounts to an undue burden under *Casey*, and is thus invalid, with or without balancing.

2.

Defendants' next argument is that they are likely to succeed on the merits because the district court's factual findings are insufficient to support its conclusion that Tennessee's waiting period law unduly burdens access to abortion in the state.  Defendants are wrong.  As we have just suggested, we are likely to uphold the district court's legal conclusion under either of the competing articulations of *Casey*'s undue burden standard.

First, we set forth a summary of the district court's findings of fact, which Defendants have not challenged in seeking a stay.  The district court found "that the statutory waiting period burdens the majority of abortion patients with significant, and often insurmountable, logistical and financial hurdles." *Adams & Boyle*, 2020 WL 6063778, at *62.  In order to attend the two in-person visits required by the statute, "patients must take time off from work, arrange childcare, and find transportation on two different occasions." *Id.*  These costs are particularly significant in Tennessee because the state had just eight abortion providers in only four cities, forcing many women to travel significant distances to attend an appointment. *See id.* (noting that 63% of Tennessee women live in a county without an abortion provider).  For low-income women especially, who make up the majority of women seeking an abortion in Tennessee, these

costs make obtaining an abortion almost prohibitively expensive, putting them to an impossible choice between the abortion and its attendant costs and providing for their own and their household's "basic needs." *Id.* at *62–63.[7] Crediting the testimony of a plaintiffs' witness, the district court found that under Tennessee's abortion regime the significant and unexpected costs of an abortion put low-income women and their families at "grave risk" of having to sacrifice necessities like food, housing, and healthcare. *Id.* at *34, *62.

These logistical and financial hurdles, the district court found, caused delays between appointments that were "significantly longer" than the 48 hours required by § 39-15-202(d), sometimes as much as four weeks, presenting further obstacles for women seeking an abortion in Tennessee. *Adams & Boyle*, 2020 WL 6063778, at *61. Medically, as gestational age increases, "an abortion becomes lengthier, more invasive, more painful, and riskier for the patient." *Id.* at *62. The district court found that the delays caused by Tennessee's waiting period "can and do cause" women to miss the deadline for an abortion entirely (19 weeks and 6 days from the first day of the woman's last menstrual period), or at least the deadline for the strongly preferred, safer, and far less invasive medication abortion (10 weeks from the first day of the woman's last menstrual period). *Id.* at *61. Indeed, the district court found the waiting period to be responsible for the increase in medically riskier second-trimester abortions in Tennessee after the statute's passage. *Id.* at *62. Missing the deadline for a medication abortion further complicates patients' logistical challenges because only five of Tennessee's eight abortion providers offer surgical abortions. *Id.* at *61–62. Financially, abortion becomes more expensive the later into a pregnancy it takes place, and the district court found that the cost of an abortion in Tennessee has increased significantly since 2013. *Id.* at *18 & n.20, *62.[8] This increased cost compounds the

_____

[7]An example puts the financial difficulty in perspective. The district court found that the "large majority of plaintiffs' patients live in poverty" and that "the overwhelming majority of women seeking an abortion [in Tennessee] . . . are already mothers and are either poor or near low-income." *Adams & Boyle*, 2020 WL 6063778, at *62 (quoting the trial testimony of Sheila Katz, Ph.D.) (second alteration original). For a single mother of one, the poverty line sits at approximately $17,000 per year. *See id.* at *30 n.30. The cost of a surgical abortion is approximately $900, meaning that this single mother would have to spend almost her entire monthly income to receive the procedure, and that does not even account for the travel, childcare, and other expenses she would incur. *See id.* at *18 & n.20. The additional burdens and expenses caused by the statutory waiting period could well place the abortion process out of reach.

[8]For example, the district court credited the testimony of Rebecca Terrell, executive director of Choices Memphis (a Tennessee abortion provider), who testified that due to the statute's two-visit requirement, her clinic

already significant financial burdens on women who must forgo wages and pay for travel and childcare on multiple occasions in order to receive an abortion under Tennessee law. *Id.* at *61–62.

Ultimately, the district court considered these logistical, financial, and medical hurdles caused by Tennessee's waiting period and concluded that the waiting period is a substantial obstacle to abortion access in Tennessee. *Adams & Boyle*, 2020 WL 6063778, at *64. Finding that these hurdles stemmed largely from the need to attend two in-person appointments rather than the waiting period's express duration, the district court concluded that even a 24-hour waiting period would constitute a substantial obstacle. *Id.* at *34, *61, *67.

We think that the facts found by the district court likely satisfy either of the available articulations of *Casey*'s undue burden standard. First, we consider the Chief Justice's approach, which would have us inquire into whether the waiting period has the "purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" without balancing the law's benefits against its burdens in order to determine whether it unduly burdens access to abortion. *June Medical*, 140 S. Ct. at 2135 (quoting *Casey*, 505 U.S. at 877).[9] That standard is satisfied here. The burdens imposed by Tennessee's waiting period mirror (if not surpass) those in *Whole Woman's Health*, where an admitting-privileges law led to "fewer doctors, longer waiting times, and increased crowding," while also significantly increasing the amount of travel time needed to get to an abortion facility. 136 S. Ct. at 2313. Whatever else it may have done, the Chief Justice's concurrence in *June Medical* did not upset *Whole Woman's Health*'s conclusion that those *kinds* of burdens, where substantial enough, can render a state abortion law unconstitutional. Indeed, the Chief Justice emphasized the very same sorts of burdens in ruling Louisiana's admitting-privileges law unconstitutional in *June Medical*, at least under stare decisis principles. *See* 140 S. Ct. at 2140–41.

---

increased the costs charged for a surgical abortion from between $425 and $525 in 2013 to between $800 and $1,000 for the same procedure in 2019. *Adams & Boyle*, 2020 WL 6063778, at *18 & n.20.

[9]Because we conclude that the waiting period is likely unduly burdensome, it is of no consequence whether it is "'reasonably related' to a legitimate state interest." *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (quoting *Casey*, 505 U.S. at 878).

Turning to the balancing test that the district court actually employed, Defendants—who bear the burden of persuasion here—have not argued that the district court's conclusion was unwarranted if that test in fact applies.  Under *Whole Woman's Health*, *Casey* "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," and balance those considerations to determine whether the law unduly burdens the right to an abortion.  136 S. Ct. at 2309; *see June Medical*, 140 S. Ct. at 2120 (plurality op.).  Compounding the severe burdens imposed by the waiting period, the district court found that there was no evidence that the waiting period furthered the state's interest in potential life or its interest in the health of the mother.  *Adams & Boyle*, 2020 WL 6063778, at *58–61.  As for the state's interest in potential life, the district court found that "there is no evidence that patients who do not return to an abortion provider for the second appointment (i.e., for the procedure) fail to do so because the challenged statute causes them to change their minds about having an abortion."  *Id.* at *61.  Likewise, "women's mental and emotional health is not benefited because the mandatory waiting period does nothing to increase the decisional certainty among women contemplating having an abortion."  *Id.*  To the contrary, the district court found that "at least 95% of women are certain of their decisions [to have an abortion when seeking care], post-abortion regret is uncommon, and abortion does not increase women's risk of negative mental health outcomes."  *Id.*  In short, whatever limited benefits Tennessee's waiting period may provide, they are "vastly outweighed" by its burdens.  *See EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 808 (6th Cir.), *reh'g en banc dismissed*, 831 F. App'x 748, 753 (6th Cir. 2020), *petition for cert. filed* (Oct. 30, 2020).

To summarize, we think it likely that the district court's factual findings compel the conclusion that Tennessee's waiting period unduly burdens women's abortion rights, whether analyzed under the Chief Justice's understanding of *Casey*, or the understanding articulated by the majority in *Whole Woman's Health* and the plurality in *June Medical*.  Defendants—who bear the burden of persuading us that a stay is warranted—have not so much as attempted to challenge those factual findings for clear error.  Thus, we reject Defendants' argument that they are likely to succeed on the merits because the waiting period is not an undue burden on abortion rights.

Our dissenting colleague disagrees. Primarily, he points to *Casey*, and accuses us of turning a blind eye to Supreme Court precedent. Not so—if anything, *Casey* supports our conclusion. In *Casey*, one of the Pennsylvania abortion restrictions that the Supreme Court addressed was a 24-hour waiting period that operated similarly to Tennessee's here. Acknowledging that such a waiting period "*[i]n theory* . . . does not amount to an undue burden," the Court went on to examine whether the waiting period amounted to a substantial obstacle "*in practice*" based on the district court's findings of fact. *Casey*, 505 U.S. at 885 (emphasis added). Calling it a "closer question," the Court concluded that the delay and increased costs associated with the waiting period did not amount to a substantial obstacle, even for those—like poor women or those who lived furthest from clinics—for whom the burden was the most significant. *Id.* at 886. The Court was careful, however, to note that its conclusion was based on "the record before [it]," *id.* at 887, a record that this court has since characterized as "sparse," *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 372 (6th Cir. 2006). As explained above, the record here is substantial—with specific and comprehensive findings as to the logistical, financial, and medical obstacles created by § 39-15-202(a)–(h) that substantially limit the accessibility of abortion in Tennessee—far more so than the record in *Casey*. Indeed, the district court specifically found that Tennessee's waiting period "significantly delays this time-sensitive medical procedure, and also makes it so time-consuming, costly, and inconvenient to obtain that the predominantly low-income population seeking the service must struggle to access it, if they can access it at all." *Adams & Boyle*, 2020 WL 6063778, at \*64; *cf. Casey*, 505 U.S. at 886 (noting the district court's failure to "conclude that the increased costs and potential delays amount to substantial obstacles"). Furthermore, as the district court here noted, Pennsylvania had 81 abortion providers at the time that *Casey* was decided, compared to just eight in comparably sized Tennessee, which illustrates the waiting period's disproportionate impact on women seeking an abortion in Tennessee. *Adams & Boyle*, 2020 WL 6063778, at \*24 n.24, \*64.[10] Thus, if anything, *Casey* supports our conclusion that the waiting period of § 39-15-202(a)–(h)—whether 48 or 24 hours—is likely unconstitutional.

---

[10]Our dissenting colleague challenges this finding regarding the comparative availability of abortion facilities. Yet Defendants have stopped short of challenging this finding for clear error. Instead, in a footnote, they mention that the availability of Pennsylvania abortion providers was not mentioned in *Casey* and assert that it was

Nor does *Casey* categorically preclude logistical and financial obstacles from establishing undue burden, as our dissenting colleague contends. To the contrary, the Court's failure to disregard those sort of burdens out of hand and its repeated references to the district court's failure to find that they amounted to a substantial obstacle suggest that it had no intention of making such a sweeping rule. *See* 505 U.S. at 885–87. *Whole Woman's Health*, where the Court found such kinds of burdens sufficient in portions of its opinion unaffected by the Chief Justice's *June Medical* concurrence, only underscores the point. *See Whole Woman's Health*, 136 S. Ct. at 2313.[11]

In sum, our dissenting colleague dramatically overstates *Casey* in criticizing our purported failure to "treat like cases alike," Dissent at 28 (quoting *June Medical*, 140 S. Ct. at 2133–34 (Roberts, C.J., concurring)). The fact is that these cases are not alike: although both involve superficially similar waiting period laws, the burdens imposed here are substantially more severe, even if generally the same in kind. In *Casey*, the Court took pains to avoid a categorical ruling on the constitutionality of waiting period laws—it is not for an intermediate court such as ours to write such a holding into that case over a quarter-century later. *See Wright*,

---

improper for the district court to consider it. Mot. Stay at 16 n.4. We disagree. The district court relied on record evidence to determine the relative availability of abortion services in Pennsylvania when *Casey* was decided. *See Adams & Boyle*, 2020 WL 6063778, at *24 n.24. The district court acknowledged testimony that the Pennsylvania figure likely included types of facilities not counted in Tennessee, but nevertheless found that the evidence established that abortion services were far less available in Tennessee than in Pennsylvania when the Court decided *Casey*. *See id.* This evidence helps to explain why the burdens in this case are more severe than those established in *Casey*, and Defendants' cursory footnote has not given us reason to think otherwise.

[11]*Cincinnati Women's Services*, which the dissent also relies on, does not compel a different result. In that case, a panel of this court interpreted *Casey* to require that courts "determine whether a large fraction of the women 'for whom the law is a restriction' will be 'deterred from procuring an abortion *as surely as if the [government] has outlawed abortion in all cases.*'" *Cincinnati Women's Services*, 468 F.3d at 370 (emphasis added) (quoting *Casey*, 505 U.S. at 894). Latching onto the emphasized portion of the quoted language, the dissent would uphold any state abortion restriction so long as it remains at all possible for women to receive abortion services, no matter the difficulty they would face in doing so. Dissent at 29. Yet, under *Whole Woman's Health* and *June Medical*, that cannot be the test. In *Whole Woman's Health*, the Court invalidated a Texas admitting-privileges law that—like the waiting period law at issue here—imposed severe financial and logistical burdens upon women seeking an abortion. 136 S. Ct. at 2310–14. These burdens were enough to render the law invalid, despite the fact that women could still (though with great difficulty) receive an abortion with the law in place. *See id.* *June Medical* only underscores the import of *Whole Woman's Health* in this regard. Indeed, in *June Medical*, the Court specifically rejected a similar formulation of the undue burden test. *See* 140 S. Ct. at 2133 ("[T]he State argues that Act 620 would not make it 'nearly impossible' for a woman to obtain an abortion. But, again, the words 'nearly impossible' do not describe the legal standard that governs here.") (plurality op.); *id.* at 2139 (Roberts, C.J., concurring).

939 F.3d at 702. If *Casey* stood for the proposition that waiting period laws are always constitutional, then it would have said so.

**3.**

Defendants' final argument is that they are likely to succeed on the merits because the district court misapplied the "large fraction" test that determines whether an abortion restriction is facially invalid. Under *Casey*, a state abortion restriction is facially invalid if it is an undue burden "in a large fraction of the cases in which [the restriction] is relevant." 505 U.S. at 895. In *Cincinnati Women's Services*, we explained that this test "is more conceptual than mathematical," but requires that the restriction at issue impose a substantial obstacle for "something more" than 12.5% of women for whom it is relevant. *Cincinnati Women's Services*, 468 F.3d at 374. We think that the district court is likely correct that the test is met here.

The district court concluded that, at the very least, Tennessee's waiting period imposes a substantial obstacle on the 60% to 80% of women seeking an abortion who qualify as "low-income," and concluded that this satisfied the large fraction test. *Adams & Boyle*, 2020 WL 6063778, at *65. As explained above, we agree that Tennessee's waiting period is an undue burden for at least those women who qualify as low-income and risk going without basic necessities in order to cover the increased costs that the district court attributed to the waiting period. Thus, even assuming that the denominator for the fraction would be "all women seeking an abortion," the test would be well satisfied here. *See Cincinnati Women's Services*, 468 F.3d at 374 (noting that the "challenged restriction need not operate as a *de facto* ban for all or even most" of the relevant population to be facially invalid).

In any case, the denominator is smaller than that. *Casey* directs us to compare the number of women unduly burdened by the law at issue (the fraction's numerator) against the number of women for whom the law "is an actual rather than an irrelevant restriction." 505 U.S. at 895. This relevance requirement means that the denominator is "a class narrower than 'all women,' 'pregnant women,' or even 'the class of *women seeking abortions* identified by the State.'" *Whole Woman's Health*, 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 894–95). Here, we think that the class of women for whom the waiting period is relevant would be those women

who were certain that they wanted an abortion when they sought out the service—about 95% of all women seeking an abortion in Tennessee, according to the district court. *Adams & Boyle*, 2020 WL 6063778, at *65. For those women, the waiting period is relevant because it forces them to delay their abortion when they otherwise would not have; for women who were uncertain whether they wanted to have an abortion, it is possible that the waiting period is irrelevant because they may have chosen to take time to consider their decision before returning to have the procedure (or not). Thus, the pertinent "large fraction" is modestly larger than the 60% to 80% of women seeking an abortion in Tennessee who qualify as low income—either way the fraction is large enough.[12]

On this point, our dissenting colleague essentially reissues his opinion that Tennessee's waiting period law does not amount to an undue burden for *any* woman and thus fails the large fraction test. We have already rejected that argument and will not repeat ourselves here.

### B.

Turning to the remaining stay factors, we conclude that this is the ordinary constitutional case where likelihood of success on the merits is determinative on the issue of whether to grant a stay pending appeal. *See Beshear*, 981 F.3d at 508, 511. Insofar as § 39-15-202(a)–(h) is likely unconstitutional, neither the state nor anyone else will be harmed by the state's inability to enforce it. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987). In contrast, staying the injunction and leaving a likely unconstitutional waiting period in place would harm women seeking an abortion while we consider the parties' full arguments on appeal. As for the final factor—the public interest—it should go without saying that the public has no interest in the enforcement of an unconstitutional law. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]t is always in the public interest to prevent violation of a party's

---

[12]The district court also concluded that the waiting period is an undue burden for *all* of the 95% of women seeking an abortion in Tennessee who are certain of their decision to have an abortion, satisfying the large fraction test. *Adams & Boyle*, 2020 WL 6063778, at *65. However, we need not address that conclusion here because even using the smaller of the two fractions identified by the district court—60% to 80%, which qualifies as a large fraction—Defendants are unlikely to succeed on the merits.

constitutional rights.") (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

### III.  CONCLUSION

For the foregoing reasons, we **DENY** the motion for a stay pending appeal.  The appeal will proceed on the previously determined briefing schedule.

No. 20-6267          *Bristol Reg'l Women's Center et al. v. Slatery et al.*          Page 20

---

**DISSENT**

---

THAPAR, Circuit Judge, dissenting.    Since *Casey*, no federal appellate court has successfully struck down an abortion waiting period.    Why?    Because the Supreme Court says that waiting periods are constitutional.    *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 881–87 (1992) (plurality opinion).    Indeed, both the Supreme Court and our court have upheld such laws.    But here the majority, like the district court before it, decides to chart its own course.

In doing so, the majority ignores Supreme Court and Sixth Circuit precedent, as well as the correct legal standard.    Given the weighty interests involved in this case, the majority's failure to issue a stay merits immediate correction either by our court or a higher one.    After all, "it is not our place to ignore precedent and push our own agenda."    *United States v. Navarro*, 986 F.3d 668, 675–76 (6th Cir. 2021) (Moore, J., dissenting).[1]

---

[1]The majority insists that Tennessee cannot seek en banc review of today's decision because it is preliminary.    I disagree.    *See* Fed. R. App. P. 35(b) (noting that any "party may petition for a hearing or rehearing en banc").    Our court has often granted petitions to review non-merits rulings.    *See, e.g.*, *Preterm-Cleveland v. Acton*, No. 18-3329 (6th Cir. argued March 11, 2020) (en banc); *In re Ohio Execution Protocol*, 860 F.3d 881 (6th Cir. 2017) (en banc); *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427 (6th Cir. 2014) (en banc); *Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) (en banc); *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777 (6th Cir. 2005) (en banc).    Of course, these are preliminary-injunction cases.    But there is no material difference between a preliminary-injunction case and a stay case:    Courts apply the same test in both.

At best, the rules are confusing on whether a party may seek en banc review of a stay order.    What is not confusing, however, is that there are at least two other options in this setting:    (1) any active judge may seek sua sponte en banc review, and (2) a party may seek initial hearing en banc on the merits.

First, Rule 35 says a majority of a circuit's judges "may order that an appeal *or other proceeding* be heard or reheard by the court of appeals en banc."    Fed. R. App. P. 35(a) (emphasis added).    And the United States Code provides that a majority of active circuit judges may hear any "case or controversy" en banc.    28 U.S.C. § 46(c).    Finally, our operating procedures say that any active judge may request a poll sua sponte.    6th Cir. I.O.P. 35(e).    When that occurs, "the clerk will immediately circulate voting forms to the en banc court."    *Id.*

Second, if Tennessee chose to file a petition for initial hearing en banc on the merits, our court could grant it.    Both opinions herein comprehensively discuss the merits, and nothing more will be added by an additional panel decision.    The majority has already concluded that the law appears to be "unnecessary, unjustified, and unduly burdensome."    Maj. Op. 2.    And if the en banc court grants review, it would have jurisdiction over the entire case and could consider any motion for reconsideration Tennessee might file.

I.

Tennessee's legislature enacted a waiting-period law in 2015.  The law requires doctors to give women certain information at least 48 hours before performing an abortion (except in cases of medical emergency).  Tenn. Code Ann. § 39-15-202(a)–(h).  That information includes the age of the unborn child, the alternatives to abortion, and the medical risks and benefits of abortion and pregnancy.  *Id.*  The law also provides that a 24-hour waiting period will take effect if a court enjoins the 48-hour waiting period.  *Id.*

In June 2015, a group of abortion providers sued.  They alleged that Tennessee's waiting-period law burdens abortion and is facially unconstitutional.  They did not seek a preliminary injunction, and the law went into effect in July 2015.  For five years, the law remained in force.  And for five years, women continued to obtain abortions in Tennessee:  Abortion rates remained above 10,000 per year both before and after passage of the law.

Four years later, the district court held a bench trial.  But it did so using the wrong legal standard:  balancing the law's benefits against its alleged burdens.  *Adams & Boyle, P.C. v. Slatery*, --- F. Supp. 3d ---, No. 3:15-CV-00705, 2020 WL 6063778, at *63 (M.D. Tenn. Oct. 14, 2020).  This approach directly conflicts with our published precedent and the standard set forth in the Chief Justice's controlling opinion in *June Medical*.  *See EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020).  Applying the wrong standard, the district court then said that the law "provides no appreciable benefit."  *Adams & Boyle*, 2020 WL 6063778, at *63.  It also found that the law "causes increased wait times, imposes logistical and financial burdens, subjects patients to increased medical risks, and stigmatizes and demeans women."  *Id.* at *61.  Thus, the district court held that the law unduly burdens abortion.  *Id.* at *63–64.

Although the *Casey* Court held that nearly identical burdens did not render Pennsylvania's waiting period unconstitutional, the district court distinguished the case in just two paragraphs.  It claimed that the "fully developed record" here enabled it to reach a conclusion contrary to *Casey*:  that Tennessee's waiting period "severely burdens the majority of

women seeking an abortion." *Id.* at *64. The district court permanently enjoined enforcement of the law.

Tennessee then sought a stay pending appeal from the district court. It pointed out that the district court's decision conflicted with Supreme Court and Sixth Circuit precedent governing waiting periods. *See Casey*, 505 U.S. at 871–76; *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 366, 372–74 (6th Cir. 2006). It also flagged that the Sixth Circuit had recently held that a benefits-burden test does not apply in the abortion context. *EMW*, 978 F.3d 418. Even so, the district court refused to issue a stay pending appeal.

Tennessee now seeks a stay in this court.

## II.

Courts consider four factors when determining whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). In constitutional cases, the propriety of a stay largely hinges on the likelihood of success on the merits. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

Tennessee is likely to prevail on the merits for three reasons. *First*, the district court impermissibly balanced the benefits and burdens of the law in violation of controlling precedent. *Second*, the district court failed to apply rational basis review to the State's basis for enacting the law. And *third*, the district court improperly held that the law substantially burdens abortion in Tennessee. Each of these errors will require us to reverse the district court's judgment and injunction, so Tennessee is entitled to a stay pending appeal.

## A.

Start with a foundational problem: The district court applied the wrong legal standard. It weighed the benefits and burdens of the waiting-period law to find the law unconstitutional. *Adams & Boyle*, 2020 WL 6063778, at *58–64. But our circuit has rejected this approach.

*EMW*, 978 F.3d at 430–34. So too has the Supreme Court. *See June Medical Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2136–39 (2020) (Roberts, C.J., concurring in judgment) (controlling opinion). And "a district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

To be fair, in balancing the benefits and burdens, the district court relied on the four-justice plurality opinion in *June Medical*. But as our court recently held, the Chief Justice's separate opinion in *June Medical*—not the plurality opinion—provides the controlling legal rule in the case. *EMW*, 978 F.3d at 433; *accord Hopkins v. Jegley*, 968 F.3d 912 (8th Cir. 2020). That is because when the Supreme Court decides a case and no rationale garners majority support, "the holding of the Court" is the position taken by the justice or justices "who concurred in the judgment[] on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). In *June Medical*, that means the Chief Justice's separate opinion controls.

Under the Chief Justice's controlling opinion, the undue burden test does not permit judges to balance the benefits and burdens of an abortion regulation. *June Medical*, 140 S. Ct. at 2136–39 (Roberts, C.J., concurring in judgment). Instead, an abortion regulation is valid as long as it: (1) is "reasonably related to a legitimate state interest," and (2) doesn't place "a substantial obstacle in the path of a woman seeking an abortion." *EMW*, 978 F.3d at 433–34. "Because the controlling opinion in *June Medical Services* clarified that the undue burden standard is not a balancing test, the district court erred in attempting to weigh the benefits of [the law] against [its] burdens." *Id.* at 437.

What is the majority's response? It says that our court's holding in *EMW* might be "dicta" and that Tennessee "may well have overstated the precedential value of *EMW*." Maj. Op. 9–11. It claims (incorrectly) that the panel may have had an alternative basis for its decision, so its holding about the correct standard of review is not binding. (Never mind that alternative, independent holdings are themselves binding. *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019); *Chambers v. United States*, 763 F. App'x 514, 522 n.2 (6th Cir. 2019) (Moore, J., concurring) ("I am not prepared to question the practice of alternative holdings, and an alternative holding is still a holding.").) The majority's suggestion is premised on a fundamental misunderstanding of *EMW*. And its invitation to defy precedent runs counter to the settled rule

of this and every other circuit: that "the holding of a published panel opinion binds all later panels unless overruled or abrogated en banc or by the Supreme Court." *Wright*, 939 F.3d at 700.

A bit of background is necessary to understand the scope of *EMW*'s holdings. *EMW* involved a Kentucky law that requires abortion providers to obtain transfer-and-transport agreements with local hospitals. 978 F.3d at 438. The district court did not have the benefit of *June Medical* and thus applied the balancing test found in *Whole Woman's Health*. *Id.* After a three-day bench trial, the district court first found that the transfer agreements did not confer "a substantial medical benefit" and so did not promote "the health of women seeking abortions in Kentucky." *Id.* Second, the district court found that the law imposed a burden on women seeking abortions because it would result in the closure of clinics. *Id.* at 426. Balancing the benefits against the burdens, the district court held that the law was unconstitutional.

Kentucky appealed. The *EMW* court began with a thorough and careful analysis of the relevant case law, and of *June Medical* in particular. That analysis was not easy. Indeed, it spans nearly ten pages in the *Federal Reporter*. *Id.* at 429–37. Over the course of this thoughtful analysis, the majority explained why Chief Justice Roberts' separate opinion in *June Medical* supplied the relevant legal test. And once the majority determined the relevant test, it applied that test to Kentucky's transfer-and-transport law.

To understand why that determination mattered, one must look at the arguments plaintiffs made in *EMW*. The plaintiffs advanced two independent arguments.

*First*, the plaintiffs argued that the law was unconstitutional because the district court found that the law offered no benefits—even if it did not pose a substantial obstacle to abortion. *Id.* at 438. Our court disagreed. *Id.* Importantly for present purposes, we rejected the notion that a district court gets to independently determine whether a law has benefits. *Id.* Why? Because under *June Medical* it is not "the role of courts to objectively assign weight to the State's interests in passing regulations on abortion." *Id.* (cleaned up). Instead, we "are only to ascertain" whether the legislature had a rational basis to act. *Id.*

*Second*, the plaintiffs argued that Kentucky's law posed a substantial obstacle to abortion and so was unconstitutional for that reason too.  *Id.* at 440–41.  The district court agreed and found that the law would cause all of Kentucky's abortion clinics to close.  This time, we reversed based on clear error.  We concluded that the district court lacked a sound evidentiary basis for finding that clinics would be forced to close.  *Id.* at 441–46.  Thus, we held that the law did not pose a substantial obstacle to abortion.

My colleagues in the majority suggest they may not be bound by *EMW*'s analysis of *June Medical* because it was not "necessary to the determination of the appeal."  Maj. Op. 9–10 (quoting *United States v. Hardin*, 539 F.3d 404, 410–11 (6th Cir. 2008)).  Because the *EMW* court held that the district court clearly erred in its substantial-obstacle finding,  the majority says that *EMW*'s benefits-burden holding was potentially "unnecessary" and "much ado about nothing."  *Id.* at 9–11.  Not so.

In *EMW*, the plaintiffs argued that—even in the absence of a substantial obstacle—an abortion regulation could be unconstitutional based on its lack of benefits.  978 F.3d at 438 ("The plaintiffs contend that, even after *June Medical Services*, the district court's findings establish that the challenged provisions are 'not reasonably related to a legitimate purpose' and are therefore unconstitutional even if they do not impose a substantial obstacle.").  If this argument were correct, it would have been an independent basis for affirming.  But the *EMW* court applied the Chief Justice's opinion in *June Medical* to reject the argument.  *Id.* at 438–40.  Under the Chief Justice's opinion, courts must defer to legislative judgments about the benefits conferred by a law regulating abortion (so long as the law survives rational basis review); district court findings to the contrary are irrelevant.

As this discussion shows, *EMW*'s application of *June Medical* plainly "contribute[d] to the judgment."  *Wright*, 939 F.3d at 701.  So it constitutes a binding holding of this court.  And since the district court abused its discretion by applying the wrong legal standard, Tennessee is likely to succeed on the merits of its appeal.[2]

---

[2]The majority notes that defendants "have not argued that the district court's conclusion was unwarranted if the [*Whole Woman's Health*] test in fact applies."  Maj. Op. 14.  The reason no one presses this argument is because

B.

But the district court's errors didn't stop there.  It also concluded that Tennessee's waiting-period law serves "no legitimate purpose." *Adams & Boyle*, 2020 WL 6063778, at *58–64.  This conclusion is deeply flawed.

In determining whether abortion regulations "reasonably relate[] to a legitimate state interest," courts must apply rational basis review.  *EMW*, 978 F.3d at 433, 438 (citation omitted); *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in judgment).  A rational basis to regulate abortion exists when there "is a problem at hand for correction and it might be thought that the particular legislative measure was a rational way to correct it." *EMW*, 978 F.3d at 438 (cleaned up).  This standard is "highly deferential." *Id.*  Under it, "legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *see also Vance v. Bradley*, 440 U.S. 93, 110–11 (1979) (holding the same).  Thus, a law remains constitutional even if it seems to offer "little if any benefit." *EMW*, 978 F.3d at 438 (citation omitted).  All that matters is whether the legislature had a rational basis to act.

Here, the Tennessee legislature plainly did.  In *Casey*, the Supreme Court held that waiting-period laws are rationally related to two legitimate state interests.  First, they are "a reasonable measure to implement the State's interest in protecting the life of the unborn." 505 U.S. at 885.  And second, they are a reasonable means of ensuring that women's consent is "informed and deliberate." *Id.*  Just as these rationales justified Pennsylvania's 24-hour waiting period, so too do they justify Tennessee's 48-hour waiting period.  Thus, Tennessee had (as a matter of law) a rational basis for enacting its waiting-period law.

But the district court apparently believed the reasoning of the Tennessee legislature (and the Supreme Court) was not good enough.  So it decided to engage in freewheeling factfinding of

---

the *Whole Woman's Health* test does not apply after *June Medical* and *EMW*.  But if that test did apply, the law would almost certainly remain constitutional.  As the Supreme Court recognized in *Casey*, abortion waiting periods play an important role in furthering informed consent and protecting the lives of unborn children.  505 U.S. at 885–86.  And any resulting burden does not amount to a substantial obstacle to abortion for the reasons explained elsewhere in this dissent.  Thus, Tennessee's waiting period would almost certainly survive benefits-burden balancing under the (since overruled) *Whole Woman's Health* standard.

its own.  And based on that factfinding, it held that Tennessee's waiting period does not "actually further[]" a legitimate state interest.  *Adams & Boyle*, 2020 WL 6063778, at \*58, \*63.  Yet as noted above, a district court cannot supplant a legislature's judgment with "courtroom factfinding." *Beach Commc'ns*, 508 U.S. at 315; *see also EMW*, 978 F.3d at 438–39.  Nor can it "resolve conflicts in the evidence against the legislature's conclusion," reject the legislature's findings based on "statistics in the record," or dismiss the legislature's judgment because it is based on "speculation." *Vance*, 440 U.S. at 111 (cleaned up).  The district court's opinion contravenes these key principles of rational basis review.  This alone requires vacatur.

But that's not all.  In its frolic and detour, the district court also ignored a key part of the Supreme Court's holding in *Casey*:  that abortion waiting periods are reasonably related to legitimate state interests as a matter of law.  505 U.S. at 885.  Because the district court "failed to perform traditional rational-basis review," and because it failed to apply controlling precedent, Tennessee is likely to succeed on the merits of its appeal.  *EMW*, 978 F.3d at 439–40.

C.

All of this is reason enough to stay the district court's decision.  But the district court committed another fundamental error:  It held that Tennessee's waiting-period law poses a substantial obstacle to abortion for almost all women in Tennessee.  Once again, the district court's holding defies Supreme Court and Sixth Circuit precedent.  It also badly misapplies the large-fraction test, which is used to determine whether abortion regulations are facially valid.

1.

A law is unconstitutional if it places "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *June Medical*, 140 S. Ct. at 2138 (Roberts, C.J., concurring in judgment) (cleaned up).  "Under the law of our circuit, a woman faces a substantial obstacle when she is 'deterred from procuring an abortion as surely as if the [government] has outlawed abortion in all cases.'" *EMW*, 978 F.3d at 434 (quoting *Cincinnati Women's Servs.*, 468 F.3d at 370).  Here, the plaintiffs failed to show that Tennessee's law imposes such a burden.

Begin with precedent.  In *Casey*, the Supreme Court held that Pennsylvania's 24-hour waiting period was not a substantial obstacle to abortion.  It acknowledged that the law would often cause delays of "much more than a day" given the need to schedule two appointments.  505 U.S. at 886.  It recognized that the effects of the law would be "particularly burdensome" for "those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others."  *Id.*  It noted that the delays might result in women experiencing additional "harassment" or "hostility."  *Id.*  And it "did not doubt" that the law had "the effect of increasing the cost and risk of delay of abortions."  *Id.* (cleaned up).  Still, the Supreme Court held that these findings were not enough to "demonstrate that the waiting period constitutes an undue burden."  *Id.*  This was true even for the women most affected by the law, such as those with low incomes.  *Id.* at 886–87.

Likewise, in *Cincinnati Women's Services*, our court held that Ohio's 24-hour waiting period did not pose a substantial obstacle to abortion for most women it affected.  468 F.3d at 373–74.  We recognized that the waiting period might have the "effect of delaying abortions up to two weeks."  *Id.* at 366.  But even still, we held that the law was constitutional.

So how did the district court get around this precedent?  It claimed that a more "fully developed record" allowed it to part from those decisions and find that Tennessee's waiting period poses a substantial obstacle to abortion.  *Adams & Boyle*, 2020 WL 6063778, at *64.  But the burdens the district court identified are generally the same as those rejected as insufficient in *Casey*:  "logistical and financial hurdles" caused "by having to attend two in-person appointments."  *Id.* at *62; *see also Karlin v. Foust*, 188 F.3d 446, 486 (7th Cir. 1999).

Courts have an obligation to "treat like cases alike."  *See June Medical*, 140 S. Ct. at 2133–34.  And they cannot circumvent that duty by dressing up departures from precedent in the garb of judicial factfinding.  Since this case is nearly identical to *Casey*, the law compels the same conclusion.

Beyond these financial and logistical issues, the district court pointed to a few more potential burdens.  But all fall well short of being a substantial obstacle to abortion.

First, the district court argued that Tennessee's law is both "demeaning to women who have decided to have an abortion" and "undermines patient autonomy and self-determination." *Adams & Boyle*, 2020 WL 6063778, at *63. But there is no "constitutional right to abortion on demand." *Casey*, 505 U.S. at 887. What's more, these findings say nothing about whether women are deterred from obtaining an abortion "as surely as if the [government] has outlawed abortion in all cases." *EMW*, 978 F.3d at 434 (citation omitted). That is the test. And the district court didn't even pretend to satisfy it.

Next, the district court claimed that "as gestational age increases, an abortion becomes . . . riskier for the patient." *Adams & Boyle*, 2020 WL 6063778, at *62. For a health risk to potentially pose an undue burden, that risk must be at least "appreciable." *Casey*, 505 U.S. at 885. Yet at trial, the plaintiffs' own expert testified that "surgical abortion at all times remains very safe." *Adams & Boyle*, 2020 WL 6063778, at *8; *see also id.* at *11 (finding this testimony "fully credible" and giving it "great weight"). To be sure, the district court cites testimony suggesting that medical risk increases slightly as gestational age increases. But minimal increases in risk cannot create appreciable medical risk when, as plaintiffs contend, the procedure isn't risky to begin with. *See Tucson Women's Ctr. v. Ariz. Medical Bd.*, 666 F. Supp. 2d 1091, 1103 (D. Ariz. 2009) ("Plaintiffs cite a 38% increase in risk [from an abortion procedure], but 38% of a very small number is still a very small number."). Thus, any slight increase in risk does not amount to a substantial obstacle to abortion.

Finally, the district court found that Tennessee's waiting-period law "places significant burdens on the clinics themselves." *Adams & Boyle*, 2020 WL 6063778, at *63. But burdens on abortion providers are irrelevant unless they unduly burden women's access to abortion. Tennessee's law does not require clinics to close or doctors to stop performing abortions. *Cf. June Medical*, 140 S. Ct. at 2133–34 (Roberts, C.J., concurring in judgment); *EMW*, 978 F.3d at 446. And for the reasons discussed elsewhere in this opinion, the waiting period does not unduly burden women's ability to obtain abortions. Thus, this rationale offers no basis for finding that the law poses a substantial obstacle to abortion.

The majority sees things differently. It suggests that the district court's factfinding insulates its undue-burden determination. But whether particular facts amount to an undue

burden is a question of law we must review de novo.  *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 n.1 (6th Cir. 1999); *see also A Woman's Choice–East Side Women's Clinic v. Newman*, 305 F.3d 684, 689 (7th Cir. 2002).  Otherwise, there would be "arbitrary discretion in the courts."  *June Medical*, 140 S. Ct. at 2134 (Roberts, C.J., concurring in judgment) (quoting Federalist No. 78); *see also Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120, 129 (7th Cir. 1987) (Easterbrook, J., dissenting) ("When everything matters, when nothing is dispositive, when we must juggle incommensurable factors, a judge can do little but announce his gestalt.").  And reviewed de novo, there is no question that the district court's undue-burden determination veered badly off course.  Why?  Because *Casey* is dispositive:  In the absence of a medical emergency, requiring a woman to attend two appointments before obtaining an abortion is not a substantial obstacle.[3]

2.

An abortion regulation that is unconstitutional in some applications "remains facially valid so long as it does not impose an undue burden 'in a large fraction of the cases in which [the regulation] is relevant.'"  *EMW*, 978 F.3d at 434 (quoting *Casey*, 505 U.S. at 895).  The district court held that Tennessee's waiting-period law imposes an undue burden in a large fraction of cases.  It took two shots at explaining why this was the case.  Both miss the mark.

---

[3]The district court and majority argue that because Pennsylvania had more abortion clinics when *Casey* was decided than Tennessee does today, *Casey* does not control.  This argument has multiple problems.  For starters, *Casey* did not rely on the number of clinics in Pennsylvania.  In fact, no opinion even mentions this statistic.  Courts cannot narrow Supreme Court holdings based on facts the Court did not consider.  *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 n.4 (2020) (When interpreting precedent, "what matters is the [evidence] the Court considered as the basis for its decision, not any latent [evidence] not alluded to by the Court.").

And even on its own terms, this attempt to distinguish *Casey* fails.  The population of Tennessee in 2020 is about half of Pennsylvania's population in 1992.  Tennessee has abortion clinics in Nashville, Memphis, Knoxville, Bristol, and Mount Juliet.  *Adams & Boyle*, 2020 WL 6063778, at *62 n.52.  And the vast majority of Tennesseans live in the metro areas, suburbs, and counties immediately surrounding these cities.  Indeed, given the shape of the State and the distribution of clinics, almost every Tennessean lives within a two-hour drive of an abortion clinic.

Finally, the district court admits that "the calculation of Pennsylvania providers also included smaller OB/GYNs or hospitals that performed abortions, which were not included in the calculation of Tennessee providers."  *Id.* at *23 n.24.  Thus, it is far from clear that Tennessee has fewer abortion providers than Pennsylvania did when *Casey* was decided, especially on a per capita basis.

The majority criticizes the dissent for discussing this point.  It claims that Tennessee "stopped short of challenging this finding for clear error."  Maj. Op. 15–16 n.10.  But Tennessee did challenge the district court's flawed use of these figures on page 16 of its stay motion (in footnote 4).  And even if it hadn't, the scope of a Supreme Court decision is a question of law, not fact, so it is a proper inquiry for appellate judges.

*Numerators and Denominators.*  Large-fraction analysis relies on two key variables.  The first is the numerator.  This is the number of women unduly burdened by an abortion regulation. *Casey*, 505 U.S. at 894–95.  The second variable is the denominator.  This is the group of women for whom an abortion regulation is "an actual rather than an irrelevant restriction."  *Id.*  The district court erred twice in identifying the relevant numerator.

*Women Who Are Certain.*  The district court first held that Tennessee's waiting-period law "unduly burdens all women who are certain of their decisions" to obtain an abortion.  *Adams & Boyle*, 2020 WL 6063778, at *65.  Why?  Because these women experience delays that carry "no benefit."  *Id.*  The district court estimated that 95% of women are certain of their decision to obtain an abortion and held that Tennessee's waiting period imposes an impermissible burden on this entire group.

But the district court did not find that these women "would effectively be barred from exercising their constitutional right to obtain an abortion."  *Cincinnati Women's Servs.*, 468 F.3d at 373 (citing *Women's Medical Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997)).  And that is the controlling legal question.  So, are 95% of women seeking an abortion "deterred from procuring an abortion as surely as if the [government] has outlawed [it] in all cases?" *EMW*, 978 F.3d at 434 (citation omitted).  All evidence is to the contrary:  Tennessee performed 12,373 abortions the year before the law went into effect, and 11,235 abortions the year after. Mot. for Stay, Exs. C, E.  The district court thus erred by holding that 95% of women are unduly burdened by Tennessee's waiting-period law (and using this figure as the numerator in its large-fraction analysis).

*Low-Income Women.*  In the alternative, the district court also concluded that "all low-income women who seek an abortion are unduly burdened by the mandatory waiting period because it requires them to make a second trip to a provider."  *Adams & Boyle*, 2020 WL 6063778, at *65.  The district court estimated that this group includes 60% to 80% of all abortion seekers in the State.  *Id.*  How are these women burdened?  By "the costs and inconvenience of the second trip," which may prove "either insurmountable or surmounted with great difficulty." *Id.*

But "inconvenience, even severe inconvenience, is not an undue burden." *Karlin*, 188 F.3d at 481. As the Supreme Court explained in *Casey*, the fact that a law might be "particularly burdensome" for women with the "fewest financial resources" does not mean the law poses a substantial obstacle to abortion. 505 U.S. at 886. And given the rate at which abortions continue to occur in Tennessee, it is implausible that 60% to 80% of women are encountering a substantial obstacle to abortion in Tennessee, such that they are functionally unable to obtain the procedure. For these reasons, the district court erred in using the 60% to 80% number as the relevant numerator in its large-fraction analysis.

Again, this error merits a stay.

## D.

The remaining factors also favor a stay pending appeal. For one, Tennessee faces irreparable injury. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). Although the majority contends that Tennessee's law is "unnecessary" and "unjustified," that is a question for the people of Tennessee, not unelected appellate judges. Maj. Op. 2. By contrast, a stay will not substantially injure the plaintiffs. The law remained in force for more than five years while the parties litigated in the district court. During that time, plaintiffs continued to operate their clinics, and women in Tennessee continued to obtain abortions. Finally, the public interest supports granting the stay. For as we have explained, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020).

## E.

One final point. The effects of today's ruling will extend far beyond this case. The majority functionally overrules *Casey*. In doing so, it calls into question waiting-period laws in fourteen states.[4] It also suggests that district courts (and appellate panels) have free rein to

---

[4]Ariz. Rev. Stat. Ann. § 36-2153(A); Ark. Code Ann. § 20-16-1703(b); Fla. Stat. Ann. § 390.0111(3)(a)(1); Ind. Code Ann. § 16-34-2-1.1(a); Iowa Code Ann. § 146A.1(1); Ky. Rev. Stat. Ann. § 311.725(1); La. Rev. Stat.

disregard controlling precedent and to substitute their preferences for the judgment of the Supreme Court.

\* \* \*

Abortion may be controversial. Following Supreme Court precedent shouldn't be. I dissent.

---

Ann. § 40:1061.16(B)–(C); Miss. Code Ann. § 41-41-33(1); Mo. Ann. Stat. § 188.027; Ohio Rev. Code Ann. § 2317.56(B)(1); S.D. Codified Laws § 34-23A-56; Tex. Health & Safety Code Ann. § 171.012(a)(4), (b); Utah Code Ann. § 76-7-305(2); Wis. Stat. Ann. § 253.10(3)(c)(1).

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ADAMS & BOYLE, P.C.,[1] et al.,

       Plaintiffs,                                   Civil Action No. 3:15-cv-00705

vs.                                               HON. BERNARD A. FRIEDMAN

HERBERT H. SLATERY, III, et al.,

       Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs in this matter are Tennessee abortion providers who challenge a Tennessee statute, Tenn. Code Ann. § 39-15-202(a)-(h), which requires women seeking an abortion to receive certain information beforehand in person from the attending physician performing the abortion, or a referring physician, and to then wait at least 48 hours after receiving the information – subject to a strict medical emergency exception – before undergoing the procedure. Plaintiffs, suing on their own behalf and on behalf of their patients, argue that § 39-15-202(a)-(h) violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. They seek to enjoin its enforcement.

Having reviewed the evidence presented at trial, including the testimony of various expert witnesses, the exhibits, and the stipulations, and having considered all of the issues involved, the Court concludes that the mandatory waiting period required by § 39-15-202(a)-(h) is unconstitutional and shall enjoin its enforcement.

_____

[1] On June 29, 2020, the Court granted plaintiffs' unopposed motion to replace Adams & Boyle, P.C., with Bristol Regional Women's Center, P.C. [docket entry 267].

## I.      Background

On June 25, 2015, plaintiffs Adams & Boyle, P.C. ("Adams & Boyle"), Wesley F. Adams Jr., M.D. ("Adams"), and Memphis Center for Reproductive Health ("Choices Memphis") filed a complaint on behalf of themselves and their patients in which they challenged three statutory requirements concerning abortions in Tennessee:  (1) that doctors' offices that perform more than fifty surgical abortions annually become licensed as ambulatory surgical treatment centers ("ASTC"), 2015 Tenn. Pub. Acts Chapter 419 (later codified at Tenn. Code Ann. § 68-11-201); (2) that doctors who perform abortions have hospital admitting privileges in the county where the abortion is performed or an adjacent county, 2012 Tenn. Pub. Acts Chapter 1008 (originally codified at Tenn. Code Ann. § 39-15-202(h), later codified at Tenn. Code Ann. § 39-15-202(j)); and (3) that abortion patients attend an in-person meeting with a doctor to receive certain information at least 48 hours before obtaining the abortion, 2015 Tenn. Pub. Acts Chapter 473 § 1(a)-(h) (later codified at Tenn. Code Ann. § 39-15-202(a)-(h)).  Compl. ¶¶ 2, 7 [docket entry 1].  Plaintiffs alleged that these restrictions violated the Fourteenth Amendment's Due Process and Equal Protection Clauses, and they sought declaratory and injunctive relief permanently enjoining their enforcement.

On June 26, 2015, the Court issued a temporary restraining order ("TRO") enjoining "Defendants . . . from enforcing . . . [the ASTC requirement], as applied to Plaintiffs Adams & Boyle and Adams," pending a July 9, 2015, hearing.  TRO at 2-3 [docket entry 13].  On July 15, 2015, the Court renewed the TRO until August 10, 2015 [docket entry 23].  On August 10, plaintiffs filed an amended complaint that challenged the same three restrictions and added defendants.  On August 14, 2015, the Court issued a preliminary injunction enjoining defendants from enforcing the ASTC requirement pending resolution of the litigation.

2

On December 17, 2015, the Court stayed "all proceedings in this matter" pending the Supreme Court's decision in *Whole Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015) (per curiam), *modified*, 790 F.3d 598 (5th Cir. 2015) (mem.), *cert. granted*, No. 15-274 (U.S. Nov. 13, 2015). Stay Order at 1-2 [docket entry 45]. On April 14, 2017, the Court lifted the stay and entered a partial judgment on consent. In light of the Supreme Court's ruling in *Whole Woman's Health* and the agreement of the parties, the Court "enter[ed] a final judgment as to Plaintiffs' claims for statewide injunctive relief concerning enforcement of" the ASTC and admitting-privileges requirements. Partial J. on Consent at 3 [docket entry 60]. The Court indicated that "nothing in this [judgment] shall affect adjudication of Plaintiffs' claims concerning what Plaintiffs reference as the 'Delay Requirement' and Defendants reference as the 'Notice and Waiting Period Requirement' . . . ." *Id.*

On August 22, 2017, plaintiffs filed a second amended complaint challenging the validity of § 39-15-202(a)-(h) on both due process and equal protection grounds. Plaintiffs, suing on their own behalf and on behalf of their patients, are Adams & Boyle,[2] Choices Memphis, and Planned Parenthood of Tennessee and North Mississippi ("PPTNM").[3] Defendants are the Tennessee Attorney General and various other state and county officials.[4]

---

[2] As noted, on June 29, 2020, the Court granted plaintiffs' unopposed motion to substitute Bristol Regional Women's Center, P.C., for Adams & Boyle, P.C. [docket entry 267].

[3] PPTNM substituted for plaintiffs Planned Parenthood Greater Memphis Region ("PPGMR") and Planned Parenthood of Middle and East Tennessee ("PPMET") on September 6, 2018 [docket entry 116]. Wesley F. Adams Jr., M.D., is no longer a plaintiff in the case. The second amended complaint added Knoxville Center for Reproductive Health, Inc., as a plaintiff; however, on March 5, 2018, the Court granted this party's motion for voluntary dismissal [docket entry 87].

[4] Defendants, all of whom are being sued in their official capacities, are Attorney General of Tennessee Herbert H. Slatery III; Commissioner of the Tennessee Department of Health John Dreyzehner; President of the Tennessee Board of Medical Examiners Michael D. Zanolli, M.D.;

3

The parties have filed deposition designations [docket entries 197, 203, 204, 217], motions in limine [docket entries 143, 145, 147, 149, 151, 153, 155, 157, 158, 162, 164, 166, 168, 172, 195, 208], and pretrial briefs [docket entries 179, 180]. Following a four-day bench trial, the parties submitted proposed findings of fact and conclusions of law [docket entries 226, 227].

## II.   Tenn. Code Ann. § 39-15-202(a)-(h)

### A.   Text of § 39-15-202(a)-(h)

Section 39-15-202(a)-(h), which went into effect on July 1, 2015, states:

(a) Except in a medical emergency that prevents compliance with this subsection (a), no abortion shall be performed or induced upon a pregnant woman unless the woman has provided her informed written consent, given freely and without coercion. Such consent shall be treated as confidential.

(b) In order to ensure that a consent for an abortion is truly informed consent, except in a medical emergency that prevents compliance with this subsection (b) or any of the requirements of subdivisions (b)(1)-(5), no abortion shall be performed or induced upon a pregnant woman unless she has first been informed orally and in person by the attending physician who is to perform the abortion, or by the referring physician, of the following facts and has signed a consent form acknowledging that she has been informed as follows:

(1) That according to the best judgment of her attending physician or referring physician she is pregnant;

(2) The probable gestational age of the unborn child at the time the abortion is to be performed, based upon the information provided by her as to the time of her last menstrual period or after a history, physical examination, and appropriate laboratory tests;

(3) That if twenty-four (24) or more weeks have elapsed from the first day of her last menstrual period or twenty-two (22) or more weeks have elapsed

---

District Attorney General of Nashville Glenn R. Funk; District Attorney General of Shelby County Amy Weirich; District Attorney General of Sullivan County Barry P. Staubus; and District Attorney General of Knox County Charme P. Allen. On September 20, 2017, Dr. Zanolli was replaced by Subhi D. Ali, M.D., as the President of the Tennessee Board of Medical Examiners [docket entry 82]. On August 28, 2019, Dr. Ali was replaced by W. Reeves Johnson Jr., M.D., and former Commissioner of the Tennessee Department of Health Dreyzehner was replaced by the current commissioner, Lisa Piercey, M.D. [docket entry 199].

4

from the time of conception, her unborn child may be viable, that is, capable of sustained survival outside of the womb, with or without medical assistance, and that if a viable child is prematurely born alive in the course of an abortion, the physician performing the abortion has a legal obligation to take steps to preserve the life and health of the child;

(4) That numerous public and private agencies and services are available to assist her during her pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place the child for adoption, and that her attending physician or referring physician will provide her with a list of the agencies and the services available if she so requests; and

(5) The normal and reasonably foreseeable medical benefits, risks, or both of undergoing an abortion or continuing the pregnancy to term.

(c) Except in a medical emergency that prevents compliance with this subsection (c), at the same time the attending physician or referring physician provides the information required by subsection (b), that physician shall inform the pregnant woman of the particular risks associated with her pregnancy and continuing the pregnancy to term, based upon the information known to the physician, as well as the risks of undergoing an abortion, along with a general description of the method of abortion to be used and the medical instructions to be followed subsequent to the abortion.

(d)(1) Except in a medical emergency that prevents compliance with this subdivision (d)(1), no abortion shall be performed until a waiting period of forty-eight (48) hours has elapsed after the attending physician or referring physician has provided the information required by subsections (b) and (c), including the day on which the information was provided. After the forty-eight (48) hours have elapsed and prior to the performance of the abortion, the patient shall sign the consent form required by subsection (b).

(2) If any court temporarily, preliminarily, or permanently enjoins enforcement of subdivision (d)(1) or declares it unconstitutional, then the waiting period imposed by subdivision (d)(1) shall be twenty-four (24) hours, subject to the same medical emergency exception. If the injunction or declaration is subsequently vacated or reversed, the waiting period shall revert to forty-eight (48) hours.

(e) Except in a medical emergency that prevents compliance with subsection (b), the physician performing or inducing the abortion shall provide the pregnant woman with a duplicate copy of the consent form signed by her.

(f)(1) For purposes of subsections (a), (b), (c), (d), and (e), a medical

5

emergency is a condition that, on the basis of the physician's good faith medical judgment, so complicates a medical condition of a pregnant woman as to necessitate an immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function.

(2) When a medical emergency compels the performance of an abortion, the physician shall inform the woman, prior to the abortion if possible, of the medical reasons supporting the physician's judgment that an abortion is necessary to avert her death or to avert substantial and irreversible impairment of major bodily function.

(3) In any case in which a physician has determined that a medical emergency exists that excuses compliance with subsection (a), (b), (c), or (d), the physician shall state in the pregnant woman's medical records the basis for such determination.

(g) For purposes of this section, "the physician", "the attending physician", or "the referring physician" means any person who is licensed to practice medicine or osteopathy in this state.

(h)(1) An intentional or knowing violation of subsection (a), (b), (c), or (d), or subdivision (f)(2) by a physician is a Class E felony.

(2) An intentional, knowing, or reckless violation of subsection (e) or subdivision (f)(3) by a physician is a Class A misdemeanor.

(3) In addition to subdivisions (h)(1) and (2), any physician who intentionally, knowingly, or recklessly violates this section is guilty of unprofessional conduct and such physician's license for the practice of medicine and surgery or osteopathy shall be subject to suspension or revocation in accordance with the procedures provided under title 63, chapters 6 and 9.

JX1.

Plaintiffs state that the challenged statute

has three components:  (1) it requires that an abortion patient receive certain information "orally and in person" prior to her procedure; (2) it requires that the information be provided by "the attending physician who is to perform the abortion" or "the referring physician"; and (3) it delays the patient from having an abortion "until a waiting period of forty-eight (48) hours has elapsed after the attending physician or referring physician has provided the information required [by the statute]."  Tenn. Code Ann. § 39-15-202(b), (d)(1).

6

Second Am. Compl. ("SAC") ¶ 47.  Plaintiffs claim that these provisions unduly burden women's access to abortion in Tennessee.

### B.   Legislative History of § 39-15-202(a)-(h)

On March 24, 2015, § 39-15-202(a)-(h) (previously House Bill 977 and Senate Bill 1222) was considered by the House Health Subcommittee; on April 1 and 8, 2015, it was considered by the House Health Committee; on April 7, 2015, it was considered by the Senate Judiciary Committee; on April 15, 2015, it was considered in the House calendar and rules and on the Senate floor; and on April 21, 2015, it was considered on the House floor.  *See* DX5 at 2.

The proposed statute was presented in the legislature in "direct response" to the adoption of Amendment 1 by Tennessee voters.[5]  *Id.* at 5, 89, 98, 173-74, 180, 249-50, 252.  The proposed statute's language was adapted from a 1978 Tennessee statute that imposed a two-day waiting period and was invalidated in 2000.[6]  *See id.* at 11-13, 25-26, 38, 98, 180, 252.  The

---

[5] Amendment 1 was a proposed amendment to the Tennessee Constitution that received a majority of votes in favor of its adoption in Tennessee's general election on November 4, 2014. *See George v. Haslam*, 112 F. Supp. 3d 700, 703-04 (M.D. Tenn. 2015).  As a result of this voter approval, the following section was added to Article I of the Tennessee Constitution:

> Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion.  The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

Tenn. Const. art. I, § 36.

[6] The legislative transcript indicates that Tennessee's waiting period enacted in 1978 was invalidated in a case referred to only as "Planned Parenthood v. Sundquist."  DX5 at 11, 180.  Presumably this is a reference to *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 22-25 (Tenn. 2000), in which the Tennessee Supreme Court concluded that the mandatory waiting period requirement (as it appeared in a prior version of Tenn. Code Ann. § 39-15-202(d)(1)), as well as other abortion statutes at issue in the case, were unconstitutional under the Tennessee

7

legislature heard testimony that the purpose of the proposed statute was to protect women and girls, to provide them with all of the facts and information available and necessary to make a careful and fully informed decision, and to give them sufficient time to consider the information provided, as well as other options, "for the well-being of both her and her unborn child." *Id.* at 8-9, 25, 27, 38, 98, 152-53, 161, 171-72, 191, 207, 220, 251, 258, 275-79. The proposed statute also was intended to reduce the number of coerced abortions. *See id.* at 251. Its requirement that physicians provide information to patients in person at the first visit was meant "to ensure that all of the accurate medical information is given" and that patients receive answers to any medical questions or concerns. *Id.* at 166-69. Some legislators indicated that the purpose of the proposed statute was not to restrict access to an abortion, to place an obstacle in the path of women seeking an abortion, or to create increased costs or an undue burden. *See id.* at 8, 13, 35, 171, 191, 260, 263, 275, 277. However, the legislature heard testimony that "[f]orcing women to wait for an abortion before they legally terminate their pregnancy causes undue and excessive hardships [that are] emotionally and financially burdensome on women" and may result in women having later abortions, "which may compromise their health" or may result in unsafe abortions. *Id.* at 258-59. The legislature also heard testimony that restrictions on abortion do not cause women to change their decisions to terminate their pregnancies. *See id.* at 259.

The legislature heard testimony that an abortion is a serious and irreversible

---

Constitution "because the[y] are not narrowly tailored to further compelling state interests." With respect to the mandatory waiting period, the court "likewise conclude[d] that the two-day waiting period has the effect of placing 'a substantial obstacle in the path of a woman seeking an abortion,' and therefore fails to pass muster under an undue burden analysis." *Id.* at 24 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992)). The waiting period requirement invalidated by *Sundquist* stated: "There shall be a two-day waiting period after the physician provides the required information, excluding the day on which such information was given. On the third day following the day such information was given, the patient may return to the physician and sign a consent form." *Id.* at 20.

medical procedure with physical and psychological health risks. *See id.* at 7-8, 25-27, 45, 83, 88, 97-98, 152, 162-63, 212, 219-20, 250, 264, 266. Some representatives commented that abortion is not safe for "the unborn child" and that it is a "deadly procedure" that "tak[es] a life." *Id.* at 14 (comment by Rep. Hill); *id.* at 105 (Rep. Faison); *id.* at 119 (Rep. Holsclaw); *id.* at 161 (Rep. Hill); *id.* at 266 (Rep. Terry).

The legislature heard testimony that over 90% of abortions in Tennessee occur in the first trimester (i.e., in the first 13 weeks of pregnancy), *see id.* at 16, 111, 159-60, 238, and that 80% of those procedures are performed within the first 9 weeks of pregnancy. *See id.* at 111. The legislature considered whether the proposed statute might restrict the options, due to the passage of time, as to the type of procedure available. *See id.* at 30-35, 246.

The legislature heard testimony that as of July 2014, 42% of women obtaining abortions had incomes below 100% of the federal poverty level and 27% of women obtaining abortions had incomes between 100% and 199% of the federal poverty level. *See id.* at 170. Some legislators believed that the proposed statute "works disproportionately against poor women," *id.* at 255-56 (Rep. Turner); *id.* at 259-60 (Rep. Gilmore), as well as against "young women, unmarried women, women of color, immigrant women, and women living in rural areas." *Id.* at 260 (Rep. Gilmore). It heard testimony that the passage of the proposed statute would result in additional costs for women and families from having to take time off from work, arrange for childcare, and pay for transportation for more than one trip to the clinic. *See id.* at 170-71, 275. It considered the cost of an abortion in Tennessee, *see id.* at 112, 250, and whether the proposed statute might require women to incur additional medical expenses. *See id.* at 18-20. It considered whether the proposed statute burdened and discriminated against women and whether similar standards should be imposed on men seeking a vasectomy. *See id.* at 66-71.

9

The proposed statute was characterized as requiring informed consent, as is required for other procedures. *See id.* at 35-37, 89, 207. The legislature heard testimony that Tennessee already had informed consent laws, but the laws did not specifically cover abortions. *See id.* at 28. The proposed statute was said to be different from other informed consent laws because it requires physicians to disclose information beyond the risks and benefits of the procedure; it "goes a little bit further" by requiring physicians to "provide information [to a woman] should she decide to go forward with the pregnancy." *Id.* at 209.

The legislature had no data suggesting that women seeking abortions lacked the information necessary for responsible decision-making or that medical professionals had identified a problem regarding a lack of information. *See id.* at 9, 37-45. The legislature heard testimony that patients seeking an abortion had enough time to ask questions and that some patients changed their mind. *See id.* at 235. The legislature did not consult with medical associations regarding their recommendations concerning the proposed statute. *See id.* at 41. According to Sen. Beavers, a 48-hour waiting period was chosen because it is a "sensible, reasonable [amount of] time," and if it were 24 hours instead, "it's probably going to be too late in the day for the abortion to be performed and would be pushed into the next day anyway." *Id.* at 28-29. The Tennessee Department of Health did not consult with legislators regarding the waiting period requirement in the proposed statute.[7] *See* Nagoshiner Dep. at 54-55.

The legislature heard that Tennessee did not have a waiting period for abortion, but

---

[7] The Tennessee Department of Health's Office of Legislative Affairs did comment on draft versions of the waiting period requirement, and it sought "rulemaking authority [to be] specifically stated in the bill." Nagoshiner Dep. at 55-56; *see also* Reed Dep. at 18-24. Other than "request[ing] the addition of the rulemaking within the . . . bill that was introduced," the Tennessee Department of Health "did not have any other involvement in the passage of the waiting period requirement bill." Nagoshiner Dep. at 69-70.

its surrounding states did. *See* DX5 at 6, 12, 26-27, 151, 277. A Right to Life representative told the legislature that "at a very minimum" a 48-hour waiting period in Tennessee was necessary if it no longer wanted to be an "abortion destination." *Id.* at 27, 47-48, 221 (stating that North Carolina was considering adopting a 72-hour waiting period, Missouri had a 72-hour waiting period, and Arkansas had a 48-hour waiting period). The legislature considered the Supreme Court's decisions, including *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), upholding the constitutionality of certain statutory requirements relating to abortions. *See* DX5 at 26, 60-61, 83-84, 127-29, 150-51, 195, 198, 220, 237, 274-75, 277-78.

A different provision of the Tennessee Code, § 56-7-2355, defines "emergency medical condition," but the proposed statute included its own definition of a medical emergency. *Id.* at 162-66. The legislature heard testimony that the proposed statute's medical emergency provision gave physicians autonomy to determine the proper course of care or treatment for patients, *see id.* at 270, 273, but it also heard testimony that the proposed statute's definition of a medical emergency was unnecessary, would narrow access to abortion, and was "setting a trap for doctors across the state of Tennessee" in terms of giving rise to liability. *Id.* at 236. The legislature considered whether the proposed statute's medical emergency exception was so restrictive that it might interfere with saving patients' lives. *See id.* at 17. Rep. Clemmons noted that no testimony demonstrated a need for a physician to be present at the first appointment. *See id.* at 233-34.

The legislature heard testimony from Jeff Teague of Planned Parenthood of Middle and East Tennessee and Ashley Coffield of Planned Parenthood of Greater Memphis Region. *See id.* at 82, 99. Teague indicated that in the previous year, Planned Parenthood in Tennessee had performed approximately 6,000 abortions. *See id.* at 119. Teague and Coffield described Planned Parenthood's "very strict" and "lengthy" informed consent process, which was required by

11

regulations dealing with informed consent generally in Tennessee. *Id.* at 49-54, 102, 106-07, 114. They indicated that "a natural built-in waiting period" resulted in women typically waiting between four days and two weeks from when they called the clinic to when they obtained the procedure. *Id.* at 50, 102, 106-07. Teague stated that "it's impossible for [women] to schedule an appointment on the same day that they call." *Id.* at 102. Teague and Coffield testified that 35% to 50% of women who schedule an abortion appointment do not keep that appointment. *See id.* at 51, 102, 108. Teague testified that the amount of time it takes women to make a decision varies, but "[w]e know that women spend many hours, days, and often weeks in very thoughtful and prayerful consideration about what they should do regarding their pregnancies." *Id.* at 57, 100-01. Coffield stated that women spend five to six hours at the clinic and that they "have a lot of time while they're there to consider their decision," in addition to the days or weeks leading up to their appointment, because Planned Parenthood starts providing information to women during their first telephone call to the clinic. *Id.* at 49, 100-01, 107-08.

Teague stated that Planned Parenthood was opposed to the proposed statute because the informed consent process was already in place and because the proposed statute would interfere with the doctor-patient relationship, would limit the delivery of care, and would force women to delay the procedure after they had made a decision, resulting in a more complicated procedure or an inability to have the procedure at all. *See id.* at 54-55. Teague indicated that the proposed statute would require women to receive information that may not be scientifically or medically accurate and would create barriers to accessing safe and legal abortions in Tennessee. *See id.* at 55-56, 82-83, 100, 111. Teague testified that an abortion "is already one of the safest medical procedures that a woman can receive." *Id.* at 100-01. Teague also indicated that the "American Psychological Association and Psychiatric Association have both issued statements saying that

12

women who go through abortion are no more likely to experience mental health [or substance abuse] issues than . . . other wom[e]n." *Id.* at 83.

The legislature heard testimony from Susan Dodd, an obstetrician/gynecologist who had practiced for thirty years in Knoxville. *See id.* at 99. Dr. Dodd testified that an abortion "is an extremely safe procedure" that is "much safer than carrying a pregnancy." *Id.* at 118. Dr. Dodd described the informed consent process at her office, which involved "extensive counseling" that lasted at least two hours. *Id.* at 108-09, 114-16. She testified that requiring women to return after 48 hours is "a big burden for the women of Tennessee" because of the need to attend a second appointment, which necessitates taking additional time off from work, finding childcare, and paying for gas, which some of her patients did not have money to cover. *Id.* at 109-10. She stated that the proposed statute would "very frequently[] postpone the procedure at least one to two weeks, which makes the procedure more painful," causes "the woman have to suffer that much longer, and it is totally unreasonable in my opinion." *Id.* at 101-03. Dr. Dodd testified that about half of her patients choose to have a medication abortion and that the delay in care caused by the proposed statute is "going to put [some women] in a different category of abortion and limit their choices." *Id.* at 110-11.

The legislature heard Rebecca Terrell of abortion provider Choices Memphis describe the clinic's informed consent process and operations in detail. *See id.* at 130, 133-34, 145-46, 148-49. Terrell testified that the proposed statute would create an undue burden because of the cost of lost wages, childcare, and transportation for women to attend a second appointment. *See id.* at 131-33. She was aware of no medical reason why physicians, as opposed to other staff, should have to deliver information about the procedure to patients. *See id.* at 143.

The legislature rejected amendments that would have broadened who could provide

13

information to patients, required that the information provided be medically accurate, allowed information to be provided over the telephone or by "Telehealth" (eliminating the in-person requirement), made the proposed statute's requirements inapplicable to victims of rape or incest, or modified the definition of a medical emergency. *See id.* at 81-84, 92-97, 183-206, 229-31, 239-48; *see also* JX6-JX14.

### III.    Trial Proceedings, Summary of Testimony, and Findings of Fact

The parties presented evidence at trial on two issues:  (1) whether § 39-15-202(a)-(h) places an undue burden on the right of women to obtain a pre-viability abortion, and (2) whether the statute discriminates against women on the basis of sex and gender stereotypes.  All of the parties' motions in limine to disqualify one another's witnesses are denied.  The parties' motions in limine to exclude one another's exhibits are denied, except that defendants' motion in limine to exclude plaintiffs' journal articles, books, and similar materials [docket entry 166] is denied as moot (as indicated by plaintiffs in their response [docket entry 194]), and defendants' motion in limine to exclude a working paper [docket entry 208] is granted.  *See* Tr. 9/23/19 (Vol. 1) pp. 13-14.

Plaintiffs called obstetrician-gynecologist Sarah Wallett as their first witness.  Dr. Wallett testified that on June 8, 2018, Planned Parenthood Greater Memphis Region ("PPGMR") and Planned Parenthood of Middle and East Tennessee ("PPMET") merged to form Planned Parenthood of Tennessee and North Mississippi ("PPTNM").[8]  *See* Wallett, Tr. 9/23/19 (Vol. 1) pp. 32-33.  PPTNM provides abortion services at four health centers:  two in Memphis (formerly PPGMR), one in Nashville (formerly PPMET), and one in Knoxville (formerly PPMET).  PPTNM

---

[8] Dr. Wallett became the chief medical officer of PPTNM at the time of the merger.  *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 34.  Prior to that, she was the medical director of PPGMR.  *See id.*

provides approximately 6,500 abortions per year.  *See id.* at 39, 121, 123.

Dr. Wallett testified that PPTNM provides medication abortions up to 10 weeks LMP[9] and surgical abortions up to 19 weeks and 6 days LMP (the latest gestational age cutoff that is permitted for surgical abortions in Tennessee).  *See id.* at 38, 41-42.  One health center in Memphis and the health center in Nashville offer both medication and surgical abortions.  *See id.* at 38.  The other health center in Memphis and the health center in Knoxville offer only medication abortions; however, the health center in Memphis has temporarily suspended this service.  *Id.* at 38-39.  Dr. Wallett stated that it was suspended because "in efforts to make sure access is maintained, . . . all of the abortion [procedures have] been moved to one health center so the other health center can focus on family planning only."  *Id.*

Dr. Wallett explained that "a medication abortion involves a woman taking two medications in order to pass a pregnancy.  She will typically take one medication in the clinic, a medication called mifepristone, and then a second medication [called misoprostol] at home, typically anywhere up to 48 hours after the first pill."  *Id.* at 39.  The patient will "experience cramping and bleeding at home," which "is very equivalent to what a woman might experience with a miscarriage."  *Id.* at 40.  A medication abortion does not require sedation and is available up to 10 weeks LMP.  *See id.* at 40, 42.  Many patients "strongly prefer[]" a medication abortion for various reasons:  to avoid a procedure or sedation, because its resemblance to a miscarriage makes it seem "more natural," or because for certain patients it is medically safer than a surgical abortion.  *Id.* at 42.  A medication abortion would be the medically preferred option for patients with fibroids or benign uterine tumors or for those with a history of uterine surgery or scarring.

---

[9] Plaintiffs indicate that "'LMP' denotes the first day of a pregnant woman's 'last menstrual period.'  It is the standard measure of gestational age used by medical professionals."  SAC ¶ 14 n.1.  Defendants do not dispute the meaning or usage of this term.

15

*See id.* at 43-44.  Dr. Wallett testified that many women with a history of sexual trauma prefer a medication abortion because they "find any pelvic exams re-traumatizing."  *Id.* at 43.

A surgical abortion "involves a patient undergoing a simple aspiration procedure, usually lasting about five minutes, to remove the contents of her uterus.  That procedure may involve sedation," and it may be done as an outpatient procedure.  *Id.* at 40.  As a pregnancy progresses, this procedure may take more time and require additional skills, training, and equipment.  *See id.* at 40-41, 43, 82.  Dr. Wallett testified that "[a]lthough surgical abortion at all times remains very safe, the risk of surgical abortion does go up as the pregnancy gestational age increases."  *Id.* at 41-42.  After 16 or 17 weeks LMP, a surgical abortion "may typically involve a two-day procedure, so the woman must come in one day to receive medications or procedures to help prepare her cervix for the abortion, and then return . . . a second day for that procedure."  *Id.* at 42.  This two-day procedure became a three-day procedure when § 39-15-202(a)-(h) went into effect.  *See id.* at 44.

Dr. Wallett testified that "[a]ll types of patients" seek abortion care at PPTNM for various reasons and that "[i]t's impossible to name all of the different types of patients that we take care of."  *Id.* at 45-46.  "Women of all income levels obtain abortions, but abortion is more common among women with lower income levels, and we did see that at PPTNM."  *Id.* at 46.  As with other doctors' appointments, patients commonly do not attend a first or second appointment for abortion care, but the frequency of "no-shows" for the second appointment is "significantly less" than for the first appointment.  *See id.* at 85-88.  Dr. Wallett testified that between June 13, 2012, and June 30, 2015 (before the challenged statute went into effect on July 1, 2015), approximately 483 patients obtained an abortion-related ultrasound at PPGMR but did not obtain an abortion there.  *See id.* at 114; *see also* JX53 at 10.  Between July 1, 2015, and January 31,

2018, approximately 729 patients obtained an abortion-related ultrasound at PPGMR but did not

obtain an abortion there. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 113; *see also* JX53 at 2-3, 10; JX57

at 2-3, 9-10 (approximately 309 patients between August 1, 2018, and December 31, 2018,

obtained an abortion-related ultrasound at PPGMR but did not obtain an abortion there).

Dr. Wallett stated that "[i]t's impossible to know why patients no-show[]" for an

appointment because there are many possible reasons for this: patients could have an appointment

elsewhere, be no longer seeking abortion care, be uncertain, be unable to return to the clinic due

to logistics, or be ineligible to return because of a miscarriage, an ectopic pregnancy, a pregnancy

that is too far along, or because they are not actually pregnant. Wallett, Tr. 9/23/19 (Vol. 1) pp.

85-87, 114-15, 132, 145-46. As a result, the number of patients who are conflicted about the

abortion decision is not directly correlated with the number who do not return for a second

appointment. *Id.* at 145-46. PPTNM does not track the reasons for "no-shows" out of respect for

patients' privacy and because it is irrelevant to their medical care. *Id.* at 86-87. PPGMR did not

track these reasons either. *See* JX53 at 3; JX57 at 3-4.

Dr. Wallett testified that it is her legal and "ethical obligation [as a physician] to

make sure patients understand any procedure that they're undergoing" and that "[i]t's also

important as part of our mission at Planned Parenthood, [for] patients to have all information

available to them to make informed choices." Wallett, Tr. 9/23/19 (Vol. 1) pp. 51, 146. Prior to

§ 39-15-202(a)-(h) taking effect, a patient who would appear at one of the Memphis health centers

would meet with a trained patient educator for approximately thirty minutes. *See id.* at 48-49. The

patient educator would obtain the patient's history and provide information regarding options,

abortion, contraception, as well as counseling and community resources. *See id.* The patient

would discuss her decision with the patient educator, who would conduct a decision assessment

and screen for coercion. *See id.* at 49. The assessment and screening would involve the patient educator asking the patient about her decision, if she has support in her decision, and if she is being pressured to make a certain decision about her pregnancy. *See id.* at 49-50, 52. A patient would receive "an extensive packet of materials to also review in writing." *Id.* at 49. These materials would be given to the patient at check-in, would be reviewed with the patient educator, and would be signed by the patient to indicate she understood the information. *See id.* at 61-69; PX1. The patient would have an ultrasound at her visit, with the opportunity to view it and the option to receive a picture of the ultrasound. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 60.

After meeting with the patient educator, the patient would meet individually with the physician for approximately ten minutes, depending on the patient's needs, questions, and concerns. *See id.* at 50-51. The physician would "confirm informed consent for the procedure and that the patient understood the risks, benefits, and all the alternatives of proceeding." *Id.* at 51. This would involve reviewing the patient's medical history, counseling the patient about medical concerns, answering her questions, and "always review[ing] the patient decision assessment and assur[ing] that the patient was firm in her choice to have an abortion" "by asking the patient if she was confident of her decision, if she has support in her decision, and [if] she had any concerns about proceeding." *Id.* at 50-51.

Patient educators who were uncomfortable with a patient's responses about her decision would ask the physician to do some additional screening "to ensure that the patient[] w[as] making decisions on [her] own and . . . w[as] clear about the decision-making process." *Id.* at 50. Patients who were unsure of their decisions would receive counseling, would be encouraged to take more time, and would not have the abortion on that day. *See id.* at 59, 70-71. Patients who changed their minds about the abortion would be free to leave the facility. *See id.* at 59. Patients

18

who were unsure or who changed their minds would be given information on prenatal care, parenting, and adoption.  *See id.* at 59, 69.

After § 39-15-202(a)-(h) went into effect, the counseling and informed-consent process at the Memphis health centers stayed largely the same.  Now the patient meets with the patient educator and the physician at her first appointment, "with the addition of making sure that the physician provide[s] the state-mandated information as well."  *Id.* at 60.  The patient returns at least 48 hours later for her second appointment, where her medical history and her decision are "reverif[ied]" before proceeding with the abortion.  *Id.* at 61.  Dr. Wallett testified that apart from the physician providing the patient with the state-mandated information, the only other change is the addition of a document entitled "Patient Acknowledgement of Physician Counseling" to the written materials given to the patient at check-in.  *Id.* at 61-63, 65-66, 70; PX1.  This document contains the state-mandated information and is signed by the patient to confirm that she waited at least 48 hours before obtaining the abortion.  *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 70.

Dr. Wallett testified that the Memphis health centers record patients' decision assessments – i.e., the conversation about decision-making and how patients feel about the decision – in their electronic health records.  *See id.* at 52.  These records show whether the patient "described being confident and clear in her decision"; the patient "describe[d] being sad, angry, or ambivalent, but clear in her decision to have an abortion"; the patient was "confused, conflicted, or undecided"; or the patient was "clear that she did not want to have an abortion."  *Id.*  Dr. Wallett stated that prior to § 39-15-202(a)-(h) taking effect, "most of the patients [at the Memphis health centers] were very, very clear about their decision at the time that they arrived at the health center."  *Id.* at 52-53.  She stated that many patients had already consulted with partners, families, friends, or religious leaders and that they had enough time to consider their options prior to their

appointment because "[p]atients start thinking about their options for pregnancy long before they enter the doors of the health center." *Id.* at 53. Information from PPGMR's electronic health records shows that before and after § 39-15-202(a)-(h) took effect, "more than 97 percent" of patients were "confident and clear" in their decisions, and "a very small percentage" of patients were uncertain.[10] *Id.* at 57; *see also* JX53 at 8-9; JX56 at 13; JX57 at 8. Dr. Wallett testified that "most women are very confident of their decision when they come in to have an abortion" and for these women, any delay is not medically necessary and has no medical benefit. Wallett, Tr. 9/23/19 (Vol. 1) p. 71, 107. To the contrary, the medical risks increase as gestational age increases. *See id.* Women who are uncertain "always have the option to not proceed" with the procedure. *Id.* In her experience, having treated thousands of abortion patients, Dr. Wallet has not observed patients express regret after the procedure. *See id.* at 144.

After § 39-15-202(a)-(h)'s enactment, wait times for appointments increased. *See id.* at 73. Before it took effect on July 1, 2015, patients had to wait one to two weeks between scheduling the appointment and having the procedure. *See id.* After it took effect, patients must wait two to three weeks for the first appointment. *See id.* They then must wait an additional one to two weeks between the first and second appointments. *See id.* at 74. The wait times are generally longer in Memphis than in Nashville or Knoxville and depend on whether the patient is receiving a medication or surgical abortion. *See id.* at 74-75. Increased wait times can affect patients' eligibility for a medication abortion or make it impossible for them to have a surgical

---

[10] These percentages are based on data from the Memphis health centers prior to the PPGMR/PPMET merger on June 1, 2018, and data from all four PPTNM health centers after the June 1 merger. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 58. From November 2013 to June 2015, 99.9% of patients at PPGMR were clear in their decisions; from July 2015 to January 2018, 99.6% of patients were clear in their decisions; from February 2018 to July 2018, 98.4% of patients were clear in their decisions; and from August 2018 to December 2018, 97.4% of patients were clear in their decisions. *See* PDX1 (referencing JX53 at 8, JX56 at 12, JX57 at 8).

20

abortion before the facility's gestational age cutoffs for these procedures expires. *See id.* at 75-76.

Dr. Wallett noted an increase in the gestational ages in abortion patients after § 39-15-202(a)-(h) went into effect. *See id.* at 92. In 2014, prior to its enactment, 119 women obtained an abortion in the fourteenth week of pregnancy. *See id.* at 94; *see also* JX49 at 14. In 2016, after its enactment, 215 women obtained an abortion in the fourteenth week of pregnancy, and 45 women obtained an abortion in their fifteenth week of pregnancy.[11] *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 94; *see also* JX49 at 14. In 2017, 151 women obtained an abortion in the fourteenth week of pregnancy, 143 in the fifteenth week, 24 in the sixteenth week,[12] 18 in the seventeenth week, and 1 in the eighteenth week. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 94; *see also* JX49 at 14. Dr. Wallett testified that delays in abortion care increase the procedure's risks. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 95. Delays in abortion care may also negatively affect the health of patients who have certain medical conditions, such as hypertension and prior uterine surgery, because these patients are at risk of their condition worsening as gestational age increases. *See id.* at 95, 97-99; *see also* JX53; JX56; JX57.

Dr. Wallett observed that it is "very difficult" for patients to attend two appointments because each appointment involves handling numerous logistics – i.e., taking time off from work, arranging childcare, finding transportation, and coordinating with others. Wallett, Tr. 9/23/19 (Vol. 1) p. 75. In Dr. Wallett's experience, patients must manage additional logistics if they are traveling long distances from home to a clinic. *See id.* at 99-100. Information from PPGMR's electronic records database demonstrates that between July 2015 and December 2018,

---

[11] In May 2016, PPGMR increased its gestational age cutoff from 14 weeks and 6 days LMP to 15 weeks and 6 days LMP. *See* JX49 at 14.

[12] In October 2017, PPGMR increased its gestational age cutoff from 15 weeks and 6 days LMP to 17 weeks and 6 days LMP. *See* JX49 at 14.

21

with respect to patients who resided within Tennessee,[13] 626 patients resided between 50 and 100 miles from the PPGMR or PPTNM facility where they obtained care, and 489 patients resided at least 100 miles from the PPGMR or PPTNM facility where they obtained care.[14] *See* JX53 at 9; JX56 at 13-14; JX57 at 9. With respect to patients who resided outside of Tennessee, 1,087 patients resided between 50 and 100 miles from the PPGMR or PPTNM facility where they obtained care, and 674 patients resided at least 100 miles from the PPGMR or PPTNM facility where they obtained care. *See* JX53 at 9; JX56 at 13-15; JX57 at 9. In addition to involving additional logistics, attending two appointments puts patients who are victims of intimate partner violence "at increased risk of having the people who are perpetrators of that violence know why they're there and increases the risk of becoming unsafe." Wallett, Tr. 9/23/19 (Vol. 1) p. 102.

Dr. Wallett testified that § 39-15-202(a)-(h) has created operational difficulties for the Memphis health centers. *See id.* at 72. Seeing each patient twice requires additional clinic hours, clinic time, and staff time. *See id.* at 72-73, 89. In May 2017 "PPGMR opened a second health center in Memphis in part to accommodate the increased need for abortion appointments," which "helped" but did not significantly reduce appointment wait times. *Id.* at 77. The Memphis health centers adjusted their hours and number of appointment slots to fit in as many patients as possible, and they increased the number of days per week that they performed abortions, from two days and every other Saturday before the statute was enacted, to four to five days per week after it

<hr>

[13] The data that is from before the merger on June 1, 2018, includes patients at the Memphis health centers only. The data that is from after the June 1 merger includes patients at all four PPTNM health centers.

[14] In providing this information in response to an interrogatory, PPGMR explained that "[t]hese distances were calculated using the county of residence of the patient, and the approximate driving distance from the county seat to the PPGMR health center where that patient obtained care." JX53 at 9; JX56 at 14.

was enacted. *See id.* at 77, 85. Additional physicians and staff were hired,[15] and the Memphis health centers increased the gestational age limits for medication and surgical abortions.[16] *See id.* at 78, 80-81, 92. By requiring abortion patients to attend two appointments, the statute also caused the Memphis health centers to increase their prices by approximately $125 per procedure. *See id.* at 89, 91; *see also* PX3; PX4.

The Court finds Dr. Wallett's testimony to be fully credible and gives it great weight. She testified convincingly that an abortion is a safe procedure whose risks increase as gestational age increases, particularly for women with certain medical conditions. Abortion is "more common" among women with lower incomes. *Id.* at 46. "[M]ore than 97 percent" of patients are "confident and clear" in their decisions when they arrive at the Memphis health centers, which have an extensive informed consent process that remained largely unchanged after § 39-15-

---

[15] Dr. Wallett testified that it is challenging for Planned Parenthood to recruit physicians and non-physician staff because "[b]eing a physician who works at Planned Parenthood and an abortion provider in Tennessee is difficult," and physicians "face a lot of stigma, harassment, and fear of harassment." Wallett, Tr. 9/23/19 (Vol. 1) p. 78. Dr. Wallett indicated that she has faced harassment at the health center and has "not been welcomed into all medical communities in Tennessee because of the work that I do." *Id.* at 78-79. As a result, "Planned Parenthood has taken many steps to recruit physicians, including sign-on bonuses, moving expenses, repayment of student loans, support of continuing medical education, paying for travel and transportation." *Id.* at 79. Dr. Wallett stated that "while those things have been somewhat successful, we remain in a place where additional providers are difficult to recruit." *Id.* Non-physician staff members also face harassment, such as protesters yelling at them as they walk into the clinic. *See id.* at 80. Dr. Wallett stated that a protester "appear[ed]" at one of our clinics carrying a handgun, which he is legally allowed to do in Tennessee, but which, of course, sparked a lot of fear in our clinic staff to continue to walk through those doors." *Id.*

[16] After the statute in question went into effect, the Memphis health centers increased the gestational age limit for a medication abortion from 9 weeks LMP to 10 weeks LMP. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 92. As for surgical abortions, in May 2016, the Memphis health centers increased the gestational age limit from 14 weeks and 6 days LMP to 15 weeks and 6 days LMP. In October 2017, they increased the gestational age limit to 17 weeks and 6 days LMP. In December 2017, they increased the gestational age limit to 19 weeks and 6 days LMP. *See id.* at 81. These changes were made to the gestational age limit for a surgical abortion "to increase access to abortion in the second trimester." *Id.*

23

202(a)-(h) was passed.  *Id.* at 57.  Patients who are uncertain "always have the option to not proceed."  *Id.* at 71, 107.  Dr. Wallett has treated thousands of abortion patients, and none has expressed regret after the procedure.  It is "impossible" to know why some patients do not return for a second appointment because there are many possible reasons for this, which PPGMR and PPTNM do not track.  *Id.* at 85-87, 114-15, 132, 145-46.  Since § 39-15-202(a)-(h) was enacted, patients must overcome numerous logistics to attend two appointments, especially if they are traveling long distances, and wait times for appointments have almost tripled (from waiting one to two weeks between scheduling the appointment and having the procedure to waiting three to five weeks between scheduling the first appointment and having the procedure at the second appointment).  These delays contribute to a larger number of abortions being performed at later gestational ages, and this increases the medical risks to patients.  Delays may eliminate patients' eligibility for a medication abortion or for a surgical abortion in Tennessee entirely.  The Memphis health centers' operational changes to increase abortion access following the enactment of § 39-15-202(a)-(h) have not significantly reduced wait times.

Plaintiffs' next witness was University of Miami professor Kenneth Goodman, Ph.D., the founder and director of a university ethics institute and the chair of a hospital ethics committee.  *See* Goodman, Tr. 9/23/19 (Vol. 1) pp. 148-49, 151.  Dr. Goodman defined informed consent, also referred to as valid consent, as "the way by which free people are able to control what happens to them."  *Id.* at 163, 165-66.  He testified that "[t]he criteria and standards for informed consent are well established and universally agreed on."  *Id.* at 154.  He explained that in bioethics,[17] informed consent has five elements:  (1) disclosure, (2) understanding, (3)

---

[17] Dr. Goodman clarified the difference between medical ethics and bioethics.  He stated that "medical ethics applies to the practice of physicians or medics . . . ; that is to say, the actual act of practicing medicine as opposed to, for example, nursing ethics, which would apply to nursing

24

voluntariness, (4) competence, and (5) consent. *See id.* at 165. These five elements can be reduced to three: (1) adequate information, (2) capacity, and (3) voluntariness. *See id.* at 166-67, 169. Adequate information refers to information that "a reasonable person would need" to make a decision. *Id.* at 166-67. Capacity refers to "the ability to understand and appreciate that information." *Id.* at 167. And voluntariness refers to a lack of coercion or undue influence in agreeing or consenting, in this case, to a procedure. *See id.* These elements remain the same regardless of the tools or method used for the informed consent process. *See id.* at 185.

  In the medical context, adequate information may include information about what the treatment or procedure consists of, as well as its risks, its potential benefits, and alternatives. *See id.* at 166, 169. Adequate information is "fundamental to autonomy, i[s] fundamental to self-determination, and it undergirds many of the liberties we enjoy in this country." *Id.* at 170, 175. Dr. Goodman indicated that "[s]eeking out the best way to obtain . . . valid consent is a signal of respect for [a person's] autonomy and self-determination," *id.* at 177, and that informed consent is a process, as opposed to a specific event, with opportunities to ask questions and to present new information that is relevant to the decision. *See id.* at 178. The purpose of having a patient sign an informed consent form is to document that the exchange of information has been completed successfully. *See id.* at 229. Dr. Goodman testified that his views on the essence of informed consent are shared by leading medical associations, such as the American Medical Association and American College of Obstetricians and Gynecologists ("ACOG"). *See id.* at 170-73, 175-78. Factors that could impact the informed consent process include the complexity of the information;

---

practice and so forth." Goodman, Tr. 9/23/19 (Vol. 1) p. 162. Meanwhile, "[b]ioethics is an inclusive and much larger term, so it would include . . . medical ethics, nursing ethics, [and] human subjects protection ethics." *Id.* "Bioethics has to do with consent . . . to be touched with a good intention by a trained professional." *Id.* at 244.

25

a patient's educational level, language skills, and social and economic status; and the context in which this process occurs. *See id.* at 179-80.

Dr. Goodman testified that § 39-15-202(a)-(h) is unnecessary and undermines "autonomy, [the] doctor-patient relationship, and the very idea of informed consent." *Id.* at 189. He questioned "what problem it was actually designed to solve" because "the laws of Tennessee and all our states require that informed consent be obtained from patients before medical interventions." *Id.* at 161. Prior to this statute taking effect, plaintiffs were obligated by other statutes to follow standard professional practices for obtaining informed consent.[18] *See id.* at 196. Because these other statutes already require informed consent, Dr. Goodman expressed concern that the 48-hour waiting period that applies only to abortions undermines patient autonomy and intrudes on the physician-patient relationship. *Id.* at 161. Section 39-15-202(a)-(h) has this effect because "[i]f I'm an autonomous agent and I understand and appreciate the risk of the case, to say, well, you can't go through it now, is insulting and patronizing is what I could argue." *Id.* at 181.

Regarding the impact of § 39-15-202(a)-(h) on the physician-patient relationship, Dr. Goodman stated:

> I think[] it's a little bit like requiring the physician to cross . . . her fingers behind her back and she's saying, here's the deal, here are the risks, benefits, alternatives. The law requires informed consent, and we've done this, and the patient says, I'm ready now, and the physician then has to say, but, as a

---

[18] Dr. Goodman indicated that a different Tennessee statute, Tenn. Code Ann. § 39-15-202 (effective July 1, 2012, to June 30, 2015) applied specifically to abortion and required physicians to "follow [the] professional practice for consent." Goodman, Tr. 9/23/19 (Vol. 1) pp. 195-96; JX2. Subsection (a)(1) provides that "[a]n abortion otherwise permitted by law shall be performed or induced only with the informed written consent of the pregnant woman, given freely and without coercion. Such consent shall be treated as confidential." Goodman, Tr. 9/23/19 (Vol. 1) p. 195; JX2. Another Tennessee statute, Tenn. Code Ann. § 29-26-118, imposes liability for the failure to supply appropriate information in obtaining informed consent. *See* Goodman, Tr. 9/23/19 (Vol. 1) pp. 193-95; JX3. On cross-examination, Dr. Goodman did not dispute that § 29-26-118 sets the burden of proof for medical malpractice claims and is not designed to regulate the practice of a profession. *See* Goodman, Tr. 9/23/19 (Vol. 1) p. 240.

26

matter of fact, the law in Tennessee and other states, . . . says, we're not
done yet. The law says you and I, in this relationship, are inadequately able
to make a decision that meets the criteria for consent. You need to go away
and come back.

*Id.* 190-91. Regardless of the duration of the delay (i.e., whether it is 24, 48, or 72 hours), a delay

that is "illicit and inappropriate" communicates "that we don't trust the medical profession to be

able to get this right, even though we've managed to license them according to good general

medical practice." *Id.* at 191.

The challenged statute "has the effect of undermining the very idea of the informed-

consent process," *id.* at 161, 181, and "the protections against bodily integrity infringements." *Id.*

at 179. Section 39-15-202(a)-(h) undermines the informed consent process because it "suggest[s]

that there is one way, and only one way to do [informed consent]" and that "something else [other

than what is part of standard medical practice] needs to be done." *Id.* at 180-81. Further:

If, in fact, for standard medical procedures, a patient needs to be able to
understand and appreciate the information and be capacitated and be
making a voluntary decision, then I do not understand why any addition to
that or complication of that or embellishment of that would either improve
the process, improve the research, or provide for better medical care.

*Id.* at 161-62. Dr. Goodman testified that "the professional standards [and] the philosophical

underpinnings of informed consent have been effective for protecting the rights of patients if

followed appropriately for a very long time" and "anything that interferes with that is, therefore,

subversion of that bodily integrity." *Id.* at 179. Section 39-15-202(a)-(h) "sullies, violates, [and]

impedes an adequate consent process." *Id.* at 182.

Dr. Goodman found it to be a "mystery" "[w]hy any particular embellishment or

addition to the standards would be required for one procedure and not another." *Id.* at 179. He

testified that "[t]here's nothing unique at all about abortion that would require an alteration in the

standards for informed consent," *id.* at 182, and nothing "ethically distinctive about the role of

27

consent when it comes to abortion," as compared with other medical procedures, that affects the standards or validity of the informed consent process. *Id.* at 193. Dr. Goodman noted the lack of evidence that imposing a waiting period requirement for abortion, but not other procedures, results in better outcomes. *See id.* at 189. He is not aware of another medical procedure "where consent is discussed in th[e] granularity" required by § 39-15-202(a)-(h). *Id.* at 221. He stated that "if we were so concerned about the credibility of the consent process, we would do it before all neurosurgery, heart surgery, and organ transplant surgery." *Id.* at 192-93. The only other mandatory waiting period requirement he is aware of applies to Medicaid patients desiring to undergo a sterilization procedure. *See id.* at 191-92.

Dr. Goodman testified that the statute's requirements "that take it out of the typical context of obtaining valid consent" include an in-person meeting, that the physician be present for the meeting, and a delay in obtaining the procedure after the consent process has been completed successfully. *Id.* at 182-83. His concern with the in-person meeting requirement is that there are many tools for achieving informed consent (e.g., video, video conference, internet), and what is most effective depends on the patient population. *See id.* at 183-86. "In other words, there's no required algorithm for delivering the situation that's essential to the consent process." *Id.* at 184. Dr. Goodman's concern with the component requiring the physician's presence is that in some cases, depending on the patient population, this "may actually impede consent," such as if a patient is intimidated by a physician's social standing and profession. *Id.* at 186. He testified that "there's nothing about the integrity of the consent process that requires the physical presence of a physician [or any particular individual] for its credibility and reliability." *Id.* at 186-87. Dr. Goodman's concern with the required delay in obtaining the procedure is that this requirement does not seem to be based on evidence that supports a 48-hour delay "or any number of hour[s] of delay." *Id.* at

28

188. Dr. Goodman explained:

> [A]ny law that would say that after you've obtained consent, after you've had the relationship that's governed by statute already, after a patient makes a voluntary autonomous choice, the idea that someone would say, time out for two days, go away and come back, strikes me as totally undermining the consent process, the doctor-patient relationship, and what we thought counted as autonomy.

*Id.*

Dr. Goodman could think of no benefits to delaying medical care to patients who have already provided valid consent. *See id.* He testified that having patients return at least two days later "is not voluntary" for informed consent purposes. *Id.* at 225. Dr. Goodman reviewed plaintiffs' informed consent process, prior to the enactment of § 39-15-202(a)-(h), and found it to be "adequate and exemplary." *Id.* at 197. He also expressed concern that the process is now "impeded" by the statute in question. *Id.* Additionally, "the entire point of the consent process" is that patients can change their minds if they no longer wish to have a procedure, and this would be the case even if § 39-15-202(a)-(h) did not exist. *Id.* at 244.

The Court finds Dr. Goodman's testimony to be fully credible and gives it great weight. He testified convincingly that § 39-15-202(a)-(h) undermines patient autonomy, the doctor-patient relationship, and the informed consent process. Before the statute was enacted, Tennessee laws already required medical professionals to obtain informed consent before performing any medical procedure, including abortion. Nothing about abortion requires the informed consent process to be altered or prolonged, and there is no evidence that a mandatory waiting period for this medical procedure, but not others, improves outcomes. Plaintiffs' procedures for obtaining informed consent were fully adequate before the challenged statute was enacted. That statute not only does not improve upon those procedures but actually interferes with obtaining informed consent by imposing a "one size fits all" model on a process that should be

tailored to the patient and her individual circumstances. Dr. Goodman's opinions concerning informed consent, which the Court adopts, are applicable to all medical procedures and are not undermined by the fact that the literature on informed consent that Dr. Goodman reviewed for purposes of forming his opinions did not address informed consent in the context of abortion. Dr. Goodman testified that in bioethics "the absence of literature on point in a particular case is not an impediment to arriving at a reasoned decision that can be useful and acclaimed by all parties." *Id.* at 157-58. He stated that "mapping rules" exist for taking "foundational principles, what we've learned about them and their applicability and how best practices follow from them" and applying them "to a novel case." *Id.* at 158.

The executive director of Choices Memphis ("Choices"), Rebecca Terrell, testified that this organization provides reproductive healthcare services, including medication abortions up to 10 weeks LMP and surgical abortions up to 15 weeks LMP. *See* Terrell, Tr. 9/23/19 (Vol. 1) pp. 246-47, 249. In addition to § 39-15-202(a)-(h), Choices is subject to "all the laws that govern any kind of medical practice or medical care," regulations specific to abortion care, and regulations that apply to it as a licensed ambulatory surgical center. *Id.* at 252-53. Choices' website provides information about the different procedures, what to expect, and frequently asked questions. *See id.* at 269-70.

Terrell testified that most of Choices' patients are between eighteen and thirty-five years old and that "[w]e see people from all classes, all races, religions." *Id.* at 249. She testified that Choices has "many lower-income patients," with about 80% of them qualifying for "some kind of financial assistance for their [abortion] medical care," which Choices attempts to obtain from various sources. *Id.* at 250, 287-88. Choices helps patients cover the cost of medical care but not associated costs such as travel expenses or lost wages. *See id.*

30

Prior to § 39-15-202(a)-(h) taking effect, an abortion patient at Choices would have her vital signs taken, would have her pregnancy confirmed, and would see a trained patient educator, who is a college graduate. *See id.* at 254-55. The patient educator would speak with the patient about how she is feeling, whether she is certain of her decision, and whether she needs additional information or more time. *See id.* at 255, 261. The patient educator would describe the processes for a medication abortion and a surgical abortion, ensure that the patient understood this information, and ask her which of the two she preferred. *See id.* at 255. The patient educator would also gather information that the physician needs prior to treatment. *See id.* In addition, the patient educator would discuss family planning options with the patient. *See id.* at 255. A patient who decided to proceed with the abortion after the conversation with the patient educator would then have lab work done, have an ultrasound, and meet with the physician before the procedure was performed. *See id.* at 256. The physician would ask the patient if she had any questions, if she understood the procedure she was there for, if anyone was coercing her, and if she was making the decision on her own to have the procedure. *See id.* If appropriate, the physician would then perform the procedure. *See id.*

Patient educators would assess decisional certainty through questions and "by noting any sort of affect or if the patient seemed upset." *Id.* This conversation was accompanied by a written "Patient Concerns Form," whose format has evolved over time. *Id.* at 257; *see* JX36. The form acts as a "conversational guide," ensures the completeness of patient educators' conversations with patients, and allows patients to identify how they are feeling, for example, by circling depictions of emotions. Terrell, Tr. 9/23/19 (Vol. 1) pp. 257-58; *see* JX36. Terrell indicated that

> there's some confusion sometimes about if a patient is upset, that means she's not sure she wants a procedure, and that's not it at all.

31

> Often, a patient will be upset that this is a decision she wished she might
> not have to make or that she wished her partner was more supportive of or
> that she wished she knew how she was going to pay for it. It's a lot of
> reasons that they might be emotionally upset and still very confident that
> this is the decision that they want to make about the pregnancy.

Terrell, Tr. 9/23/19 (Vol. 1) p. 256-57. The "Patient Concerns Form" is also used to ask patients

about potential stressors, such as financial responsibilities and parenting and family-relationship

issues, in order to identify specific referral needs. *Id.* at 258-59; *see* JX36. Choices keeps "an

ongoing rolling list" of referrals or resources "for helping [patients] in other areas of their lives"

that generally patient educators share with patients. Terrell, Tr. 9/23/19 (Vol. 1) p. 259-60; *see*

PX10.

Terrell testified that "it was standard practice that if . . . patient[s] showed any

reservation, they didn't get a procedure that day" and would have the option to return on a different

day. Terrell, Tr. 9/23/19 (Vol. 1) p. 261. Patients would "rare[ly]" change their minds on the day

of the procedure, "but they did." *Id.* at 264. When this happened, they would not have the

procedure done on that day and would be refunded the cost of any services that were paid for but

not received. *See id.* Another reason patients might not have the procedure is that they miscarried

after scheduling an appointment. *See id.* Patients who expressed an interest in carrying the

pregnancy to term would be offered an opportunity to speak with the midwife at Choices. *See id.*

at 262. When this situation arose before Choices had its own midwifery practice, patients would

be provided with information about resources for prenatal care, parenting classes, baby supplies,

domestic violence, and adoption. *See id.* at 262-63; *see* PX9. Terrell testified that Choices has

had patients switch from abortion care to midwifery care, and from midwifery care to abortion

care, "[s]o women are making these decisions, and they are capable of making these decisions."

Terrell, Tr. 9/23/19 (Vol. 1) p. 262-63.

Patient educators at Choices would also screen for possible coercion. *See id.* at 260. Patients who expressed that someone is coercing them were told that "the law protect[s] them" and that "no one was allowed to coerce them or force this decision on them." *Id.* at 260-61. They would have a private conversation with Choices' clinic coordinator, and the procedure would not be performed if they were not comfortable making the decision on their own. *See id.* at 261. Patients who decided not to proceed with the procedure would be refunded any fees they had paid, and Choices would ensure they were safe in leaving the premises. *See id.*

Before § 39-15-202(a)-(h) took effect, patients would spend five to six hours at the clinic, with the procedure itself lasting five to ten minutes. *See id.* at 264-65. The wait time for an appointment at Choices was between one week and two weeks, and there were no "walk-in" appointments for abortion care. *Id.* at 265.

Certain aspects of Choices' services remained largely unchanged by § 39-15-202(a)-(h). A patient still meets with a patient educator at her first appointment, and the substance of their conversation is "primarily the same." *Id.* at 268. The patient educator goes over a revised version of the Patient Concerns Form with the patient, and the revised form has her write down how she feels. *See id.* at 267; *see* JX34. The patient educator still asks about coercion and topics such as reproductive life goals, family planning, and the need for assistance with other issues. *See* Terrell, Tr. 9/23/19 (Vol. 1) pp. 267-68. Choices continues to provide patients with a list of resources. *See id.* at 260. The counseling and informed consent process changed as a result of the statute in that some of the counseling and informed consent information that was previously covered by the patient educator is now delivered by a physician. *See id.* at 265, 267. The only portion of the state-mandated information Choices would not otherwise provide to patients is that which relates to possible viability after 22 weeks since conception or 24 weeks LMP. *See* Terrell,

33

Tr. 9/23/19 (Vol. 1) p. 266; *see* Tenn. Code Ann. § 39-15-202(b)(3).  Terrell explained that because Choices provides abortion services only until 15 weeks LMP, that information is "irrelevant to our patients."  Terrell, Tr. 9/23/19 (Vol. 1) p. 266.

At a patient's second appointment (the day of the procedure), the physician reviews a form with the patient entitled "Consent for Treatment or Procedure," which the physician and patient both sign.  Terrell, Tr. 9/23/19 (Vol. 1) p. 269; *see* JX35.  The purpose of this form is to "make sure, again, that they had their consent, that they understood the procedure, [and] that they had met with the physician . . . at least, 48 hours prior . . . ."  Terrell, Tr. 9/23/19 (Vol. 1) p. 269; *see* JX35.  After the procedure is performed, a patient may have a follow-up appointment and is welcome to call the clinic, but Choices does not follow up with patients unless asked to do so.  *See* Terrell, Tr. 9/24/19 (Vol. 2) pp. 33-34.

With § 39-15-202(a)-(h) in effect, a first appointment at Choices lasts two to four hours, and a second appointment lasts another two to four hours.  *See* Terrell, Tr. 9/23/19 (Vol. 1) pp. 268-69.  Terrell estimated that overall, "the majority of our patients are waiting, at least, a week or two for their procedure" from the time they first call the clinic.  *Id.* at 282.  Terrell stated that patients typically wait one week for the first appointment.  *See id.* at 271.  Because the second appointment depends on factors such as preferred method of abortion, gestational age, schedule openings, and physician availability, the second appointment is scheduled during the first appointment.  *See id.*  Terrell testified that data from Choices' electronic health records indicates that § 39-15-202(a)-(h) being in effect "equates to about half of our patients waiting 3 to 6 days [between the two appointments] and half of our patients waiting . . . 7 to 14-plus days [between the two appointments]."  *Id.* at 277-78, 281 (summarizing information in JX41, JX43, and JX45).  Terrell stated that "about 10 percent of our patients wait 14 or more days" between appointments.

*Id.* at 281 (summarizing information in JX41, JX43, and JX45). Factors that can extend wait times include appointment availability, as well as patients' travel distance, ability to take time off from work, and ability to raise funds, *see id.* at 281-82, but Choices does not track the reasons that may contribute to wait times apart from the 48-hour requirement. *See* Terrell, Tr. 9/24/19 (Vol. 2) p. 35.

Delays in care negatively affect patients with certain medical conditions that make it more difficult or riskier to have an abortion or to carry a pregnancy to term. *See* Terrell, Tr. 9/23/19 (Vol. 1) pp. 293-94. These conditions include sickle cell; pulmonary issues, such as tuberculosis and asthma; hypertension; hematologic disorders; heart problems; endometriosis; diabetes; and cancer. *See id.* at 295; *see also* PX12; PX13; PX14. Choices' electronic health records indicate that at least 343 patients reported a medical condition that was affected or exacerbated by pregnancy. *See* Terrell, Tr. 9/23/19 (Vol. 1) p. 296 (referring to plaintiffs' demonstrative exhibits that summarize information in PX12, PX13, and PX14).

Terrell indicated that there are different reasons why patients attend the first appointment but either do not schedule a second appointment or do not attend it: they could have a health issue, they could have miscarried, they could have decided to have the procedure elsewhere, they could have changed their minds, they could have an event at their child's school, or they could lack transportation. *See id.* at 279-80. Choices does not record this information because it is not relevant to patients' medical care. *See id.*; *see also* Terrell, Tr. 9/24/19 (Vol. 2) p. 7. Terrell indicated that from December 2017 to February 2018, 10% of patients (46 of its 462 patients) either did not attend or did not schedule a second appointment; that between March and August 2018, and between September and December 2018, 148 and 83 patients, respectively, missed or did not make a second appointment. *See* Terrell, Tr. 9/24/19 (Vol. 2) pp. 12, 14-16

(referencing JX28 at 2, JX30 at 2, JX41, JX43, and JX45).

Terrell testified that long travel distances are "a huge barrier" to patients' access to care. Terrell, Tr. 9/23/19 (Vol. 1) p. 286. Choices primarily serves residents of Shelby County (the county in which Memphis is located), but it also serves patients from surrounding counties and states. *See* Terrell, Tr. 9/24/19 (Vol. 2) pp. 17-18. As distance increases, the longer the trip takes and the more costly it is in terms of transportation and/or lost wages. *See* Terrell, Tr. 9/23/19 (Vol. 1) p. 286. It can be difficult for a patient to get to one of the few abortion providers in the state "on a good day, and if you have to drive another hundred miles and then back, and then again for a second visit, some people just can't do it." *Id.* at 287. Data from Choices' electronic health records regarding the distance traveled by patients indicates that "approximately 15 or 16 percent traveled 50 to 99 miles" one way and that "around 12 percent" of patients traveled 100 miles or more one way. *Id.* at 283-86 (summarizing information in PX11, JX42, JX44, and JX46). Terrell testified that § 39-15-202(a)-(h) has "pushed [patients' access to care] farther out of reach" because of the "combination of the additional cost with the additional days." *Id.* at 286-87.

Terrell stated that Choices sees patients at their first appointment who, because of their gestational age and the 48-hour waiting period requirement, cannot be seen for their second appointment before the clinic's 15-week LMP gestational age cutoff for surgical abortions expires. *See id.* at 288-89. Choices' records indicate that between December 1, 2017, and December 31, 2018, forty-one patients were unable to obtain a medication abortion because of the waiting period, and fourteen patients were unable to obtain a surgical abortion because of the waiting period.[19] *See id.* at 289-90 (summarizing information in JX47).

_____

[19] Terrell indicated that some patients (eleven in March to December 2018) have appeared at the first appointment who have already missed the 15-week LMP gestational age cutoff for a surgical abortion. *See* Terrell, Tr. 9/24/19 (Vol. 2) pp. 14-16; *see also* JX28 at 4; JX30 at 3-4.

36

Terrell indicated that patients are "incredibly distraught" when they learn they cannot receive a medication or surgical abortion because they are beyond the gestational age cutoff. Terrell, Tr. 9/23/19 (Vol. 1) pp. at 291-92. Patients have many reasons for preferring a medication abortion, including that it may be the safest option for them, which means that many patients are "also very distraught" when they are told that this type of procedure is no longer available to them. *Id.* Asked if there is any benefit to "the mandatory delay and two-trip requirement," Terrell answered, "None that I know of. . . . It seems intrusive, it seems demeaning, it seems contrary to the way we practice healthcare in any other field, and I don't know of any benefit." *Id.* at 296-97.

Terrell testified that § 39-15-202(a)-(h) has negatively affected Choices' operations. *See id.* at 272. The clinic has limited physical space, and because each abortion patient must be seen twice in the clinic, Choices can no longer provide some of its other services, including fertility assistance, walk-in STI testing, and HIV testing. *See id.* To alleviate wait times, Choices has modified its schedule "a dozen times trying to find the best way to accommodate everybody." *Id.* at 272-73. It hired a full-time physician so that it had one physician for "consult days" and another for "procedure days," and it also hired a full-time nurse. *Id.* at 265. Choices has "gotten relatively efficient within the constraints that we're operating under"; however, it is not able to see patients "much sooner." *Id.* at 273.

Choices has increased its prices as a result of § 39-15-202(a)-(h) due to the additional costs involved in a physician seeing each patient twice. *See id.* at 274-75. Between January 2013 and August 2019, the price of an abortion at Choices almost doubled.[20] Terrell

---

[20] Effective January 30, 2013, the cost of an abortion was between $425 for an early surgical abortion and $525 for a later surgical abortion, with a private appointment costing $1,200. *See* Terrell, Tr. 9/23/19 (Vol. 1) p. 275; *see* JX38. Effective March 1, 2018, after § 39-15-202(a)-

testified that price increases affect patients' ability to access services, especially for patients who are in the lower-income population that Choices largely serves. *See id.* at 276. For them, "money is a huge barrier, and it's why we devote so much of our staff time to helping them find assistance." *Id.* at 276-77.

The Court finds Terrell's testimony to be fully credible and gives it great weight. She testified convincingly that the majority of Choices' patients have lower incomes, with 80% of its patients qualifying for financial assistance. Choices has an extensive informed consent process that was in place before § 39-15-202(a)-(h) was enacted. After its enactment, Choices continues to assess patients' decisional certainty, screen them for coercion, and give them as much time as they need to make a decision. The only information that § 39-15-202(a)-(h) requires Choices to communicate to patients that it would not otherwise provide is irrelevant to them because of its gestational age cutoff. Consistent with Dr. Wallett's testimony, Terrell indicated that several reasons may explain why patients attend a first appointment but not a second, but one important reason is the increased time and cost caused by § 39-15-202(a)-(h), which requires them to travel to the clinic twice and pushes access to care "farther out of reach." *Id.* at 286-87. Wait times have been lengthened since the statute was passed, and delays in care negatively impact patients with certain medical conditions. The 48-hour waiting period requirement imposed by the statute puts some patients beyond the 10-week LMP gestational age cutoff for medication abortions and Choices' 15-week LMP gestational age cutoff for surgical abortions at the time of their second appointment. Choices' efforts to accommodate two visits per abortion patient in its physical space

---

(h) took effect, the cost of an abortion was between $700 for a medication and early surgical abortion and $800 for a later surgical abortion, with a private appointment costing $2,000. *See* Terrell, Tr. 9/23/19 (Vol. 1) pp. 275-76; *see* JX39. In approximately August 2019, Choices raised its prices again, with a 12-to-13-week procedure now costing $800 and a 14-to-15-week procedure now costing $1,000. *See* Terrell, Tr. 9/23/19 (Vol. 1) p. 276.

and schedule have not resulted in patients being seen "much sooner."  *Id.* at 273.

Obstetrician-gynecologist Jessica Young, plaintiffs' next witness, has provided abortion care to over one thousand patients in her career, including abortion patients at the Nashville and Knoxville health centers of PPMET, which later became part of PPTNM.[21]  *See* Young, Tr. 9/24/19 (Vol. 2) pp. 47, 54.  The Nashville health center provides medication abortions up to 10 weeks LMP and surgical abortions up to 19 weeks and 6 days LMP (the latest gestational age cutoff that is permitted for surgical abortions in Tennessee).  *See id.* at 55.  The Knoxville health center provides medication abortions up to 10 weeks LMP.  *See id.*  PPMET provided between 2,500 and 3,000 abortions per year at both its Nashville and Knoxville locations.  *See id.* at 129.

Dr. Young testified that abortion is a common medical procedure in the United States; about one in four women will have an abortion in her lifetime.  *See id.* at 57.  Abortion is safe, and it is safer than carrying a pregnancy to term.  *See id.*  The risks of abortion "in general, are rare."  *Id.* at 58.  However, certain risks increase as a pregnancy progresses, which means that "[t]he earlier in pregnancy that an abortion is done, the safer it is."  *Id.*  Therefore, the timing of a woman's access to abortion is medically important.  *See id.* at 64.  Timing determines which abortion procedures may be available to a patient.  *See id.*  It also affects the effectiveness of a medication abortion and the potential risks and complications of a surgical abortion.  *See id.*  If a medication abortion is not medically effective, "then a surgical abortion would be recommended," which "would require additional visits."  *Id.* at 102.  Regarding the timing of a surgical abortion,

---

[21] Prior to the merger between PPGMR and PPMET, Dr. Young was a contract physician, and then medical director, at PPMET.  *See* Young, Tr. 9/24/19 (Vol. 2) pp. 46-47.  After the merger, she was associate medical director, and then a contract physician, at PPTNM.  *See id.* at 47.

the risks "increase as a pregnancy increases, and so as a woman's pregnancy progresses, it puts her at increased risk for hemorrhage, uterine perforation, cervical laceration, [and] retained products of conception." *Id.* at 64. Further, after 16 weeks LMP, a surgical abortion becomes a lengthier procedure, involving an additional visit after the 48-hour waiting period is over "to dilate the cervix . . . overnight in order to decrease risks of cervical laceration or heavy bleeding during the procedure." *Id.* at 100-01. As a result, patients who are at least 16 weeks LMP must make a total of three visits to the health center. *See id.* at 101.

Dr. Young indicated that there are "certain medical conditions that get worse as time progresses, like hypertension in pregnancy." *Id.* at 83. For women who have had a prior uterine surgery, such as a cesarean section, "the earlier that they have an abortion procedure, the safer it is for them" because "particularly if they've had multiple C-sections, as they get further along in their pregnancy, their risk of . . . abnormal placentation increases."[22] *Id.* at 127. Between July 2015 and May 2018, PPMET had at least 1,657 patients seeking an abortion who had medical conditions for which a delay in care put them at increased medical risk. *See id.* at 125-26; *see also* JX54 at 4-5; JX 56 at 7-8.

Dr. Young stated that PPMET had an extensive counseling and informed-consent process prior to § 39-15-202(a)-(h) taking effect because it is "an important part of medical care for a patient to get . . . factual information, to get information about risks and benefits. Really, the

---

[22] Dr. Young explained that abnormal placentation is

> the placenta growing into the wall of the uterus, and sometimes even through the uterus, into the bladder. That condition can be very risky. It can be life-threatening, and as the pregnancy progresses towards term, patients are at higher risk. They usually need a hysterectomy. They're at higher risk for massive hemorrhage and at risk for death.

Young, Tr. 9/24/19 (Vol. 2) p. 127.

informed-consent process is a cornerstone in a patient being able to make an autonomous decision and accurate decision about any kind of medical care." Young, Tr. 9/24/19 (Vol. 2) p. 73. It is also important that counseling be "based on what an individual needs and desires in their [particular] situation." *Id.* at 79.

A patient who came to PPMET prior to § 39-15-202(a)-(h) taking effect would have an ultrasound done to determine gestational age and then would meet with a trained patient educator for thirty to forty-five minutes. *See id.* at 69-70. The patient educator would discuss the patient's medical history and pregnancy options. *See id.* at 69. The patient educator would ask the patient about the certainty of her decision and assess the decision by asking how she feels about it, what she considered during the decision-making process, if there was anything "particularly hard or stressful" about her decision, what kind of support systems she had, and if there are people who supported or opposed her decision. *Id.* at 72. This information would be recorded in a decision assessment tool, which classifies a patient's decision into one of four categories: "confident and clear in their decision; sad, angry, or ambivalent, but clear in their decision; confused, conflicted/undecided; or does not want to have an abortion." *Id.* at 70-71. In addition, the patient educator would screen the patient for pressure, coercion, and intimate partner violence. *See id.* at 69. The patient would be given a packet to review with information about the procedures for which she was eligible, the risks and benefits of the procedures, and "the informed-consent form." *Id.*

After meeting with the patient educator and completing lab work or anything else necessary for the procedure, the patient would meet with the physician. *See id.* at 70. Depending on the procedure she was having and the complexity of her medical history or individual situation, this meeting would last ten minutes to an hour. *See id.* The physician would review the patient's

41

medical history with her, as well as her decision and the decision assessment tool. *See id.* The physician would screen the patient for decisional certainty by asking some of the same questions as the patient educator and making sure her answers were consistent with the information recorded in the decision assessment tool. *See id.* at 70, 73. The physician also would answer the patient's questions and make sure the informed consent form was signed. *See id.* at 70. "[I]f the physician was certain that the patient was positive of [her] decision," the physician would perform the procedure. *Id.* at 70-71. However, the physician would not proceed if the patient was unsure of her decision. *See id.* at 79. In that event, the patient "would be given more time to decide, to become more clear, or to make a different decision." *Id.*

Regarding the decision assessment tool, Dr. Young testified that in the first two categories – "confident and clear in their decision" and "sad, angry, or ambivalent, but clear in their decision" –

> the patient is clear that this is the decision that's best for her. But the second category, the sad, angry, or ambivalent category, reflects the emotional context that a patient may be bringing to the encounter, so they may be certain in their decision but feel sad or feel angry or have other kinds of external things that are bothering them about the decision, but they still know that's the decision they want and feel confident that that's what they need to have.

*Id.* at 71.

Since § 39-15-202(a)-(h) was enacted, each patient is now required to make two visits to the health center that are at least 48 hours apart.[23] At the first visit, the patient has an

---

[23] Dr. Young testified on cross-examination that prior to § 39-15-202(a)-(h) taking effect, medication abortions required two visits: one visit to get the pills, and a second visit to make sure there were no remaining products of conception. *See* Young, Tr. 9/24/19 (Vol. 2) pp. 148-49. Dr. Young indicated that making two trips "was [the patients'] choice if they chose that procedure" and that "[f]or some people who had to travel distances, their follow-up visit could be arranged closer to home." *Id.* at 149. She added on redirect that the follow-up appointment did not delay the actual procedure and that "there was flexibility in the timing when they could come in for that

ultrasound and lab work, provides her medical history, and meets with the patient educator for counseling. *See id.* at 80. She then hears the scripted "48-hour statement" from the physician, who reviews her medical history and decision-making with her. *Id.* Dr. Young indicated that "[e]verything was the same [as before] except for the 48-hour statement in counseling," *id.*, and except for patients having to listen to state-mandated information that "may not have been relevant to them." *Id.* at 82. At the second visit, the patient has a "repeat ultrasound" and "repeat labs" depending on how much time has elapsed since her first visit. *Id.* at 81. Her vital signs are re-taken, and her medical history is reviewed for changes. *See id.* The patient meets with the patient educator, who reviews how she is feeling about her decision, and the patient signs a 48-hour consent form. *See id.* Next, the patient meets with the physician, who also reviews her decision another time, and then the procedure takes place. *See id.*

Dr. Young stated that both before and after § 39-15-202(a)-(h) took effect, "all patients meet one-on-one with the physician" and are "screened by trained staff and counselors for red flags, for uncertainty and indecision, and . . . for coercion." *Id.* at 82-83. There are also differences. Before § 39-15-202(a)-(h) existed, counseling was "tailored to meet the needs of the individual patients in terms of where they are in their decision-making process" and the timeline "was according to the patient's best interests and needs." *Id.* at 81-82. But since its enactment patients are required to attend two appointments, even though for some it would have previously been handled at one visit, and "all patients have to wait, regardless of their certainty, regardless of their individual situation." *Id.* The informed-consent process before the statute's enactment was similar to that of other outpatient medical procedures. After it took effect, "there is really no other medical procedure in Tennessee other than abortion that has a blanket waiting period for all

second appointment." *Id.* at 169-70.

patients." *Id.* at 82.

According to Dr. Young, before § 39-15-202(a)-(h) was enacted, "[t]he vast majority of patients . . . were firm in their decision." *Id.* at 73. She indicated that it was common for patients to have discussed their decisions with their partner, family, friends, pastor or church support person, or gynecologist or internal medicine physician prior to their appointment. *See id.* at 74. Patients took their decision-making seriously before coming to the health center and had sufficient time to consider their options. *See id.* at 75. Dr. Young stated: "In my experience, patients have thought very much and were very certain about their options and their decision about their pregnancy prior to even making an appointment for an abortion." *Id.* She stated that regret "is not common after abortion" and that this has been studied. *Id.* at 169.

Data from PPMET and PPGMR show that from October 2014 to May 2018, "the majority of women were confident and clear in their decision to have an abortion" and "the vast majority of women, even if they were sad, angry, or ambivalent, . . . were still clear about their decision to have an abortion." *Id.* at 78; *see also* JX54; JX56. Between October 2014 and June 2015, "over 99 percent of patients were clear about the decision," and "[i]n the latter two time periods [i.e., July 2015 to January 2018, and February 2018 to May 2018], 96 percent of those patients were clear in their decision." Young, Tr. 9/24/19 (Vol. 2) p. 78; *see also* JX54 at 8-9; JX56 at 12-13. From October 2014 to June 2015, 99.8% of patients were clear in their decisions; from July 2015 to January 2018, 96% of patients were clear in their decisions; from February 2018 to May 2018, 96.3% of patients were clear in their decisions. *See* PDX17 (referencing JX54 at 8-9, JX56 at 12-13). Dr. Young indicated that between October 2014 and June 2015, 0.2% of patients were conflicted about their decisions to have an abortion; between July 2015 and January 2018, 4% were conflicted; and between February 2018 and May 2018, 3.7% were conflicted. *See* Young,

44

Tr. 9/24/19 (Vol. 2) p. 78; *see also* JX54 at 8; JX56 at 12. In addressing this increase in percentage

of patients who were conflicted, Dr. Young indicated that the first time period was before the

enactment of § 39-15-202(a)-(h) and the other two were after its enactment. *See* Young, Tr.

9/24/19 (Vol. 2) p. 78. She testified that after it was enacted she saw more women come

> to their first abortion appointment visit, that day-one visit, not having made
> up their minds yet or still considering their options, and that many of them
> expressed that that was because . . . they knew they had to wait and there
> would be a delay in making . . . the next appointment, and they wanted to
> have their options open, given that they needed to do this 48-hour
> counseling prior to having a procedure.

*Id.* at 79; *see also id.* at 168-69 (stating that the data reflected "an increased number of women

who presented for day one who were conflicted or undecided after the delay law than before the

delay law"). In Dr. Young's opinion, "[i]t is always good to learn about a procedure you're having,

but that doesn't mean that there needs to be a delay between learning that information and actually

getting the procedure." *Id.* at 146.

On cross-examination, Dr. Young indicated that between June 13, 2013, and June

30, 2015 (before § 39-15-202(a)-(h) was enacted), 282 patients received an abortion-related

ultrasound at PPMET but did not return for an abortion. *See id.* at 134-35; *see* JX54 at 10. Between

July 1, 2015, and January 31, 2018 (after the statute was enacted), approximately 982 patients

received an abortion-related ultrasound at PPMET but did not return for an abortion. *See* Young,

Tr. 9/24/19 (Vol. 2) pp. 134-35; *see* JX54 at 2, 10. PPMET does not record why patients do not

return. *See* Young, Tr. 9/24/19 (Vol. 2) p. 134; *see* JX54 at 2. However, Dr. Young explained on

redirect that "there could be multiple reasons" why a patient does not return for a second

appointment:

> One could be that a miscarriage was diagnosed at the time of her first visit,
> or that she had a subsequent miscarriage between the time of her first visit
> and the time of her second visit. She could have had an ectopic pregnancy

diagnosed at that first visit or be undergoing evaluation for an ectopic pregnancy. She could have transportation barriers, she could make an appointment somewhere else out of state; various things . . . that would make her not come to that second appointment.

Young, Tr. 9/24/19 (Vol. 2) p. 167.

Dr. Young testified that approximately 60% to 70% of patients at the PPMET health centers live below or close to the poverty line. *See id.* at 91. National data reflects that 75% of abortion patients have low incomes, and the main reasons patients report for seeking abortion services are "their income, their ability to support a child, their work responsibilities, [and] their responsibilities for dependents." *Id.* Lower-income women "have less access to contraception, [and] less access to medical services in general." *Id.* at 92. Dr. Young stated that "although nationally[] abortion trends are declining, over the past decade, abortion trends have increased for our lowest-income women." *Id.* at 92, 94-95.

Dr. Young testified that the costs associated with an abortion affect low-income patients' ability to access care. She indicated that patients must pay for the abortion procedure, "and in Tennessee, they are very unlikely to have insurance coverage for that, particularly if they have state-funded insurance." *Id.* at 92. The cost of an abortion increases as gestational age increases. *See id.* at 93. "[S]ometimes women will delay seeking abortion care because they are trying to scrape together the funds to pay for the abortion," but "if they wait too long, that cost increases, so it can become a cycle where they're having to raise more money." *Id.* Patients also must cover travel costs, which may involve borrowing a car or taking a bus. *See id.* at 92. Patients "may have to take off of work, and many of our lower-income women do not get paid time off or paid sick leave, and so not going to work reduces the amount of money that they take home that week or that month." *Id.* Additionally, because "[m]any women who seek abortion care are already parents," patients may have to pay for childcare in order to attend their appointments. *Id.*

46

at 92-93. Dr. Young testified that patients with low incomes "have to make trade-offs" to cover the cost of abortion care: "sometimes that's a trade-off with food, other bills that they go behind on paying, whether it's rent or . . . car payments, that sort of thing." *Id.* at 93. Because of difficulties getting time off from work or arranging travel for a first appointment, "sometimes they can't get off work again or arrange travel again for sometimes weeks after that initial first appointment." *Id.* at 94. Women who are victims of intimate partner violence may have difficulty scheduling appointments and paying for the procedure because of their partner's surveillance and control over their whereabouts, telephone, and income. *See id.* at 120-21, *see also id.* at 151-52 ("[F]or women in an abus[ive] relationship, in general, her ability to make appointments, to come to appointments, to pay an abortion, can be extremely limited.").

Dr. Young stated that "abortion provider availability is [geographically] limited" in Tennessee. *Id.* at 89. Tennessee has eight clinics[24] in four cities: Memphis, Nashville, Knoxville, and Johnson City. *Id.* Dr. Young indicated that "96 percent of Tennessee counties[] . . . do not have an abortion clinic," *id.* at 89-90, and "63 percent [of women] . . . live in a county where there are no abortion providers." *Id.* at 88. "This significantly affects a patient's ability to access care" because "[i]t forces [a patient] to travel sometimes significant distances in order to get abortion care." *Id.* at 90. Given these limitations in terms of the number of providers within the state and

---

[24] When asked to compare the number of health centers in Tennessee with the number that existed in Pennsylvania when the Supreme Court upheld its 24-hour waiting period in *Casey*, Dr. Young stated that Tennessee has eight clinics, whereas Pennsylvania had eighty-one abortion providers in 1992, which means that there is "a very different makeup in terms of provider access and provider availability for the women in Tennessee." Young, Tr. 9/24/19 (Vol. 2) p. 90. On cross-examination, Dr. Young clarified that she believed the calculation of Pennsylvania providers also included smaller OB/GYNs or hospitals that performed abortions, which were not included in the calculation of Tennessee providers. *Id.* at 162. The Court takes judicial notice of the fact that Tennessee and Pennsylvania are similar in size; Tennessee is 42,144 square miles, and Pennsylvania is 46,054 square miles. *See* https://www.census.gov/geographies/reference-files/2010/geo/state-area.html (last visited September 25, 2020).

the number of counties with no abortion provider, prior to § 39-15-202(a)-(h) "it was difficult for many patients to come to even [a] first appointment." *Id.* at 93.

The distance abortion patients must travel depends on where they live and what kind of procedure they are going to have; patients may need to travel to a facility that is farther away than the one closest to them to obtain a certain type of procedure. *See id.* at 95. Between July 2015 (when § 39-15-202(a)-(h) was enacted) and May 2018, PPMET had 539 patients who were Tennessee residents who had to travel 50 to 100 miles to obtain an abortion; 500 patients who were Tennessee residents who had to travel more than 100 miles; approximately 1,000 patients who were non-Tennessee residents who had to travel 50 to 100 miles; and 800 patients who were non-Tennessee residents who had to travel over 100 miles. *See id.* at 95-96; *see* JX54 at 9; *see* JX56 at 13-14.

Because Tennessee has so few abortion providers, "at baseline without . . . a delay law" resources are strained, procedure availability is limited, and there are delays in getting an appointment. *Id.* at 90-91. With the enactment of § 39-15-202(a)-(h), which requires each patient to make two visits, there are also delays in obtaining a second appointment. *See id.* at 91. Dr. Young stated: "What we saw following the delay law is that the length of delay increased, and that was driven primarily by the two visits, so the adding [of] an additional visit that a patient needed to be seen in order to obtain care." *Id.* at 97. Before the statute was enacted, patients were often able to schedule an appointment to have the procedure done within one week. *See id.* at 98. After the statute was enacted, patients who call the Nashville or Knoxville health center to schedule an abortion must wait one to three weeks for the first visit. *See id.* at 97, 99. Patients then must wait an additional two to twenty-three days for the second appointment if they are having a medication abortion, and often over one week if they are having a surgical abortion. *See id.*

48

However, Dr. Young stated that "for some patients, th[e] delay would be increased as long as a month for the first appointment and as long as two [to four] weeks for th[e] second appointment." *Id.* The duration of the wait depends on factors such as clinic volume, time of year, provider availability, staffing issues, and health center (Nashville or Knoxville). *See id.* at 97-98.

Dr. Young indicated that because women sometimes discover they are pregnant in the 4-to-10-week LMP range, the wait for a first appointment can place patients "beyond the point where they are eligible for a medication abortion." *Id.* at 99-100. After 14 weeks and 6 days LMP, a surgical abortion is only available in Nashville and Memphis, which "further limits the care that a patient can receive and increases travel and other burdens associated with potential distance." *Id.* at 100. After 19 weeks and 6 days LMP, a patient in Tennessee must travel out of state to receive abortion care. *See id.* at 101.

After § 39-15-202(a)-(h) went into effect, Dr. Young "saw an increase in the gestational age at which abortions were obtained at PPMET, and . . . also saw a decrease in the number of medication abortions, which indicates also that pregnancies were being terminated later on beyond th[e] cutoff for medication abortion." Young, Tr. 9/24/19 (Vol. 2) p. 108. In particular, "PPMET has seen an increase in second trimester abortions."[25] *Id.* at 110; *see also* PX2. This increase is reflected in data from PPMET's electronic health records, which is consistent with statewide data on induced termination of pregnancy from the Tennessee Department of Health. In PPMET's fiscal year 2015 (ending on June 30, 2015, before the statute's enactment), 6.3% of abortions were obtained between 12 and 13.6 weeks LMP; 3.64% were obtained between 14 and 15.6 weeks LMP; and 0.3% were obtained at 16 weeks LMP or later. *See* Young, Tr. 9/24/19

---

[25] "The second trimester of pregnancy is considered between 14 to 28 weeks." Young, Tr. 9/24/19 (Vol. 2) p. 100.

(Vol. 2) pp. 110-11; *see also* PX2. In fiscal year 2016 (after the statute's enactment), 7.2% of abortions were obtained between 12 and 13.6 weeks LMP; 4.72% were obtained between 14 and 15.6 weeks LMP; and 1.48% were obtained at 16 weeks LMP or later. *See* Young, Tr. 9/24/19 (Vol. 2) pp. 110-11; *see also* PX2. In fiscal year 2017 (before PPEMT increased its gestational age cutoff), 8.9% of abortions were obtained between 12 and 13.6 weeks LMP; 5.4% were obtained between 14 and 15.6 weeks LMP; and 4.1% were obtained at 16 weeks LMP or later. *See* Young, Tr. 9/24/19 (Vol. 2) pp. at 110-11; *see also* PX2. Dr. Young stated that according to the Tennessee Department of Health's data on induced termination of pregnancy, in 2014 (before § 39-15-202(a)-(h)'s enactment), 5.3% of abortions were obtained between 13 and 14 weeks LMP; and 1.3% of abortions were obtained between 15 and 20 weeks LMP. *See* Young, Tr. 9/24/19 (Vol. 2) pp. 111-13; *see also* JX19. In 2016 (after the statute's enactment), 8.1% of abortions were obtained between 13 and 14 weeks LMP; and 3.1% of abortions were obtained between 15 and 20 weeks LMP. *See* Young, Tr. 9/24/19 (Vol. 2) pp. 112-13; *see also* JX 21.

According to Dr. Young, an increase in second trimester abortions is medically significant because an abortion performed at a later gestational age involves more risks and a longer and more painful procedure. *See* Young, Tr. 9/24/19 (Vol. 2) p. 113. In addition, patients with certain medical conditions who can safely have a surgical abortion in the first trimester in an outpatient setting will "no longer [be] eligible for an outpatient procedure and must either have an inpatient procedure or be referred out of state for a procedure." *Id.* at 113-14. These patients include those with "significant anemia" and who take anti-coagulation medication for pulmonary embolism or deep vein thrombosis, which worsens during pregnancy. *Id.* at 114. Since § 39-15-202(a)-(h) went into effect, the number of patients Dr. Young has had to refer to a hospital for a second trimester abortion has increased. *See id.* at 114-15. An inpatient surgical procedure is

50

more expensive than an outpatient procedure, and an abortion patient typically must pay for the procedure out-of-pocket because most patients do not have insurance that covers it. An outpatient surgical procedure costs about $600 to $2,000, and an inpatient procedure costs about $6,000 to $12,000. *See id.* at 115.

After § 39-15-202(a)-(h) went into effect there also "was a decrease in the number of patients who were obtaining abortions early in pregnancy." *Id.* Dr. Young indicated that statewide data from the Tennessee Department of Health shows that in 2014, 65.1% of abortions occurred at 8.6 weeks LMP or earlier; and in 2016, 56.5% of abortions occurred at 8.6 weeks LMP or earlier. *See id.* at 115-16; *see also* JX19; JX21. Between 2014 and 2016, there was a decrease in medication abortions by over 200 patients. *See* Young, Tr. 9/24/19 (Vol. 2) p. 167. After the statute went into effect, "[f]requently, if not every day," and at least "several times a week" "we had abortion day-one visits" where a patient strongly preferred a medication abortion but was beyond the gestational age cutoff. *Id.* at 116-17. This happened despite the fact that PPMET had expanded the gestational age cutoff for medication abortions from 9 to 10 weeks LMP. *See id.* at 117. After the Nashville health center expanded the gestational age cutoff in February 2015 "there was a 13 percent increase" in medication abortions, and following the enactment of § 39-15-202(a)-(h) "our medication abortion rates decreased by 20 percent." *Id.* The Knoxville health center expanded the gestational age cutoff in July 2015,[26] the same month the statute took effect, "so the Knoxville center did not see an increase in medication abortion from that increased eligibility, but rather saw a 16 percent decrease in medication abortion, in general." *Id.*

---

[26] Regarding why the expansion in the gestational age cutoff for medication abortions was implemented at different times at PPMET's health centers, Dr. Young explained that "[i]t was common for us [and common in medicine] to make a practice change at one clinic, trial it before we branched out to the other clinic." Young, Tr. 9/24/19 (Vol. 2) pp. 117-18.

Dr. Young indicated that there is a preference among patients for medication abortions; "in some studies, patients prefer medication abortion up to 70 percent of the time." *Id.* at 61. At the Nashville health center, which provides both medication and surgical abortions, "patients expressed strong preferences for medication abortion" and "approximately 70 percent of abortions are medication abortions." *Id.* Reasons for this preference include that the process of a medication abortion "mimics the natural process of a miscarriage," which some women find more comfortable, and that some patients have a strong desire to avoid a surgical procedure, as well as IVs, anesthesia, and "additional medical interventions beyond taking pills." *Id.* at 61-62. Patients with a history of sexual trauma often choose a medication abortion to avoid a pelvic exam or pelvic instrumentation because they find pelvic exams traumatizing. *See id.* at 62. In some cases, a medication abortion is the medically preferred option, such as for patients who have large uterine fibroids and patients with certain immunological conditions. *See id.* at 62-63. For patients who have "a strong preference" for a medication abortion but cannot have one because they are beyond 10 weeks LMP, "it can be traumatizing to have to go through a surgical procedure." *Id.* at 63.

Studies show that women who are unable to access an abortion from a medical professional are at a higher risk of trying to have an "illegal, or unsafe, abortion," which may involve using medications obtained through the Internet or "other kind[s] of illegal channels" to try to induce a miscarriage. *Id.* at 65. Women forced to carry an unwanted pregnancy to term instead of having an abortion also face medical risks. A vaginal delivery or cesarean section involves increased risks of hemorrhage, increased risks of infections, and increased risks of preeclampsia or eclampsia that Dr. Young described as "life-threatening hypertensive disorders of pregnancy." *Id.* at 66-67.

In addition to giving rise to increased medical risks, carrying an unwanted

52

pregnancy to term can negatively impact financial stability.  *See id.* at 67.  A study that examined

"achievement of aspirational one-year plans after women presented wanting an abortion, but were

unable to have one due to being past the gestational age limit," found that "those women who were

unable to get the abortions they desired were more likely to have financial instability and to not

achieve their one-year goals when they were looked at a year later."  *Id.* at 67-68.  For women who

are victims of intimate partner violence, being forced to carry an unwanted pregnancy to term "can

link them to their abuser for the rest of their lives, and it can make it more likely for them that that

physical violence will continue."  *Id.* at 68, 120-21.

   Dr. Young testified that § 39-15-202(a)-(h) "does not provide any benefits to

patients as the majority of patients are certain in their decision prior to stepping foot in the clinic

for the first time."  *Id.* at 57.  Before its enactment, patients who needed more time "took extra

time," and the procedure "was scheduled to their individual situation."  *Id.* at 84.  After the statute

was enacted, patients who are conflicted and undecided at their first visit, and who decide to have

the procedure, are "more certain and clear" at their second visit.  *Id.* at 85.  However, Dr. Young

pointed out that these same patients "would have waited" and "wouldn't have had a procedure that

day" if they had come to the health center prior to the law taking effect.  *Id.*  Regardless of the

timeframe and whether the mandatory waiting period is 48 or 24 hours, "the barriers and burdens

are still the same and still there" because the law "still requires additional time when the vast

majority of patients do not need additional time to continue to . . . assess their decision."  *Id.* at 85-

86.  Moreover, "[i]t still affects patient autonomy, it affects the ability for women to access

abortion care when they need it, and it impacts the patient-physician relationship."  *Id.* at 128-29.

   Dr. Young testified that § 39-15-202(a)-(h) "causes significant stress and anxiety

regarding the abortion experience."  *Id.* at 118.  "It's distressing for women to have to wait when

they have made a decision that they are certain about." *Id.* at 83. The requirement to wait is also distressing and traumatizing for women who are in abusive relationships,[27] whose pregnancy is the result of rape,[28] and who have a fetal anomaly diagnosis, which often happens "later in pregnancy" (i.e., beyond 16 weeks LMP, putting them closer to PPTNM's gestational age cutoff than the general patient population). *Id.* at 83, 119-20.

Dr. Young testified that § 39-15-202(a)-(h) "negatively impacts patient autonomy because it questions a woman's ability to make a careful and thought-out decision without state intervention." *Id.* at 128. The statute negatively affects the physician-patient relationship because

> [i]t undermines that patient-centered encounter between the patient and the physician, where the patient [sic] isn't able to individualize the care that that patient needs. It also implies to the patient that the physician thinks that the patient needs more time to consider their decision, so that it makes it seem like the physician doesn't trust the patient, that the clinic doesn't trust the patient to make the best decision for her and her family.

*Id.* at 127-28.

Dr. Young opined that "there is no benefit" to the requirement that a patient receive certain state-mandated information in person from a physician. *Id.* at 85. She stated that there is nothing in that information that must be communicated by a physician, and this requirement therefore "is a burden because [it] limits the type of provider that can give that information" and

---

[27] PPMET's electronic health records indicate that between July 1, 2015, and July 31, 2018, sixty-two patients reported being victims of intimate partner violence. *See* JX54 at 7; JX56 at 11. Dr. Young indicated that the number of patients "is likely to be an underestimate, as we know that women underreport their exposure to domestic violence or intimate partner violence." Young, Tr. 9/24/19 (Vol. 2) pp. 121-22; *see also* JX54 at 7; JX56 at 11.

[28] On cross-examination, it was disclosed that PPMET's medical records identified fifteen victims of rape or incest between July 1, 2015, and January 31, 2018. *See* Young, Tr. 9/24/19 (Vol. 2) p. 135; *see also* JX54 at 6-7. On redirect, Dr. Young indicated that based on her experience, this number "would be an underestimate" because "[w]e know that women underreport sexual assaults and rape." Young, Tr. 9/24/19 (Vol. 2) p. 169.

54

limits patients' access to care.  *Id.*  Dr. Young testified that reading a patient state-mandated information that may be irrelevant to her has a negative impact on the physician-patient relationship:

> [I]nformation that is irrelevant but required to be given by the physician undermines patient trust in that relationship.  Patients may think that the physicians themselves desire or think that that information should be given to them, even though we say that it's state-mandated information.  And because patients do not want to wait, they do not want to have a delay, it causes feelings of anger and anxiety that they direct towards the clinic and the provider sometimes.

*Id.* at 84.  In sum, Dr. Young opined that § 39-15-202(a)-(h)

> imposes a burden on women in a few ways.  It decreases their access to abortion care.  It increases both their travel time, their expense.  It increases burdens in terms of having to obtain childcare and just general logistical scheduling of the multiple visits that this law requires.

> This law is also demeaning to women and implies that women have not thought clearly and completely about their decision to obtain an abortion prior to making an appointment or prior to coming to that first visit.

*Id.* at 56-57.

Regarding the "medical emergency" exception in § 39-15-202(f), Dr. Young testified that "[i]t is a very narrow exception and really only provides an exception in extreme medical emergencies."  *Id.* at 122-23.  She has never encountered a patient in the outpatient setting with a condition that would fall under this exception, and in her experience this exception would not apply to "[m]ost patients who present to outpatient health centers" because they "are not at risk of immediate death or irreversible impairment of major bodily function."  *Id.* at 123-24.  Dr. Young opined that patients could have serious medical conditions that would not fall under this exception. For example, hypertension that worsens during pregnancy and becomes severe may put women "at risk for stroke or heart attack or other complication of high blood pressure," but it would not fall under the exception because they would not be at risk of immediate death.  *Id.*  Hyperemesis

gravidarium – a condition that involves severe nausea and vomiting due to pregnancy, may cause

electrolyte imbalances, and "may require multiple hospitalizations, IV, antinausea medications, . .

. and in severe cases, . . . a feeding tube" – negatively impacts women's health and well-being, but

it would not fall under this exception either. *Id.* at 124. That under § 39-15-202(h) a physician

faces criminal penalties or risks suspension or revocation of her license "significantly impacts" a

physician's ability to determine whether a condition falls within the medical emergency exception

out of fear of these potential consequences. *Id.* at 170-72. "[H]aving a serious penalty because of

[someone calling into question your medical judgment] is paralyzing and limiting." *Id.* at 170.

After the statute was enacted PPMET took steps in an attempt to reduce wait times

for abortion appointments. It made several changes to its schedule, "including adding patient slots

. . . to try to accommodate more patients." *Id.* at 103; *see also* JX50 at 25-26. It increased the

number of days that abortions were provided from three to four days per week (before § 39-15-

202(a)-(h) was enacted) to six days per week. *See* Young, Tr. 9/24/19 (Vol. 2) p. 103; *see also*

JX50 at 25-26. This helped alleviate "the longer ends of the wait times, but it never brought wait

times back to what they were prior to the delay law." Young, Tr. 9/24/19 (Vol. 2) p. 103; *see also*

JX50 at 25-26. PPMET added at least six new abortion physicians[29] after § 39-15-202(a)-(h) took

effect, as well as nurses, medical assistants, and patient educators, and it created a full-time medical

director position, which Dr. Young held. *See* Young, Tr. 9/24/19 (Vol. 2) p. 104; *see also* JX50

at 25-26. PPMET "doubled the front-desk staff to increase check-in time and to decrease time

---

[29] Dr. Young testified that Planned Parenthood has difficulty recruiting physicians in
Tennessee because "[t]here is a stigma against the provision of abortion care in Tennessee," and
"[m]any physicians work for institutions that prohibit them from providing abortion care in any
kind of other available time that they might have to provide those services." Young, Tr. 9/24/19
(Vol. 2) p. 104. She stated that it is easier to find a local provider in Nashville than in Knoxville,
but "there is still a need that is unmet in terms of abortion provision." *Id.* at 105.

patients were waiting for that front-desk check-in period." Young, Tr. 9/24/19 (Vol. 2) p. 104; *see also* JX50 at 25-26. As with the additional abortion procedure days, "the addition of staff decreased the longer delay times, but never made the delay times equivalent to what they were before the delay law." Young, Tr. 9/24/19 (Vol. 2) p. 105.

Another way in which PPMET "tr[ied] to combat" longer wait times was by increasing its gestational age cutoff for abortion services. *Id.* In August 2017, the surgical abortion cutoff was increased from 17 weeks and 6 days LMP to 19 weeks and 6 days LMP. *See id.* at 105-06. To implement this change, PPMET had to recruit trained providers, train staff, and obtain additional equipment. *See id.* at 106. This change helped alleviate the problem of patients being past the gestational cutoff "somewhat, but patients continued to miss the cutoff, even with the expansion of the gestational age." *Id.* at 107-08.

The Court finds Dr. Young's testimony to be fully credible and gives it great weight. She testified convincingly that PPMET had a thorough and individualized informed consent process before the statute was enacted, and "over 99 percent of patients were clear about the[ir] decision[s]." *Id.* at 78. Since it took effect, all patients are subjected to the mandatory waiting period without consideration of their individual situations, which undermines patient autonomy and the physician-patient relationship, regardless of whether the waiting period is 24 or 48 hours. The medical emergency exception, which carries serious penalties for physicians, is extremely narrow and inapplicable to nearly all patients in the outpatient setting. PPMET made minimal changes to its informed consent process to comply with the statute's requirements, such as having patients listen to state-mandated information regardless of its relevance. *Id.* Patients who are certain of their decisions experience distress from having to wait for the procedure, and those who are uncertain take more time to make a decision, just as they did before the statute was

57

enacted. Post-abortion regret is uncommon, and Dr. Young saw more undecided patients at first appointments after the statute took effect because of its required waiting period. The majority of abortion patients at PPMET's health centers (60% to 70%) and nationwide (75%) have low incomes, and low-income women have difficulty attending two appointments because of logistics and because the cost of the procedure and associated expenses require them to make "trade-offs." *Id.* at 93. The geographic distribution of the eight abortion providers in just four cities in Tennessee makes it difficult for patients to attend even one appointment.

Further, abortion is a common procedure that is safer than carrying a pregnancy to term. Its risks are rare, but they increase as the pregnancy progresses, making the timing of an abortion medically significant. Timing also affects the effectiveness of a medication abortion and patients' eligibility for this procedure, which is strongly preferred by 70% of patients and is the medically preferred option in some cases. Following the statute's enactment, the number of medication abortions at PPMET decreased, and the gestational age at which abortions were obtained increased. Second trimester abortions are not only riskier, particularly for patients with certain medical conditions, but they are also longer, more painful, riskier, and more expensive than earlier abortions. Before § 39-15-202(a)-(h) was enacted, patients could obtain the procedure within one week of scheduling their appointment; after its enactment, patients must wait up to two months for the procedure. The delay caused by the statute in question makes medication abortion unavailable in many cases, requiring patients to seek a surgical abortion instead, a procedure available at just two clinics (in Nashville and Memphis) up to 19 weeks and 6 days LMP. Women who are unable to access care or who are forced to carry the pregnancy to term face medical and non-medical risks.

University of Michigan psychology and women's studies professor Sara

McClelland, Ph.D., testified that § 39-15-202(a)-(h) "exacerbates existing stereotypes about women" and "contributes to the[ir] stigmatization." McClelland, Tr. 9/24/19 (Vol. 2) p. 177. She indicated that it does the latter

> by lending the authority of the law to exacerbate existing stereotypes of women as irrational or overly emotional, and that by exacerbating these stereotypes, . . . it could both affect how people think about women more broadly, as well as how women think about themselves as incapable of making their own healthcare decisions.

*Id.* at 178. The statute "causes harm" through these "increased stereotypes around women as incapable . . . decision-makers" and because it "teaches women to think of themselves as incapable decision-makers." *Id.* at 188. A woman's experience of having to return in 48 hours for a second appointment to have an abortion "devalues her, it demeans her by insisting that she herself is not the arbiter of her own healthcare," and it tells her that "her own decision of her own healthcare is insufficient." *Id.* at 188-89. In Dr. McClelland's opinion, § 39-15-202(a)-(h) therefore "makes that stereotype truth," causing men and women alike to think of women in that way, which "creates an ongoing stigmatization of her, and the consequences of that have been shown over decades of research to both have psychological and physical detriment to women's health." *Id.* at 189. Dr. McClelland's opinion would not change if the mandatory waiting period were 24 hours instead of 48 because "[t]he effects of stigmatizing a group of people would be the same regardless of the amount of time that was stated in the law, between 24 and 48 hours. The stigmatization has already occurred in that case. It doesn't matter for how long." *Id.* at 178.

Dr. McClelland testified that "what starts out relatively benign in terms of labeling [human differences]" may lead to stereotyping, a "sort of us and them" separation, and discrimination, and these events "can really take on negative consequences for particular groups." *Id.* at 179-81. Dr. McClelland referenced a meta-analysis, i.e., a study of studies, that found

"negative health effect[s] of both feeling and perceiving discrimination," including "high blood pressure, increased rates of cardiovascular disease, increased rates of cortisol secretions, as well as . . . psychological outcomes, such as depression, anxiety, and increased . . . substance use." *Id.* at 187-88. Dr. McClelland stated that stigma and stereotypes, which may turn into stigma, have negative health implications and that "stigma has, for decades, been found to be incredibly harmful for people's mental health." *Id.* at 179. Stigma has a "wear and tear" effect on people physically and physiologically. *Id.* at 186-87. According to Dr. McClelland, "thousands of studies . . . show the harmful effects of gender stereotypes across contexts, across time." *Id.* at 186.

Dr. McClelland further testified that "policies have the potential to teach people to think negatively about groups," which § 39-15-202(a)-(h) does because it "reinforces the stigmatization of women through reassociating women with poor decision-making or too emotional or irrational ways of thinking, . . . such that it then reinforces those ideas, both teaching people in general that's how women are and teaching women to think of themselves that way." *Id.* at 181. Examples of other policies or legislation that have created or reinforced such stigma are mandatory drug testing of welfare recipients and same-sex marriage bans. *See id.* at 181-84. These policies' "legislative environments" "created negative consequences for those . . . separated and considered in an us/them model," *id.* at 182, "where those who are [separated or] stereotyped [a]re considered to lose power and lose status." *Id.* at 180. They are similar to § 39-15-202(a)-(h) because they use the authority of the law to organize and teach a population to think about a group of people in a negative light. *See id.* at 185. This type of legislation "makes these stereotypes incredibly hard to resist, and there's quite a bit of psychological research in which it's very hard to undo stereotypes once they're put into place." *Id.* Dr. McClelland explained that these examples were useful in her analysis of § 39-15-202(a)-(h) because "they help us see the empirical evidence

of what happens when these kinds of laws are in place" given that "these studies . . . very usefully and importantly show the development of stigma and the mechanisms of stigma are the same across contexts." *Id.*

The Court finds Dr. McClelland's testimony to be fully credible and gives it great weight. She testified convincingly that, regardless of the mandatory waiting period's duration, § 39-15-202(a)-(h) "exacerbate[s] existing stereotypes" of women as irrational, overly emotional, and incapable decision-makers. *Id.* at 178. The challenged statute reinforces these stereotypes and therefore contributes to the stigmatization of women, and stigma has been shown to have negative physical and psychological health implications. While Dr. McClelland has not conducted direct research in Tennessee, *see id.* at 185-86, her opinions are based on "a study of how stigma operates, and especially how it operates within legislative environments," as well as "close review of the empirical and theoretical research in the social sciences, in particular, sociology and psychology." *Id.* at 196. Dr. McClelland indicated that "the mechanisms of stigma are quite similar regardless of where they show up." *Id.* As a result, "the analogous case studies help us understand the health consequences for living in stigmatizing environments," and they are "used to then draw conclusions about how the mandatory delay law would operate similarly." *Id.* at 196-97.

University of Houston sociology professor Sheila Katz, Ph.D., testified that since its enactment in 2015, § 39-15-202(a)-(h) "has created . . . barriers and burdens on low-income women," including "financial burdens," "logistical burdens," and "social-psychological burdens." Katz, Tr. 9/24/19 (Vol. 2) p. 213. She stated that these burdens would be no different if the waiting period were 24 hours instead of 48. *See id.*

Dr. Katz indicated that poverty is typically measured in the United States by using

the federal poverty guideline, a dollar amount published annually by the United States Department of Health and Human Services.[30]  *See id.* at 213-14.  Because "[t]he federal poverty guideline is widely recognized by social scientists as an inadequate measure of poverty in the United States," social scientists, social programs, and government agencies use both the federal poverty guideline and 200% of the federal poverty guideline in referring to low-income or "near low-income" individuals.  *Id.* at 214.

Dr. Katz stated that "a family living under 200 percent of the poverty line is still poor" and is "not making ends meet."  *Id.* at 215.  "[A] family at 200 percent of the poverty line or below is living in a much more financially precarious situation than just paycheck to paycheck. There are [basic] needs that are going unmet in those households," such as "adequate and safe housing," utilities, "nutritious food," healthcare, and transportation.  *Id.*  Getting a flat tire while driving to work may be "an annoyance" or "an inconvenience" for a "middle-income or upper middle-income person"; however, for a low-income family, such an event "will throw their delicate balance off entirely."  *Id.*  Further:

> There's a couple of different pieces to this.  One, low-income families drive cars that are much older than – the average age of their vehicles is older than middle- and higher-income people, so a flat tire might damage the car more than it would a newer or nicer car.
>
> Low-income people usually work in jobs that have a lot less flexibility for being late to work or having an unexplained absence. . . .
>
> So it's something that an upper middle-class person would think of as simple and maybe annoying, but for a low-income family, it can be a tragedy that kind of sets in motion a series of other problems, if the person loses their job or even just loses the income from those missed hours of work, plus the cost of having a flat tire.

---

[30] In 2019, the federal poverty guideline for an individual was $12,490.  *See* Katz, Tr. 9/24/19 (Vol. 2) p. 214.  For each additional member of the household, the dollar amount increases by slightly over $4,400.  *See id.*  Based on these numbers, a single mother with two children who earns under $21,330 would be considered "poor."  *Id.*

*Id.* at 216.  Data from the United States Census Bureau's American FactFinder shows that Tennessee is the eleventh poorest state in the country and that the poverty rate in Tennessee in 2016 was 17.2%.[31]  *See id.* at 217.  "[T]his level of poverty" means that "there are more families that would experience th[e] sort of imbalance and sort of crisis" described above.  *Id.* at 216; *see also id.* at 219 ("[B]ecause Tennessee is the eleventh-poorest state, . . . more families are experiencing this [in Tennessee] than in states that have less poverty.").

> Dr. Katz also testified that
>
> poverty disproportionately affects women in the United States.  Women are more poor than men, so they have a higher poverty rate, and . . . they are also more likely to be taking care of dependents in their household, so they have less resources to take care of more people.

*Id.* at 217-18.  Dr. Katz estimated that "[a]pproximately half a million" women in Tennessee are living under the federal poverty guideline, and "hundreds of thousands more" are living from 100% to 200% above the federal poverty guideline.  *Id.* at 222.

> Women living under 200% of the poverty line "have a very hard time meeting the basic needs of themselves and their household."  *Id.* at 218.  These women live in housing that is unsafe or inadequate for their family's needs, they cut back on utilities like air conditioning or heat, they sacrifice their own food intake and their own nutrition to give their children enough to eat, and they avoid going to the doctor or filling prescriptions because they cannot afford to do so.  *See id.* at 219.  An unexpected emergency or expense "puts the family at grave risk" because it "throws [into question] the already sort of precarious balance that [low-income women are] trying

---

[31] Dr. Katz indicated that at the time of her testimony, the United States Census Bureau had released poverty data numbers for 2017 but not "the 2018 state-level numbers."  Katz, Tr. 9/24/19 (Vol. 2) p. 217.  She stated that any changes in the data do not affect her analysis because "[t]he poverty rate does change by a couple of tenths of a percent each year, but overall, the overall picture of poverty in Tennessee is unchanged."  *Id.*

to maintain to not be evicted, to not have utilities shut off, to make sure the children have food and basic medical needs are met." *Id.* at 229-30.

Citing the United States Census Bureau's American FactFinder, Dr. Katz indicated that in Tennessee "women have a poverty rate of 18.5 percent" and "men have a poverty rate of 15.8 percent." *Id.* at 218. One factor that contributes to this difference is that Tennessee does not have a minimum wage and therefore the federal minimum wage of $7.25 per hour applies. *See id.* at 219. A person who lives alone and who works full time for an entire year earning the federal minimum wage is "making approximately [100% of] the poverty line" but "significantly under . . . 200 percent of the poverty line." *Id.* at 219-20. If the person has children or dependents, the household would be below the poverty line. *See id.* at 220.

Dr. Katz testified that 23.9% of working poor[32] households are headed by women, and 14% of working poor households are headed by men. *See id.* This difference in percentages shows that "[w]orking poor households are much more likely to be headed by women." *Id.* Moreover, "the number of women who are classified as working poor is higher than the number of men who are classified as working poor." *Id.* Using fair-market rent data from the United States Department of Housing and Urban Development for the cost of rent in Knoxville, Memphis, and Nashville, Dr. Katz testified that a Tennessee woman "working full-time year round at minimum wage" (i.e., "working poor") is paying "between half to three-quarters of her monthly income on rent in these cities. We know that then there's not enough money left over to pay for the rest of the expenses, for her utilities, for food, and to meet other basic needs." *Id.* at 221-22.

"[F]amilies headed by single mothers tend to be low income"; approximately half

---

[32] Social scientists and the United States Department of Labor use the term "working poor" to refer to "a person who is working approximately full-time year round, but is still making very close to the poverty line." Katz, Tr. 9/24/19 (Vol. 2) p. 220.

of the families in Tennessee headed by single mothers are living at or below 125% of the federal poverty guideline, and one-third of them are living at or below the federal poverty guideline. *Id.* at 222-23. In addition, 18.2% are living in "deep poverty," a term meaning less than 50% of the poverty line. *Id.* at 223. People living in deep poverty "are just not making ends meet in any way." *Id.* The deep poverty rate has been decreasing globally over the last twenty years, but it is increasing in the United States, particularly in the Southeast. *See id.* In Tennessee "overall, 7.5 percent of Tennesseans live in deep poverty, but of people who are poor, 43.5 percent are in deep poverty. So almost half of people who are poor are in deep poverty." *Id.* Further, based the United States Department of Agriculture's measures, nine counties in Tennessee have "persistent poverty" and fifty-three are at risk of falling in this category. *Id.* at 224. "[P]ersistent poverty is a measure that the poverty rate at the county level has been above 20 percent for approximately the last 40 years." *Id.* A family living in an area that has persistent poverty lives in a place with "significantly less resources for emergencies or unexpected expenses, and less economic opportunities to . . . meet those needs." *Id.* at 224-25.

Dr. Katz testified that on a national level 75% of women seeking abortions are poor or low income, meaning under 200% of the federal poverty guideline. *See id.* at 226-27. Further, "approximately two-thirds of women who obtain abortions in Tennessee already have[] at least[] one child, so the women who . . . seek[] abortions are providing for themselves, [and] also for dependents." *Id.* at 227. Together these figures "suggest[] that the overwhelming majority of women seeking an abortion in Tennessee are already mothers and are either poor or near low-income." *Id.* Dr. Katz stated that plaintiffs' data on the income levels of their patients "supports the national data and my assessment of it." *Id.*

Dr. Katz testified that § 39-15-202(a)-(h) imposes "a handful of different categories

of burdens" involving transportation, travel, childcare, time away from home or a job, lost wages, and raising unexpected funds for the procedure, as well as funds for travel and childcare. *Id.* at 228. The statute also creates "psychological hurdles." *Id.* "[T]ransportation barriers and logistical barriers . . . make[] it much harder to access [abortion] service[s]," *id.* at 226, and apply in particular to poor and low-income women seeking an abortion in Tennessee because of the state's high poverty rate and "not . . . small geographic area" that make transportation "more difficult." *Id.* at 227-28.

Because of the small number and location of abortion clinics in Tennessee, "women are traveling some distance to access that service" and "accessing an abortion in Tennessee comes with a travel burden." *Id.* at 232. Section 39-15-202(a)-(h) "creates a significant additional burden and expenses and stress" for women who must travel for abortion services. *Id.* at 240. The research analyzing the effect of increased travel on women seeking an abortion concludes that "low-income women experience travel burdens and hurdles associated with accessing an abortion from not having access to a car, not having access to reliable public transportation systems, and the schedules of those transportation systems being out of sync with the services that the person is trying to access." *Id.* at 228-29. Dr. Katz indicated that this finding "is consistent with Tennessee women seeking an abortion after the implementation of th[e] law [at issue]" and is consistent with her own research. *Id.* at 229. Because Tennessee does not have a statewide public transportation system, alternatives for transportation mostly include a private car or a bus service, like Greyhound. *See id.* at 232. Approximately 10% of households in Tennessee cities do not own a car, "but this percentage is much higher for low-income households." *Id.* at 234. Low-income families own fewer cars per household, and the cars they own are older and in worse mechanical shape, as compared to the number and condition of cars owned by middle- and upper-income

66

families.  *See id.* at 225-26.  Even if a low-income woman is in a household with one car, low-income families with one car prioritize the man's job for use of the car over all other household uses.  *Id.* at 234.

Dr. Katz calculated that on the low end in terms of travel distance, women seeking an abortion would make a twenty-five-mile round trip from, for example, Johnson City to Bristol, which would take at least ninety minutes and would cost under five dollars in gas or between twenty four and forty dollars for a Greyhound bus ticket.  *See id.* at 233.  Dr. Katz stated that five dollars is almost what someone earning the federal minimum wage is paid for an hour of work.  *See id.* at 234.  Low-income families, particularly those headed by single mothers, do not have disposable income, and therefore paying for gas or buying a bus ticket requires them to make sacrifices in other areas.  *See id.* at 235.  Even a small amount of money for such a trip "can have a tremendous impact on low-income women" and "can cause an upset in a delicate balance [as] [they] attempt to meet their families' basic needs."  *Id.* at 234-35.  In addition to having to cover the cost of travel, the loss of wages while traveling increases the cost of the trip.  *See id.* at 234.  A round trip can take more than one day, depending on factors such as the distance traveled, the provider's schedule, and the bus schedule, and it may require an overnight stay.  *See id.* at 239.  Low-income women also have difficulty reserving a hotel room in advance because of their limited access to the internet and credit cards.  *See id.* at 240.  If they are able to reserve a hotel room, they may not have enough money to pay for it.  *See id.*

Dr. Katz testified that travel burdens – going to an unfamiliar city, arranging transportation, taking time off from work, obtaining childcare, managing privacy and confidentiality concerns – exist whether the distance traveled is 50 or 100 miles.  *See id.* at 256, 280.  These burdens are also present when poor or low-income women accesses abortion services

in their own cities. *See id.* at 280. Dr. Katz stated that "even small changes in distance can affect service utilization," a finding that is reflected her own research, in the broader literature, and in the literature on access to abortion. *Id.* at 230-31.

Specifically regarding childcare, because § 39-15-202(a)-(h) requires that a patient see a provider twice, at least 48 hours apart, a woman with children must pay twice for childcare or coordinate twice to leave her children with someone who can watch them. *See id.* at 241. Childcare centers are typically open from early mornings to early evenings, running parallel to the typical work schedule. *See id.* However, evening and overnight childcare are "very, very expensive" and not widely available. *Id.*

Regarding lost wages, Dr. Katz testified that "41 percent of working parents with household incomes below twice the federal poverty line do not receive paid sick leave, vacation days, personal days, or other forms of compensated leave." *Id.* at 242. It is also very difficult for low-income workers, who are often seen as disposable, to obtain unpaid leave. *See id.* They may risk their jobs by asking for a day off, asking for consecutive days off, or requesting changes to their work schedules, which are often unpredictable, irregular, and made by employers on a week-by-week basis. *See id.* at 242-43. Therefore, coordinating time off from work with the clinic's availability and transportation to the clinic is a difficult balance that involves both risks and expense. *See id.*

Dr. Katz stated that "having to pay [travel and associated] expenses twice isn't just like multiplying it by two, but it becomes more exponential[;] . . . arranging it all for one visit is very different than arranging it for two visits close together." *Id.* at 257. Dr. Katz concluded that § 39-15-202(a)-(h) "has a significant impact" on the lives of poor and low-income women who seek an abortion and that "low-income women may not be able to access this service" as a result

of it.  *Id.* at 256-57.  "For the ones who do manage to arrange this and raise the money, I really worry – and the literature supports this concern – that they would be unable to provide for themselves, their children, or they put themselves at grave risk."  *Id.* at 257.  Poor and low-income women raise money in an emergency or unexpected situation by sacrificing basic needs, such as rent, utilities, food, and healthcare; through predatory loans; and by borrowing money from abusive partners or ex-partners, which puts their safety at risk.  *See id.* at 243-44.  They may resort to these methods to cover as little as a fifty-dollar expense.  *See id.* at 244.  As part of her research, Dr. Katz asked low-income women about needing twenty dollars for an emergency, and "they report that they have no one to turn to, and they don't know how they would come up with that."  *Id.* at 244-45.

Dr. Katz cited a 2006 study that found that 58% of the women surveyed reported wanting to have an abortion earlier but experienced delays because of financial and logistical hurdles.[33]  *Id.* at 248-49.  This response was more common among women with later gestational ages (32% of women at 6 weeks LMP or earlier; 52% of women in their first trimester; 91% of women in their second trimester).  *See id.* at 249-50.  It was also more common among poor women than women above 200% of the poverty line.  *See id.* at 250.

The Court finds Dr. Katz's testimony to be fully credible and gives it great weight. She testified convincingly that § 39-15-202(a)-(h) imposes various burdens on low-income women

---

[33] On cross-examination, Dr. Katz agreed that the reasons for the delay that were identified by the study included that it took a long time to make arrangements (59% of women), that it took a long time to decide (39% of women), that it was a difficult decision to make (27% of women), that there were religious or moral concerns (10% of women), and that there was a legally-required waiting period (2% of women; 2% of first trimester patients and 1% of second trimester patients). *See* Katz, Tr. 9/24/19 (Vol. 2) pp. 273-75.  In responding to questions about these different reasons and their percentages, Dr. Katz stated that "this article was published in 2006, and the legally mandated waiting periods have increased since 2006."  *Id.* at 275.

that substantially limit their access to abortion or prevent them from accessing this service altogether. These burdens would exist even if the statute's 48-hour waiting period were instead 24 hours. The Court accepts Dr. Katz's statements that 75% of women seeking abortions are poor or low income, i.e., with incomes under 200% of the federal poverty guideline, and that "the overwhelming majority of women seeking an abortion in Tennessee are already mothers and are either poor or near low-income." *Id.* at 227.

In defense of § 39-15-202(a)-(h), defendants first called Bowling Green State University psychology professor Priscilla K. Coleman, Ph.D., who testified that the statute benefits women because it enables them to decide whether to terminate a pregnancy "in a way that is fully informed" and "time is needed to maximize human decisional processes." Coleman, Tr. 9/25/19 (Vol. 3-A) pp. 32-33. Dr. Coleman based this opinion on research showing that women seeking an abortion have "fairly high levels of decisional ambivalence and uncertainty," between 25% to 40%.[34] *Id.* She also based it on her understanding that women at an abortion clinic receive information they may not have seen beforehand regarding the risks and benefits of abortion and childbirth, as well as resources for those wishing to carry a pregnancy to term. *See id.* at 33. In addition, Dr. Coleman indicated that her opinion is based "generally" on

> the research that I cited in my primary report. It's based on research I've conducted. It's based on extensive review of research by others, many studies that I did not cite – can't cite everything, but the last 25 years, I have stayed on top of everything that's published on this topic, so I have had a high level of experience broadly studying this topic, and so it's based on all my review of studies that have been published; my own research, you know, my education and training in the methods of science.

---

[34] Later in her testimony, Dr. Coleman provided a larger range for the percentage of women seeking an abortion who experience decisional ambivalence or distress: "[T]he studies indicate that approximately 25 to 40, 50, in that range – a lot of different studies on ambivalence and decisional distress or difficulty. Each study kind of describes it differently . . . ." Coleman, Tr. 9/25/19 (Vol. 3-A) p. 45.

*Id.* at 33-34.

Dr. Coleman characterized abortion as a medical procedure "that is unlike any other because it involves two biological systems, and the result of an abortion is the destruction of one." *Id.* at 34-35. She stated that the decision to have an abortion is "unlike any other" because "a significant, important percentage of women" "view the developing embryo or fetus as a human being." *Id.* at 35. Data in "peer-reviewed journals indicates that a significant percentage of women . . . see the termination as having moral implications" and "[a]bout 25 to 50 percent of women, depending on . . . the particular study, are aware that there's more to an abortion than a simple medical procedure" and that it may have "relational aspects," "social aspects," or "spiritual aspects." *Id.*

There is a standard decision-making process "that involves looking at what are our options, what are the strengths and weaknesses of each option, and then afterwards, how effective was it in terms of meeting our goals?" *Id.* at 41-42. Stress and emotion play a role in the abortion decision-making process because "a sizeable number of women do enter the clinic with significant stress . . . related to the fact that it's an unplanned – typically unplanned, untimed pregnancy." *Id.* at 35-36. The decision to have an abortion is "not an easy decision for many women" and "could have lifetime implications for them in terms of their psychological and physical health." *Id.* at 36. Women may also experience other forms of stress, such as from intimate partner violence, which Dr. Coleman indicated may affect approximately 30% of women, according to "a meta-analysis by Hall" that she reviewed. *Id.* Dr. Coleman stated that "most of the research that I've reviewed and described involves stress in a real-life situation, one that has long-term implications for some women," as opposed to laboratory-based or hypothetical situations. *Id.* at 43. "[M]any settings" have indicated that abortion is a significant stressor "not for every woman, but for a sizeable

71

percentage." *Id.* at 42.

> Dr. Coleman stated that
>
> [w]hen we're under stress, like in the context of deciding what to do about an unplanned pregnancy . . . , the type of reasoning, the type of decision-making that we do, tends to be more emotionally based rather than analytical, rational, thoughtful. We make more hurried decisions when we're under stress.

*Id.* When asked about women who have five to ten minutes "to meet with the physician, finish the informed consent, and have the procedure start, particularly for a medication abortion," Dr. Coleman stated that her "opinion, based on all of the review of the literature, is that when they only have five or ten minutes, and you're stressed to begin with – and this is based on lots of studies – your decisional processes are compromised." *Id.* at 44-45. For women deciding whether to have an abortion, Dr. Coleman stated that a decision "of this magnitude, which it is for many women," results in stress that causes the body to release hormones, including cortisol, and that the body's physiological responses to stress "impact the brain as well, and it makes it much more difficult to arrive at a decision without some time." *Id.* at 36-37. Therefore, Dr. Coleman opined that "[i]t's important for the woman to get out of that acute stress state and have time to consider her options and what's best for her as an individual." *Id.* at 37. Dr. Coleman believes that § 39-15-202(a)-(h) "allows for [women] to make a good decision" because it gives them opportunities to evaluate the state-mandated information, to consider "the pros and cons of each decision," and to contact agencies that can help them continue the pregnancy, if that is their preference. *Id.* at 42-43.

Dr. Coleman conceded on cross-examination that she is not an expert in the brain's physiological functions in connection with decision-making and that she does not have research experience in the psychology of decision-making generally, divorced from the topic of abortion.

*See id.* at 80-81.  She also conceded that she has not conducted research quantifying the amount of time it takes to make a stressful decision or to achieve decisional certainty.  *See id.* at 81.  None of the studies she identified concerning stress and decision-making "directly apply" to 48-hour waiting periods, *id.* at 107, 110-11, and Dr. Coleman's deposition testimony is that "[t]he nature of this type of work on this decision-making is not directly analogous.  It requires a, quote, leap." *Id.* at 112.  On redirect, Dr. Coleman indicated that she could not find studies on 48-hour waiting periods that were conducted in a clinical setting and that she is not aware of any.  *See id.* at 124. She stated that she "found no studies that indicated that extra time hurts decision-making."  *Id.*

Dr. Coleman opined that "counseling is beneficial" for women in the abortion context.  *Id.* at 45-46.  However, she could not recall a study "that actually looks at what [women] know about the procedure" when they arrive at an abortion facility.  *Id.* at 47.  Dr. Coleman referenced a 2013 study in which nearly 1,000 women were asked what topics they wanted to discuss during counseling sessions.  *Id.* at 57.  Results included information about the procedure (82%), the women's doubts (40%), information on consequences (73%), the reasons for the abortion request (36%), and alternatives (not specified).  *See id.* at 56-57.

Referring to studies showing that between 25% and 50% of women experience decisional ambivalence or distress, Dr. Coleman testified that "a good percentage of women . . . may need some help . . . in making that decision, so we do know that there is significant ambivalence, decisional distress, [and] there may be pressure or coercion."  *Id.* at 46.  She listed ways in which a woman might feel pressured:  "active coercion [by] a perpetrator of domestic violence," financial pressure, "life pressure," pressure from partners, or pressure from parents.  *Id.* She stated that these forms of pressure may make women who would like to continue the pregnancy feel that they have no choice but to have an abortion.  *See id.*  There is "quite a bit of

73

research" on partner pressure to abort "showing different ranges in terms of percentages, but at least 10 percent probably experience pressure, and the pressure is a variable associated with poor outcomes later." *Id.* at 60. Dr. Coleman stated that research also shows that a woman who wants to continue the pregnancy but is pressured into making a different decision is more likely to suffer sadness, depression, guilt, anxiety, and posttraumatic stress disorder ("PTSD"). *See id.*

Dr. Coleman indicated that there is "uniformity . . . among practitioners and academics, that if women have certain characteristics or certain ways of viewing this decision, if they're coerced, if they're ambivalent, if they're uncertain, if they feel some bonding to the child, then they are much more likely to have adverse psychological consequences." *Id.* at 46-47. The risk factors for poor post-abortion adjustment with "the most robust support in the literature" include "prior psychological problems"; pre-existing depression and anxiety, suicidal thoughts, and substance abuse; ambivalence and decision difficulty; pressure or coercion from partners, parents, or someone else; feelings of bonding or attachment to the fetus; age; religious beliefs; and values that are at odds with the decision to have an abortion. *Id.* at 57-58. Dr. Coleman believes § 39-15-202(a)-(h) is beneficial because "when you add up all the risk factors, a significant proportion of women have one or more risk factor, so if they're more likely to have a psychological problem afterwards, of course, a little bit of time could be helpful." *Id.* at 58.

Regarding mental health history as a risk factor, Dr. Coleman testified that women who have "a prior mental-health problem . . . experience more decisional difficulty, so they are . . . more likely to need time and counseling to arrive at the best decision," and "they're more likely to have postabortion mental-health problems." *Id.* at 55-56. Studies "suggest that if women have a prior mental-health problem, whether it's depression, anxiety, just a range of mental-health challenges, then they're more likely to experience an abortion as traumatic." *Id.* at 54. Dr.

Coleman agreed that it is "universally recognized that women seeking an abortion have higher-than-average rates of pre-existing mental-health issues." *Id.* at 55. Regarding decisional ambivalence as a risk factor, Dr. Coleman stated that because it is "a predictor of adverse outcomes," if a woman is "not ambivalent, she's less likely to have a mental-health problem." *Id.* at 70-71.

Regarding decisional difficulty or ambivalence, Dr. Coleman relied on a 1995 study, which she explained had "339 participants, and nearly a third said they were in doubt as to whether the decision to seek an abortion was right for them." *Id.* at 49-50. This study was not performed in the United States, but Dr. Coleman indicated that it is common practice in her field to rely on international, as well as domestic, studies because "the experience of deciding whether or not to continue a pregnancy involves kind of universal decision-making processes" and "there's a lot of universality to the decision of whether or not to continue a pregnancy." *Id.* at 50-51.

Dr. Coleman testified that there is a "high probability" of women feeling guilty and regretting an abortion, and therefore they should "have time and counseling to arrive at the decision that's best for them." *Id.* at 53. Dr. Coleman stated that studies show that between 25% and 75%[35] of women "feel some level of guilt after undergoing a procedure." *Id.* at 52-53. She stated that "indicators that are more likely to be linked to feelings of guilt" include a woman's religious views and a desire to continue the pregnancy. *Id.* at 53. Dr. Coleman indicated that "with that guilt, [women] may experience regret," and that "they may really regret their decision" "[i]f the guilt becomes monumental" or "too much to bear." *Id.* Dr. Coleman noted that she published a study

---

[35] Dr. Coleman stated that "[s]ome studies showed 25[%]"; "a study published in The Los Angeles Times back many years ago . . . was around 50 percent"; and "a study we . . . did involving Russian and American women published in 2004 in The Medical Science Monitor . . . found even higher rates, like close to 75 percent." Coleman, Tr. 9/25/19 (Vol. 3-A) p. 52.

in 1998 in which 38% of women who had an abortion regretted their decisions. *See id.*

On cross-examination, Dr. Coleman agreed that "many women will not regret their decision to have an abortion" and "many women will feel abortion was the right decision retrospectively." *Id.* at 86. She confirmed that in forming her opinion that abortion may cause feelings of guilt, she relied on "the Skelton article," which was a newspaper poll, not a peer-reviewed study, and "the Brown article," which was a survey of anonymous letters written to a pastor at a church in Florida. *Id.* at 103-05. On redirect, she stated that she relied on other peer-reviewed articles on abortion and guilt, including a paper that compared guilt among women in Russia with women in the United States. *See id.* at 121-22. She found the Brown article valuable because "they reported numerical values" and because the letters showed women's experiences regarding abortion. *Id.* at 122-23.

Dr. Coleman testified that "the strongest studies" show that "abortion operates as a significant risk factor for mental-health issues afterwards."[36] *Id.* at 62. Adverse mental-health outcomes include depression, anxiety (generalized anxiety or PTSD), phobias, suicidal ideation (thoughts about suicide or "suicide completed"), and substance abuse. *Id.* at 63.

Dr. Coleman testified that a 2013 Italian article "shows that there are mixed findings, but predominantly studies show that abortion operates as a risk factor" because "[t]hirteen studies showed a clear risk for at least one of the reported mental-health problems in the abortion group versus childbirth, five papers showed no difference, and . . . only one paper reported a worse mental outcome for childbirth." *Id.* at 67. Dr. Coleman also cited a 2006 study ("the Klick study") that concluded that "when there is a mandatory waiting period in effect, there's

---

[36] Dr. Coleman clarified that her opinion is not that abortion causes mental health issues because of difficulties determining causality, particularly in a single study. *See* Coleman, Tr. 9/25/19 (Vol. 3-A) pp. 63-65, 98-99.

76

. . . significantly lower suicides among women." *Id.* at 72-73. This was "a broad-stroke analysis" that found "correlation" by looking at the suicide rates in states that had a mandatory waiting period law; the study "just look[ed] at suicide rates" and "didn't follow the women." *Id.* at 73.

On cross-examination, Dr. Coleman indicated that the Klick study was published in a journal that is not a peer-reviewed social science journal, and she stated that she was not aware that the journal has a 0.769 impact factor.[37] *See id.* at 101. She conceded that this study examined women who were twenty-five to sixty-four years old and excluded women who were eighteen to twenty-four years old, and that women between the ages of forty-six and sixty-four are less likely to be pregnant than women between the ages of eighteen and twenty-four. *See id.* at 102. Dr. Coleman also conceded that the Klick study has been severely criticized.[38] *See id.* On redirect, she stated that it was peer-reviewed and published in a law and medicine journal. *See id.* at 120.

On cross-examination, Dr. Coleman agreed that in reaching her opinion that abortion increases the risk of negative mental health outcomes she relied on seven articles she co-authored with Reardon, whom she described as "too political and not good at statistics and writing," *id.* at 86-89, and that she relied on three articles she co-authored with Vincent Rue, whom she believes is "too politically minded" and "wants to insert political comments into academic studies." *Id.* at 90. She was aware that Rue had been excluded from testifying "in *Casey*." *Id.*

---

[37] According to Dr. Coleman, an impact factor is "an index of the quality of a journal and how widely cited particular articles are in that journal. Only about 20 percent of journals across all fields have an impact factor of 3.0 or higher." Coleman, Tr. 9/25/19 (Vol. 3-A) p. 19. The higher a journal's impact factor is, the more difficult it is to get published in that journal. *See id.*

[38] In an article published in April 2009, Theodore J. Joyce and his co-authors wrote that "Klick's findings lack transparency and plausibility" and that "it is unclear why Klick included suicide rates from 1981 when the first laws were not enforced until 1992. Nor did he analyze the association between suicide rates and mandatory counseling and waiting-period laws in the earlier period, which accounts for over 60 percent of the sample." Coleman, Tr. 9/25/19 (Vol. 3-A) p. at 103.

Dr. Coleman indicated that she has collaborated with Reardon on more than ten articles or presentations, *see id.* at 87, and has collaborated with Rue on more than ten articles. *See id.* at 89.

Dr. Coleman discussed her own meta-analysis[39] entitled "Abortion and Mental Health: A Quantitative Synthesis and Analysis of Research Published from 1995 Through 2009," which was published in 2011 in the *British Journal of Psychiatry*. *Id.* at 69. Dr. Coleman explained that "the quality of [a] meta-analysis depends on the studies that you're putting into it, and I strove to identify the strongest studies based on methodological criteria that were published from 1995 to 2009." *Id.* Among these studies were some of Dr. Coleman's own studies. She included her own studies "[b]ecause they met criteria. I wasn't going to leave out my studies just because I'm doing the meta-analysis." *Id.* at 72. She stated that doing so is customary practice "because, typically, people conduct a meta-analysis when they've done a lot of research in that area." *Id.* Dr. Coleman summarized the key findings of her meta-analysis as follows:

> [T]he primary analysis showed that women who have an abortion history, compared to those who do not, have an 81 percent increased risk of experiencing a mental-health problem of various forms. And what's also significant here is, they calculated the population attributable risk statistics that's based on its ratios, it revealed that 10 percent of the incidence of mental-health problems were directly attributable to abortion.

*Id.* at 70.

On cross-examination, Dr. Coleman confirmed that she was the sole author of her meta-analysis and that of the twenty-two studies on abortion and mental health outcomes that she analyzed and summarized, she was the author or co-author of half of them. *See id.* at 95. Other than students who worked with her, she did not have a professional in the field conduct an

---

[39] A meta-analysis combines data from multiple studies. *See* Coleman, Tr. 9/25/19 (Vol. 3-A) p. 95. It "is a quantitative review of the literature. . . . [It] takes data from various studies and puts it onto a single metric, so it provides a numerical summary of the reports that have been published." *Id.* at 68.

78

independent review of whether her inclusion criteria were appropriate and whether the studies she used satisfied these criteria. *See id.* at 95-96. In her meta-analysis, Dr. Coleman did not describe the unpublished rubric she created for evaluating studies, and she did not mention all of its nine parameters. *See id.* at 96-98. On redirect, she indicated that her meta-analysis was peer-reviewed and "submitted to other researchers who do meta-analyses." *Id.* at 119-20.

Considering the information she reviewed on decisional difficulty and ambivalence, and on feelings of regret and guilt, Dr. Coleman opined that "a significant percentage of women need time to make a decision . . . that . . . [has] the possibility of such serious and long-term consequences." *Id.* at 77. She testified in favor of a mandatory waiting period as follows:

> I just think two days in a woman's life to . . . get the information they may not have, seek out alternative information, and then if everything winds up, then they go ahead and go through with the abortion, and, ideally, they'll be more certain if there's a couple days. I think we want everybody to be as certain as possible.
>
> * * *
>
> When women are certain of their decisions, they're much less likely to have an adverse response later.

*Id.* at 78. She also testified that the waiting period requirement is beneficial "particularly in sensitive cases like domestic violence and fetal anomaly, where it's more involved and the recommendations . . . from professionals tend to be in the direction of abortion." *Id.* at 77-78.

On cross-examination, Dr. Coleman disclosed that she believes that abortion is never the right decision and is never beneficial for a woman unless her life is in imminent danger. *See id.* at 82. She agreed that she believes abortion should not be legal except when a woman's life is in imminent danger. *See id.* She supports restrictions on abortion and agreed that she could not name a restriction she does not support. *See id.* at 83. In each of the twenty-four cases in which she has been involved as an expert, Dr. Coleman testified in support of the abortion

restriction at issue and did not opine that it was harmful to women's mental health. *See id.* at 90-91. She could not name an example of an abortion restriction that she believes may be harmful to women. *See id.* at 91. Dr. Coleman has testified before legislative bodies in support of abortion restrictions, *see id.* at 90, and she has spoken at events sponsored by organizations that oppose access to abortion. *See id.* at 91-92. She has spoken for National Right to Life "fairly often" and before the American Association of Pro-Life OB/GYNs "often." *Id.* at 92. She has also spoken for state right-to-life groups. *See id.* On redirect, Dr. Coleman indicated that she is not a member of any pro-life organization. *See id.* at 114-15. She stated that her personal views on abortion do not affect her research and findings, which are based on data she did not collect, systematic research, and protocol. *See id.* at 114. She answered affirmatively when asked if her research is based on the usual and customary practices in the area of psychology and not her personal viewpoint. *See id.*

Dr. Coleman believes that there is political bias in most of the mainstream journals in her field. *See id.* at 92. She believes that major medical journals often ignore the foundation and methods of science to serve political ends. *See id.* at 94. She also believes that the peer-review process in her field "is blind to scientific deficiency as long as the results support abortion-rights initiatives" and that numerous scientists "have suspended personal and professional ethics to safeguard women's rights to abortion." *Id.* at 94-95. These opinions are based on her experience with the submission and review process of journal articles for publication. *See id.* at 117.

The Court finds Dr. Coleman's testimony not credible and not worthy of serious consideration. Dr. Coleman conceded that she is not an expert in decision-making separate from the topic of abortion. The Court notes that Dr. Coleman's testimony contained generalizations (i.e., "a significant, important percentage of women" "view the developing embryo or fetus as a

80

human being"; abortion is a significant stressor "for a sizeable percentage of women"; "a sizeable number of women" enter a clinic with significant stress; the abortion decision is not easy for "many women") and broad ranges of percentages (i.e., 25% to 40% of women experience decisional ambivalence or distress, which later became 25% to 50% of women; 25% to 50% of women are aware "there's more to an abortion than a simple medical procedure; 25% to 75% of women "feel some level of regret after undergoing a procedure"). In forming her opinion that abortion increases the risk of negative mental health outcomes, Dr. Coleman relied on articles she co-authored with Reardon or Rue, whom she herself described as "too political." *Id.* at 87-88, 90. Her views as a social scientist are heavily influenced, if not entirely overridden by, her personal views, which are strongly anti-abortion. Dr. Coleman supports abortion restrictions and believes abortion is never the right decision, and should be illegal, unless a woman's life is in imminent danger. She has testified before legislative and judicial bodies in support of abortion restrictions and regularly speaks for and before pro-life organizations. Plaintiffs have presented persuasive evidence that Dr. Coleman's opinions lack support and that her work has serious methodological flaws. In a different case, another district court commented that "Dr. Coleman's studies are the subject of significant criticism." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 830 (7th Cir. 2018), *cert. granted, judgment vacated sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, No. 18-1019, 2020 WL 3578669 (U.S. July 2, 2020).

Plaintiffs called Jeffrey Huntsinger, Ph.D., a social psychology[40] professor at Loyola University Chicago, as a rebuttal witness. Dr. Huntsinger opined that emotions and stress

---

[40] Dr. Huntsinger explained that social psychology "examines how our thoughts, feelings and behavior are influenced by other people," and it "includes the study of judgment and decision-making, the influence of emotion on decision-making, stereotyping prejudice, [and] group processes." Huntsinger, Tr. 9/25/19 (Vol. 3-B) p. 7.

benefit decision-making and that requiring women to wait for an additional 24 or 48 hours after they have already made a decision will not help them make better decisions. *See* Huntsinger, Tr. 9/25/19 (Vol. 3-B) pp. 40-41.

Dr. Huntsinger, who specifically studies the decision-making process, opined that Dr. Coleman is not an expert on judgment and decision-making because she does not have the relevant background or experience in this area in terms of her graduate training, research, and publications, and because of her misinterpretation of the literature. *See id.* at 16-17. As to this latter reason, Dr. Huntsinger indicated that Dr. Coleman's "characterization of the literature itself either directly contradicts the conclusions of the researcher she's talking about or she mischaracterizes the literature in a way that suggests that she may not actually understand the literature that she's discussing." *Id.* at 17. "[T]he clearest example" of this is that the research Dr. Coleman cites "directly contradicts" her "broad-based claim that emotions have basically deleterious or negative effects on decision-making." *Id.* This is because "[t]he research that she cites . . . suggests or comes to the conclusion that emotions have a positive influence on decision-making leading us to make thoughtful, rational decisions." *Id.* at 17-18. Dr. Huntsinger stated that Dr. Coleman relied on research done by Antonio R. Damasio and that

> Damasio's research as well as a wide variety of other . . . literature demonstrate that the emotions we experience when making decisions that are directly elicited from the decision we have to make provide adaptive feedback or provide important information about our decisions, and the extent to which we attend to them and use them when making a decision leads us to make optimal decisions.

*Id.* at 18. Dr. Huntsinger defined adaptive feedback as "[f]eedback that will lead us to make a decision that is consistent with our goals and that will ultimately make us happy." *Id.* at 18-19. He concluded that it was "hard to say" whether Dr. Coleman had considered this research because she cited it "and yet claims that the research demonstrates that emotions are detrimental to

82

decision-making when, in fact, the complete opposite conclusion is reached by the researchers themselves and the field." *Id.* at 19-20.

Dr. Huntsinger disagreed with Dr. Coleman's opinion that § 39-15-202(a)-(h) provides a benefit to decision-making. In the general decision-making process, "individuals are quite good at determining their . . . aspirational level, which is essentially what is a good enough decision for me in the circumstance," and "we're also quite good at determining exactly how long we need to think about a decision before we should stop the decision-making process." *Id.* at 20. Applying this to § 39-15-202(a)-(h), "forcing a person to think longer will provide no benefit . . . . In fact, there's good research to suggest that basically forcing people to think more about something, to analyze their choices, to analyze their decisions, will lead them to make suboptimal decisions, decisions that won't make them happy." *Id.* at 20-21.

Dr. Huntsinger further testified that the laboratory-based studies Dr. Coleman relied on in forming her opinion on stress and decision-making are not consistent with her opinion, but they are consistent with his. *See id.* at 21. Dr. Huntsinger discussed a study on stress and decision-making in a laboratory setting as an example of the type of research Dr. Coleman cited. *Id.* at 22-23. In this study, a group of participants who had experienced a stressor (in the form of having to give an unprepared speech in front of others) were given an unimportant decision-making task. *Id.* Dr. Huntsinger opined that this type of study is "largely irrelevant" to his opinion concerning § 39-15-202(a)-(h) because it involves low stakes, "rapid fire," and "trivial" decisions "that don't mean anything" or are not important and it involves very narrow time frames (five to twenty-eight minutes). *Id.* at 23-24.

Dr. Huntsinger identified research by Grant S. Shields as being "more relevant to the abortion decision" because it has "more . . . real world applicability or more direct relevance

to decision-making in people's lives, including high-stakes decisions." *Id.* at 25. Instead of having participants do "a gambling task or some other trivial task," Shields studied "what's called a measure of adult decision competency" and had participants "complete a series of tasks that involve . . . decision-making ability at a very general level." *Id.* The study "essentially correlated people's scores on this adult decision-making competency scale to important life outcomes like quitting a job within two weeks and often going to jail," making it a "well-validated measure of how well you make decisions in daily life." *Id.* The study induced stress on one group of participants, but not the other, and it had all of them complete the "performance-based measure of adult decision-making competence." *Id.* at 25-26. It found that "the group that was experiencing stress scored higher on this measure than the group that was in the controlled condition that did not experience stress." *Id.* at 26.

Dr. Huntsinger disagreed with Dr. Coleman's "blanket statement" that individuals make more hurried, less rational decisions under stress. *Id.* at 26. The "influence of stress on decision-making is varied" and whether it makes people think faster "depends on the particular decision context." *Id.*

Regarding Dr. Coleman's opinion that time is necessary to maximize human decisional processes, Dr. Huntsinger testified that he agreed with this statement "in a general sense, . . . but the amount of time that . . . benefit[s] decision-making is going to vary individual to individual and situation to situation." *Id.* at 32. When asked if making a decision quickly can be beneficial, Dr. Huntsinger responded, "Yes, there's research that suggests that intuitive gut reactions can lead to good decisions." *Id.* at 32-33.

In response to Dr. Coleman's testimony about the presence of emotion in the decision to have an abortion, Dr. Huntsinger testified that the statutory waiting period would not

be helpful to a person who was making a decision with an "emotional correlate" because (1) "decisions that are informed by emotion are largely beneficial, [and] lead us to have optimal decisions"; and (2) "women are able to think about abortion as much as they want before they come to the clinic and after the clinic and also while they're there," and "people are quite good at determining exactly how long they think they need to think about a decision." *Id.* at 34-35. Dr. Huntsinger stated that there is "no strict relationship between emotion and rationality," and research indicates that they are "not in opposition to each other." *Id.* at 37.

Dr. Huntsinger testified that § 39-15-202(a)-(h) would not benefit a person experiencing ambivalence or decisional distress because these are "aversive states," and a person instinctively wants to relieve herself from them. *Id.* at 37-39. "[T]he research indicates that the most common way of reducing feelings of ambivalence . . . is to think in a more deliberate way because doing so will help us resolve that negative state." *Id.* at 37-38. Worry is another aversive state that Dr. Huntsinger indicated "tends to trigger deliberative information processing," and it "mak[es] us think about the decision more because it's something that's important to us." *Id.* at 39. He elaborated on this as follows:

> [W]hen people are worried, they have a pretty good idea of how much time they need to think until they have come up with a good decision.
>
> So for all of these [emotional] states, people are quite capable of giving themselves enough time . . . to come to a decision. So the [emotional] state itself isn't making them think little about a decision or think in a rash way. People are quite capable if they are worried or anxious . . . to say, hey, I'm anxious, let me think about this more.
>
> The anxiety in all these other states, these negative effective states, are signaling that this is an important decision, that there's some problem. That just makes people think more. . . . [T]he emotion doesn't limit your thinking.

*Id.* at 67-68. On cross examination, Dr. Huntsinger indicated that there may be situations in which additional time benefits decision-making but that "forcing people to think for a certain period of

time is detrimental." *Id.* at 66-67.

The Court finds Dr. Huntsinger's testimony to be fully credible and gives it great weight. He presented convincing evidence to rebut Dr. Coleman's opinions on abortion and decision-making. He demonstrated that emotions and stress benefit rather than interfere with the decision-making process and that a mandatory waiting period does not benefit this process because people are quite good at determining for themselves how much time they need to reach a decision.

Defendants next called obstetrician/gynecologist Michael Podraza, who opined that § 39-15-202(a)-(h) is "a reasonable law" "in order to prevent coercion and regret." Podraza, Tr. 9/26/19 (Vol. 4) p. 41. He stated:

> It's my opinion that, for a non-emergent, non-urgent surgery, a 48-hour waiting period is reasonable because it is, most of the time, just a fact that most surgeries that are of any significance would be done with time in between the initial consultation and the surgery, for the patient to be able to research, ask questions, and those kind of things, on their own before they came back for the actual surgery.
>
> And then my other opinion was that there's a significant regret rate for abortion, and because of that and because of . . . the potential for things like coercion, I think . . . it's a good idea for patients to have time to think about that decision before they are taken to surgery.

*Id.* at 18-19.

Dr. Podraza described his practice as being 60% obstetrics, and the remaining 40% is split between doing infertility work, conducting annual exams, and treating various gynecologic issues. *See id.* at 12-13. He does not recommend or prescribe "artificial contraceptives" or birth control to his patients because his practice "is based on the kind of a natural mindset of trying to heal the body" and because of his own religious beliefs as a practicing Catholic. *Id.* at 13-14. He stated that he does not perform abortions because "I don't believe in the morality of abortion." *Id.* at 14.

In his practice, Dr. Podraza does not perform an elective procedure on the same day that he obtains informed consent from a patient because time in between the two is necessary for insurance and scheduling purposes. *See id.* at 23. The informed consent meeting typically occurs one to three days before the procedure, but it can happen two weeks before the procedure, depending on the patient's availability. *See id.* Dr. Podraza does not know "if that time is built in for the purpose of necessarily giving informed consent," but in his practice he uses the time for patients to have an opportunity to do their own research and ask questions before the procedure. *Id.* at 23. He stated that "[a]lmost all of my patients come back and ask additional questions, regardless of the surgery." *Id.* at 24. In his experience, women are "definitely" more confident in their decisions to have a procedure after having time to think about it. *Id.*

On cross-examination, Dr. Podraza agreed that patients can give informed consent without waiting 48 hours and that under the legal definition of "informed consent" patients can give informed consent to an abortion without waiting 48 hours. *Id.* at 47-48. He agreed that abortion has a low complication rate and that it is generally a safe procedure. *See id.* at 50. He acknowledged his prior testimony in which he agreed that if a woman is denied access to abortion, the risks of the procedure will increase because the procedure may become more medically complicated as time elapses. *See id.* at 51.

Dr. Podraza testified that he performs procedures on patients seeking to reverse their sterilizations. *See id.* at 26. Based on his experience, women "absolutely" regret their sterilization procedures. *Id.* at 26-27. He stated that in 1978, "the government instituted Medicaid sterilization, basically, like a waiting time, cooling-off period . . . where you have to sign sterilization papers at least 30 days before you can do a sterilization on a Medicaid patient because they were worried about coercion." *Id.* at 27. He stated that "you assume that that waiting period

87

was instituted . . . to avoid things like rash decisions and coercion and things like that," and he "assume[d]" this thirty-day period gives patients enough time to think about their decisions. *Id.* at 28. On cross-examination, Dr. Podraza agreed that the "Medicaid sterilization" law does not prohibit women from having a sterilization procedure done immediately or in less than thirty days; rather, it states that doctors who perform a sterilization procedure without waiting the required thirty days will not receive payment from Medicaid. *Id.* at 42. Other than "Medicaid sterilization," Dr. Podraza is not aware of any other procedure that requires a waiting period. *Id.* at 43. He conceded that ACOG does not support the waiting period for sterilization procedures and that it thinks the waiting period interferes with patient autonomy. *See id.*

Dr. Podraza indicated that he is the medical director of Confidential Care Mobile Ministry, a pro-life organization "that does ultrasounds for at-risk women." *Id.* at 11. He is also a referring physician for the Abortion Pill Rescue Network, which arranges appointments with physicians for women who have started the medication abortion process by taking mifepristone but want to prevent it from working and causing an abortion. *See id.* at 11, 28-29. Dr. Podraza stated that when he became a referring physician for this organization four or five years ago, he initially received three to five referrals a year. *See id.* at 29. He estimated receiving "two calls in the last year" because another referring physician is now in his area. *Id.* He has donated money to Confidential Care Mobile Ministry but not the Abortion Pill Rescue Network. *See id.* at 11-12. On cross-examination, Dr. Podraza did not dispute his prior deposition testimony disclosing that he has participated in weekly prayer chains outside of Planned Parenthood in Amarillo, Texas. *See id.* at 39-40. He agreed that he was on the board of a pro-life group in Texas and that he donates to pro-life groups. *See id.* at 40-41.

Dr. Podraza has never performed an abortion, has never participated in an abortion

88

procedure, and has never been trained in how to perform an abortion. *See id.* at 44-45. He has never referred a patient for an abortion. *See id.* at 44. He has never published any articles on abortion, and he has never given talks or presentations on abortion. *See id.* at 46. Dr. Podraza has not conducted any research on abortion regret. *Id.* at 45-46. Dr. Podraza conceded that a patient who does not return for a procedure after an initial appointment could have sought care elsewhere; the fact that she did not return does not mean that she did not have the procedure she wanted to have. *See id.* at 48-49. He recognized that there are "multiple reasons" why it might be difficult for someone to return for an appointment. *Id.* at 49.

On cross-examination, Dr. Podraza confirmed that he previously said he believes abortion is immoral, *see id.* at 31-32, and that he would not perform an abortion even if it was necessary to save a woman's life. *See id.* at 34-35. He does not believe there is ever a situation in which an abortion is necessary to save a life because he "believe[s] there's always another option." *Id.* at 35. He did not dispute his prior deposition testimony that he does not believe abortion should be legal, even if it is medically indicated because of a woman's health condition. *See id.* at 33. He stated that he believes an abortion is "unnecessary" if there is a severe or lethal fetal anomaly. *Id.* He also believes that a situation "does not exist" in which it would be "necessary to perform an abortion immediately because a delay would create a serious risk of substantial and irreversible impairment of major bodily functions for a woman." *Id.* at 35. Therefore, in his opinion, a medical emergency under § 39-15-202(a)-(h) could never occur, but he "understand[s] that there are physicians who would have a different opinion than me." *Id.* at 36. Dr. Podraza indicated that he would never refer a patient for an abortion, even for a health condition. *See id.* Nor would he refer a patient for an abortion if it was necessary to save her life because he doesn't "believe that situation exists." *Id.* at 36-37.

89

The Court is unable to accord Dr. Podraza's testimony, which is largely irrelevant to the issues the Court must decide, any significant weight. Dr. Podraza has never performed an abortion and has never studied abortion regret. His testimony about his own practice relates to other medical procedures for which there is no mandatory waiting period. These procedures typically follow a certain diagnosis, and they cannot be performed on the same day as the consultation visit because they require time before the procedure for scheduling and insurance purposes. *See id.* at 51-53. Dr. Podraza stated that his personal opinion on abortion does not affect his testimony, *see id.* at 54, but it is apparent the he has strong personal and religious views on abortion that have influenced his medical practice and his involvement in "various pro-life organizations over the last 20 years." *Id.* at 12.

Defendants next called Vanessa Lefler, Ph.D., the Director of Vital Statistics of the Tennessee Department of Health ("TDOH"). Dr. Lefler supervises the State's collection and maintenance of vital events data, including induced termination of pregnancy ("ITOP") statistics. *See* Lefler, Tr. 9/26/19 (Vol. 4) p. 60. The TDOH collects ITOP data on abortions performed in Tennessee, as well as "reports of abortion events that happen to Tennessee residents out of state," if the outside state elects to share that data. *Id.* at 63. Within Tennessee, the TDOH collects ITOP data from abortion providers. *See id.* at 62. The collected ITOP data is then compiled and published annually. *See id.* at 64, 68; *see* DX 70-75 (ITOP annual reports for 2008 to 2013).

On cross examination, Dr. Lefler indicated that "the majority of abortions [in Tennessee] are provided at outpatient clinics rather than a hospital" and that "it is a very, very small number that are provided outside of the clinic," possibly less than 5%. Lefler, Tr. 9/26/19 (Vol. 4) pp. 82-83. The parties in this matter stipulated that as of October 3, 2019, they knew of eight abortion providers in Tennessee (excluding hospitals and individual

obstetricians/gynecologists): (1) Bristol Regional Women's Center in Bristol, (2) Carafem in Mount Juliet, (3) Knoxville Center for Reproductive Health in Knoxville, (4) Memphis Center for Reproductive Health ("Choices Memphis") in Memphis, (5) PPTNM in Knoxville, (6)(7) PPTNM in Memphis (two facilities), and (8) PPTNM in Nashville.

Dr. Lefler created visual representations of the data from the annual reports, which she discussed during her testimony. In discussing a graph showing the rate and number of abortions reported by Tennessee residents and Tennessee providers from 2013 to 2017, she indicated that

> the number of Tennessee residents who have received an abortion and the rate of Tennessee residents who have received an abortion over this time period has been decreasing steadily [since 2013], and also the number of abortion services that are provided in the state of Tennessee have also been decreasing since 2013.

*Id.* at 68-71. Dr. Lefler later expanded this time frame and added that "there has been a decrease in the number and rate of abortions" obtained in Tennessee between 2008 and 2017. *Id.* at 76, 81.

Dr. Lefler discussed a graph illustrating the percentage of abortions performed between 2013 and 2017 at various gestational ages from "less than or equal to 6 weeks . . . through 20 weeks gestation." *Id.* at 71. She indicated that the "overall picture" shown in the graph is that in 2013 "less than 6 weeks gestation was the most common time period that an abortion was performed," but otherwise "7 to 8 weeks remains the highest time period for an abortion to be performed, and it steadily decreases after that, until we get to about 11 to 12 weeks, where then very few abortions are performed at that time period." *Id.* at 72. In addition, between 2013 and 2017 there was a decrease in the percentage of abortions performed at less than or equal to 6 weeks; however, Dr. Lefler stated that "2014-2015 seems to be the turning point, where . . . there is significantly more abortion happening at less-than-six-week period then the seven-to eight-period.

Then after that, the lines seem to track fairly parallel to each other." *Id.* at 73-74. In reviewing some of the years individually, Dr. Lefler explained that in 2013, "at less and/or equal to 6 weeks" is "the largest share of abortions," and "[t]hen it decreases steadily over time." *Id.* at 72, 81. In 2014, there was also "a higher rate for less or equal to 6 weeks, but not so much higher than 7 to 8 weeks, and, again, that decreases steadily over the different gestational ages." *Id.* at 72-73. In 2015, "we see, again, fewer abortions happening at less than 6 weeks, 7 to 8 weeks, and increasingly becomes more common [at] 9 to 10 weeks, 11 to 12. But eventually, we get to the point with all these lines, very few abortions are occurring after 12 weeks of gestation." *Id.* at 73.

The final diagram Dr. Lefler discussed was "a cumulative column graph" reflecting the percentage of abortions performed at various gestational ages between 2013 and 2017. *Id.* at 74. This third graph showed that

> again, the majority of abortions are performed at less than 10 weeks gestational age. That is becoming a smaller share over time relative to abortions that are performed at 11 to 12 weeks and 13 to 14 weeks, and throughout the time period, abortions that happen after 16 weeks are exceedingly small.

*Id.* In addition, the graph reflects that "abortions that happen [at] less than or equal to six weeks have been decreasing since 2013" and that "[t]he seven- to eight-week range has also been decreasing, [although] not as dramatically." *Id.* at 75. She later added that "there has been a decrease in the number of abortions prior to six weeks." *Id.* at 81.

The Court finds Dr. Lefler's testimony to be fully credible and gives it great weight. She testified convincingly that ITOP annual reports published by the State of Tennessee reflect a decrease between 2013 and 2017 in the number of Tennessee residents who have received an abortion, the rate of Tennessee residents who have received an abortion, and the number of abortion services provided in Tennessee. The number and rate of abortions obtained in Tennessee

92

has decreased between 2008 and 2017. In 2013 and 2014, most abortions were performed "at less and/or equal to 6 weeks LMP," but from 2013 to 2017 the number of abortions performed at this gestational age, and at 7 to 8 weeks LMP, has dropped. In 2015, abortion was more common at 9 to 12 weeks LMP. Between 2013 and 2017, the percentage of abortions performed at less than 10 weeks LMP made up "the majority of abortions," but this "becomes a smaller share . . . relative to abortions that are performed at 11 to 12 weeks and 13 to 14 weeks." *Id.* at 74. During this time period, the percentage of abortions that took place after 16 weeks LMP was marginal.

Plaintiffs called Antonia Biggs, Ph.D., a reproductive healthcare researcher at the University of California San Francisco, to rebut the testimony of Drs. Coleman and Podraza. Dr. Biggs opined that the statutory waiting period does not benefit women who are seeking abortions in Tennessee and that her opinions would be no different if the waiting period were 24 instead of 48 hours. *See* Biggs, Tr. 9/26/19 (Vol. 4) p. 142.

Dr. Biggs disagrees with Dr. Coleman's opinions regarding the effects of abortion on mental health "[b]ecause there is a lot of data on this topic, and when we look at all of this data together, it really clearly shows that abortion does not increase women's risk of having experienced negative mental health outcomes." *Id.* at 95. Dr. Biggs based this conclusion on "on a number of papers, [her] own work, [and] some of the high-quality literature . . . on the topic." *Id.* Dr. Biggs also disagrees with Dr. Coleman's opinion that a waiting period would benefit women's decision-making because she "see[s] no evidence that a waiting period would help women in any way, and, in fact, the literature shows the opposite, that it increases women's burdens, costs, travel, delays." *Id.* at 95-96. On the issue of regret, Dr. Biggs agrees that some people regret their abortions or later believe it was the wrong decision for them. *See id.* at 224. However, Dr. Biggs disagrees with Dr. Coleman's suggestion that regret is common. *Id.* Dr. Biggs "see[s] no evidence that the

93

mandatory delay law would have any effect on whether or not they regret their abortions, and I definitely don't agree that most women regret their abortions." *Id.* at 96. She stated that "[w]e have clear evidence that most women are very certain of their decisions, and we actually even know that women who are denied care, or turned away from care, regret being turned away." *Id.*

Dr. Biggs indicated that most of her research on abortion and mental health is through the Turnaway Study, a prospective longitudinal study that interviewed nearly 1,000 women seeking an abortion "one week postabortion seeking" and then every six months for five years.[41] *Id.* at 96-97. The study looked at two groups of women: (1) women who obtained an abortion and were just below the gestational age limit, and (2) women who were unable to obtain an abortion because they were beyond the gestational age limit.[42] *See id.* at 97. The participants were recruited from thirty clinics located in twenty-two states (some with waiting period laws) throughout the United States. *See id.* at 97-98. "[E]ach clinic was selected because it provided the latest gestational age limit of any other facility within 150 miles[,] . . . represent[ing] that last-stop clinic for women where they could obtain care." *Id.* at 98. The Turnaway Study found that there were no long-term differences between the two groups of women in terms of certain mental

---

[41] Dr. Biggs identified the Turnaway Study's longitudinal design as one of its strengths, and she discussed others. *See* Biggs, Tr. 9/26/19 (Vol. 4) p. 101. This study is "very unique" because it "comes as close as you possibly could to randomization" and allows researchers to look at two "very similar groups of women who are seeking the same thing." *Id.* at 97. It used validated measures of mental health and well-being, and it controlled for prior mental health history and other factors to reduce the likelihood of erroneously attributing negative mental health issues to the abortion. *See id.* at 100-01.

[42] On cross examination, Dr. Biggs clarified that the study did not follow women who were not seeking an abortion. *See* Biggs, Tr. 9/26/19 (Vol. 4) pp. 219-20. She is not aware of a study that compares the mental health outcomes of the two groups included in the Turnaway Study with the mental health outcomes of women who come to a first abortion appointment and then decide they do not want to have an abortion. *See id.* at 220-21.

94

health outcomes; "both groups, women who had an abortion and women who were denied an abortion, [had] similar levels of anxiety, depression, suicidal ideation[,] posttraumatic stress, [and] self-esteem."[43]  *Id.* at 104.

Dr. Biggs disagreed with Dr. Coleman's opinion that the Turnaway Study's low participation rate is a fatal flaw.  *See id.* at 102.  Dr. Biggs stated that the participation rate is "what you would expect" for similarly-designed longitudinal studies.  *Id.* at 103-04.  The study "had an incredibly good retention rate" for this type of study because it "lost only five percent of [its] participants from wave to wave" (i.e., every six months) over the five-year period.  *Id.* at 102, 192.  On cross examination, Dr. Biggs did not dispute that "at least over 45 percent" of the participants "have dropped out of the study over time."  *Id.* at 216.  Dr. Biggs "took many steps in order to assess to what extent the participation rate may have biased our findings," and the published results of her sensitivity analyses "show that the overall conclusions . . . do not differ when we run the analyses in those different ways."  *Id.* at 103.

Dr. Biggs' own research on abortion and mental health is consistent with "a general consensus within the scientific community" on this topic.  *Id.* at 104.  She indicated that "a series of reviews . . . published by leading mental health organizations, psychiatric organizations, scientific organizations, and researchers . . . have concluded that abortion does not increase women's risks from a negative mental health outcome."  *Id.* at 104-05.  These organizations include the American Psychological Association ("APA"), which Dr. Biggs described as the

---

[43] With respect to depression, suicidal ideation, and symptoms of posttraumatic stress, "[t]here was no difference[] between the women who obtained an abortion and the women who did not obtain an abortion" "for the entire five-year period."  Biggs, Tr. 9/26/19 (Vol. 4) pp. 99-100.  With respect to anxiety, "women who were unable to obtain an abortion had higher levels of anxiety at the time of being denied an abortion than the women who were able to obtain their abortion."  *Id.* at 99.  But "by six months to one year, the two groups did not differ[] for the rest of the five-year period."  *Id.* at 100.

"leading mental health organization in the U.S.," the Academy of Medical Royal Colleges in the United Kingdom, and the National Academies of Sciences, Engineering, and Medicine, "a leading scientific organization in the U.S." *Id.* at 105.

Dr. Biggs indicated that an APA task force reviewed over 200 papers in conducting a thorough literature review published in 2008. *Id.* at 105, 107. Dr. Biggs believes this to be a reliable source because "they . . . did a very thorough search. They were very clear and delineated all the steps they did in terms of reviewing the evidence, and they looked at the quality of the evidence to formulate their conclusions" that abortion is not associated with negative mental health outcomes. *Id.* at 107.

According to Dr. Biggs, the Academy of Medical Royal Colleges in the United Kingdom published a "very thorough" systematic review in 2011 in which it reviewed 180 papers on the mental health outcomes of abortion. *Id.* at 105-06. Dr. Biggs believes this systematic review is a reliable source because many studies were reviewed, and "they were very clear and transparent in terms of the way they searched their publications and the way they graded the quality of each study, and they were very thorough with their methods." *Id.* at 106. It contains a table of excluded studies that shows that the reviewers excluded ten studies for which Dr. Coleman is the lead author for various reasons, including "inappropriate health measure," "beyond scope of the review," "no useable data," "inappropriate comparison group," and "inappropriate control of previous mental health." *Id.* at 226-28.

Finally, Dr. Biggs noted that the National Academies of Sciences, Engineering, and Medicine reviewed the evidence on the safety of abortion, including data from the Turnaway Study, and "summarized the evidence on mental health harm" in a report published in 2018. *Id.* at 105-07. This report "concluded that abortion does not increase women's risk for negative mental

health issues." *Id.* at 106. Dr. Biggs indicated that this report "is not as formal a systematic review as the other ones," but she believes it is a reliable source because it was authored by "a leading scientific organization" and because "it's a comprehensive review of the latest evidence on the quality of abortion care." *Id.* at 108-09. Dr. Biggs testified that there are other literature reviews that have reached similar conclusions, and she cited some of them in her expert report. *See id.* at 109.

In response to Dr. Coleman's opinion that research demonstrates that abortion increases women's risk of mental health harm, Dr. Biggs stated that she agrees with Dr. Coleman "that there are many studies out there" and that "there's a large body of evidence." *Id.* at 110. However, Dr. Biggs explained that

> [t]he challenge . . . is what all of these reviews have shown is, when you rely on the lower quality studies, those tend to conclude that abortion leads to mental health harm, whereas the higher-quality studies show that it does not increase women's risk for mental health harm, and there's a series of reasons why that happens.

*Id.* Dr. Biggs stated that one reason for this is that "it's really important to look at two similar groups of women." *Id.* at 111. Many studies that are unreliable compare women who have an abortion with women who are not pregnant or who have intended pregnancies they carry to term. *See id.* These studies "don't take into account women's pregnancy intentions. And we know very well that the women who seek an abortion versus the women who have an intended pregnancy are in very different places in their lives." *Id.* Dr. Biggs indicated that studies that have this kind of comparison group issue are "going to erroneously conclude that the women who are never pregnant or the women who have intended pregnancies are doing better when really they were doing better before they even became pregnant than the other group." *Id.* at 111-12. According to Dr. Biggs, another flaw of lower-quality studies is the use of inadequate controls for mental

97

health history, "as well as other factors that we know are associated with having adverse psychological outcomes." *Id.* at 112.

Dr. Biggs spent a considerable amount of time methodically criticizing the quality of several studies Dr. Coleman cited as supportive of her opinions regarding decision-making and post-abortion mental health outcomes. Dr. Biggs found these studies to be severely lacking in their methodologies and irrelevant to whether a mandatory waiting period benefits women's decision-making. *See id.* at 113-23.

Regarding Dr. Coleman's meta-analysis, Dr. Biggs indicated that "[i]mmediately following the publication of her meta-analysis, there were a number of researchers, people who submitted letters critiquing her review." *Id.* at 123. Several critiques were published in the *British Journal of Psychiatry*, the same journal that published Dr. Coleman's meta-analysis, including a critique by J. H. Littell and J. C. Coyne in 2012. *See id.* at 123, 129. The Littell and Coyne critique noted that Dr. Coleman's meta-analysis did not follow any of the established guidelines for conducting a meta-analysis. *See id.* at 124-25. It also identified as flaws the fact that Dr. Coleman's meta-analysis had no duplicate study selection or duplicate data extraction, did not describe the search strategy in sufficient detail, did not provide a list of excluded studies, did not document the scientific quality of the included studies, and did not use "[a]ppropriate methods . . . in combining the findings of the studies." *Id.* at 125-28. Dr. Biggs agreed with and expanded on these criticisms of Dr. Coleman's meta-analysis.[44]

---

[44] Dr. Biggs testified in great detail about the flaws of Dr. Coleman's meta-analysis, but the ones the Court found particularly important are that Dr. Coleman listed herself as the sole author (without disclosing that students assisted her in rating the evidence) and included eleven of her own studies in the meta-analysis, did not have someone else simultaneously extract the data and evaluate it, and was not transparent in her search strategy and in explaining what studies she included and excluded and the reasons for inclusion and exclusion. *See id.* at 125-31, 221. These flaws deprive Dr. Coleman's meta-analysis of all credibility.

In response to Dr. Coleman's testimony regarding women experiencing decisional uncertainty in the abortion context, Dr. Biggs testified that the research on this subject, by others and by Dr. Biggs herself, shows that women seeking an abortion have high levels of decisional certainty. In one study, 95% of women who seek abortion care are certain of their decisions upon arriving at the clinic; and in another study, "the vast majority" are certain at the time of accessing care. *See id.* at 133-34. Additionally, the Turnaway Study shows that in the three-year-period for which its results have been published, "95 percent of women reported that they felt that abortion was the right decision for them." *Id.* at 134. Dr. Biggs cited studies that found regret was much more prevalent among women who were denied abortion care than among those who obtained it. *See id.* at 138. "[A]mong the women who reported regret as an emotion that they were feeling, 89 percent of those women still stated that they felt that abortion was the right decision for them." *Id.* at 139. Further, Dr. Biggs has no reason to think" that a mandatory waiting period "would prevent [women] from feeling regret." *Id.*

Regarding regret, Dr. Biggs indicated that it is important to distinguish between situational regret and decisional regret when discussing abortion. Dr. Biggs defined situational regret as "regretting . . . the circumstances that led you to the decision to have an abortion," such as financial circumstances or circumstances related to a relationship. *Id.* at 135. She defined decisional regret as "prefer[ing] to not have to make that decision." *Id.* The distinction between these two concepts is important in the abortion context "because women may report regret, but it may not be about the abortion decision. It might be about their circumstances that lead them to that decision." *Id.*

Dr. Biggs indicated that it is also important to distinguish between "mental health problems" and "negative psychological experiences or reactions" when discussing the mental

health effects or outcomes of abortion.  *Id.* at 137.  She noted that the APA Task Force on Mental Health and Abortion defines "mental health problems" as "clinically significant disorders assessed with valid and reliable measures [for] physician diagnosis."  *Id.* at 135-36.  It defines "negative psychological experiences or reactions" as "negative behaviors and emotions, guilt, regret, [and] sadness."  *Id.* at 135-37.  Dr. Biggs indicated that the distinction between these two concepts is important because experiencing negative emotions as "part of everyday life" is not necessarily concerning, "whereas a mental-health problem refers to something that's clinically significant and something that we should be concerned about from a health perspective."  *Id.* at 137.  Dr. Biggs testified that "[i]n reviewing [Dr. Coleman's] report and her testimony, I felt that she was conflating those two and not distinguishing the difference between emotions and a clinically significant condition."  *Id.*

On cross-examination, Dr. Biggs agreed that the stated intent of § 39-15-202(a)-(h) is to ensure that informed consent before an abortion is provided.  *See id.* at 148-49.  She is unaware of any research in Tennessee that shows that it is detrimental to women to be informed of the risks, benefits, or alternatives of the procedure.  *See id.* at 150-52.  Dr. Biggs is not familiar with any way in which communicating this information would prevent women from being able to give informed consent, but she believes that a mandatory waiting period may interfere with the informed consent process if it "pushe[s] [them] back past a gestational age."  *Id.* at 153-54.  She stated that "[t]he research I know from other states where women are required to get mandated counseling and come back later, they report harm to that, anxiety, increased costs, more travel, coming to later gestational age, so I would argue that is harmful."  *Id.* at 152.  Dr. Biggs agreed that there are no studies that show that patients cannot understand information delivered to them by physicians, but she added that "I also think there are no studies to show that someone else

100

couldn't give you information." *Id.* at 157.

Dr. Biggs was asked about the findings of a paper by her colleague Sarah Roberts entitled "Utah's 72-Hour Waiting Period for Abortion: Experiences Among a Clinic-Based Sample of Women." *Id.* at 171-72. The study's researchers recruited 500 women (from four clinics) who attended a first appointment, and Dr. Biggs agreed that out of the 309 women who completed follow-up telephone interviews three weeks later, "86 percent had an abortion, 8 percent were no longer seeking an abortion, 3 percent had miscarried or discovered they were not pregnant, and 2 percent were still seeking an abortion." *Id.* at 172-73. She agreed that the main reason the participants did not return for the second visit was "they just couldn't do it" (in response to open-ended questions) or "they had changed their minds" (in response to closed-ended questions). *Id.* at 173. Dr. Biggs seemed to agree that the study's finding that 8% of women "were no longer seeking an abortion" could be applied to Tennessee, but she stated that for those who did not return, "[i]t doesn't necessarily mean that they decided not to come back." *Id.* at 175. Dr. Biggs "think[s] it's possible that in Tennessee, there will be some women who don't obtain – aren't able to obtain the care, they're beyond the gestational age limit." *Id.* Dr. Biggs agreed that 71% of the women in the study who were still pregnant at follow up indicated in response to closed-ended questions that the reason for not having the abortion was that they changed their minds. *Id.* at 176. In response to this data, Dr. Biggs explained that

> we know that women, when they come to a visit the first time . . . – they might just be seeking information, and what they found in this study, among those women who changed their mind . . . I don't know how many, but 11 of them indicated that – baseline, that they preferred to have a baby, . . . so 11 of these women – so 4 percent never wanted to – it sounds like that wasn't really something they wanted to do in the first place.

*Id.* at 176-77. Dr. Biggs did not dispute that all of these women wanted to get information, but she noted that women are "in different stages of their decision-making when they seek care. Some are

seeking more information. Some are very decided." *Id.* at 177. And "[t]hey are not all necessarily planning to have an abortion that day when they come in." *Id.* at 178. If women "want to come in and gather information" from the abortion provider, they should be able to do that. *Id.* at 180. Dr. Biggs conceded that "women can come to a visit, and they can change their mind[s]," but she stated, "I don't think they need a waiting-period requirement in order to change their minds." *Id.* at 178.

Dr. Biggs agreed that the study found that "[o]verall, Utah's 72-hour waiting period and two-visit requirement did not prevent women who presented for information visits at the study facilities from having abortions," but she noted that "the sentence continues, 'but [it] did burden women with financial costs, logistical hassles, and extended periods of dwelling on decisions they had already made.'" *Id.* at 178-79. On redirect, Dr. Biggs testified that the study on Utah's waiting period found that "[o]n average, eight days elapsed between the information visit and the abortion." *Id.* at 228. The authors concluded that "[a]s most women in the cohort were not conflicted about their decision when they sought care, the 72-hour waiting requirement seems to have been unnecessary. Individualized patient counseling for the small minority who were conflicted when they presented for care may have been more appropriate." *Id.* Dr. Biggs indicated that one woman in this study was unable to have an abortion because she was "pushed beyond the facility's gestational age limit," and two women did not have an abortion because they were "pushed beyond their own personal gestational age limit that they felt in terms of feeling comfortable." *Id.* at 228-29. Dr. Biggs also indicated that "one of the main focuses of the paper were . . . the burden[s]" of the 72-hour waiting-period law. *Id.* at 229. She indicated that the paper "talk[s] about the burden of having to take time off work, the distance traveled to the clinic, lost times scheduling an appointment, arranging childcare, increased costs, waiting, making travel

102

arrangements, feeling frustrated, feeling physically sick, . . . questioning the decision, feeling

nervous about the procedure." *Id.*  Dr. Biggs indicated that the findings of this paper do not suggest

that mandatory waiting period laws caused patients to change their minds.  *See id.* at 230.

Dr. Biggs was asked on cross-examination about another study by Roberts on

Utah's 72-hour waiting period entitled "Do 72-Hour Waiting Periods and Two-Visit Requirements

for Abortion Affect Women's Certainty?"  *Id.* at 181.  Dr. Biggs agreed that the study found that

"[c]hanges in certainty were primarily in the direction of increased certainty, with more women

reporting an increase, 29 percent, than a decrease, 8 percent."  *Id.*  She commented that

> [i]n reading these papers and looking at some of the quotes coming from
> women, what it shows is . . . women are coming in certain, and then they're
> more certain, so it's not clear that it's beneficial because it also is adding
> more frustration, more increased cost burden, now they're at later
> gestational age.
>
> So if you are really certain and now you just feel more certain, it's not clear
> to me that that's better when we look at some of the negative impacts.

*Id.* at 182.  Moreover, Dr. Biggs noted that "if you're already certain, and now you're more certain,

that doesn't mean you have . . . high decisional conflict, so we can't assume that the women who

become more certain are experiencing decisional conflict."  *Id.* at 183.

The Court finds Dr. Biggs' testimony to be fully credible and gives it great weight.

Dr. Biggs testified convincingly that contrary to Dr. Coleman's opinion on abortion and mental

health, high-quality studies demonstrate, and leading organizations within the scientific

community agree, that abortion does not increase the risk of negative mental health outcomes.  Dr.

Coleman's meta-analysis has serious flaws and can therefore be given no weight, as Dr. Biggs and

others have noted.  Dr. Biggs also presented convincing evidence that rebuts Drs. Coleman's and

Podraza's opinions that regret is common after an abortion, including studies showing that women

who have an abortion report lower levels of regret post-abortion than women who are unable to

have an abortion, and of the women who report regret, 89% still feel that abortion was the right decision for them; 95% of women are certain of their decisions when accessing care; and 95% of women feel that abortion was the right decision for them. Based on Dr. Biggs' testimony and the evidence she cited, the Court finds that women who have an abortion are no more likely than women generally to have, in the long run, higher levels of anxiety, depression, suicidal ideation, and posttraumatic stress symptoms, or lower levels of self-esteem. The evidence shows that a waiting period does not benefit decision-making, prevent feelings of regret, or cause women to change their minds; rather, it is harmful because it makes it significantly more difficult to obtain an abortion by increasing the costs (of the procedure itself and to get to the clinic twice) and the frustration and anxiety of having to wait for the procedure or missing it altogether.

    Instead of having obstetrician/gynecologist Wesley F. Adams testify at trial, the parties stipulated to submit designations and exhibits from his deposition testimony. In 1980, Dr. Adams and Gary Boyle, M.D., established Adams & Boyle, P.C. ("Adams & Boyle"), which provides women's health services and gynecological care. *See* Adams Dep. at 17 [docket entry 216-1]. Adams & Boyle operated a facility in Nashville until the facility closed in September 2018, and Adams & Boyle continues to operate a facility in Bristol that Dr. Adams described as "a doctor's office" and "not a clinic."[45] *Id.* at 17, 111, 135; SAC ¶ 14. The Nashville facility provided medication abortions through 10 weeks LMP and surgical abortions through 16 weeks LMP. *See* SAC ¶ 14. The Bristol office provides medication abortions from 3 to 10 weeks LMP, and it provides surgical abortions from 6 weeks and 3 days LMP to 13 weeks and 6 days LMP.

---

[45] Dr. Adams indicated that the Nashville clinic closed in 2018 because "[w]e got an offer we couldn't refuse on the building out of the blue." Adams Dep. at 135. Adams & Boyle was dissolved in 2019 [docket entry 265 ¶¶ 1-2]. Adams & Boyle's Bristol facility is now operated by Bristol Regional Women's Center, P.C., which is owned by Dr. Adams. *Id.* ¶¶ 3-4.

104

*See* Adams Dep. at 90, 101, 109; *see* SAC ¶ 14.

Dr. Adams provides all services at the Bristol office, and approximately six other physicians from other states worked with Drs. Adams and Boyle at the Nashville facility from 2010 until 2018. *See* Adams Dep. at 19-21. Adams & Boyle hired one additional physician in Nashville after § 39-15-202(a)-(h) took effect.[46] *See id.* at 20-21. Adams & Boyle no longer provides obstetrical care and therefore Dr. Adams refers women who want to carry the pregnancy to term to another physician. *Id.* at 114-15. The Bristol office maintains its own adoption referral list and helps patients find other agencies. *See id.* at 116-17.

Dr. Adams testified that prior to § 39-15-202(a)-(h) taking effect, Adams & Boyle's Tennessee facilities would disclose to patients the state-mandated information listed in subsection (b) for purposes of providing informed consent. *See id.* at 35-36. The informed consent process would occur after an ultrasound was performed to determine gestational age. *See id.* at 38-39. Adams & Boyle "had group counseling for years," *id.* at 39, and physicians were not involved in the counseling process. *See id.* at 36. At the Nashville facility, the informed consent disclosure would be provided by various individuals, including counselors, the director, and the registered nurse, who would use an informed consent form. *See id.* Counselors would use notes to ensure they covered everything. *See id.* at 36-37. Dr. Adams estimated that the informed consent process would take between fifteen and twenty-five minutes: five or ten minutes to go through the forms "and another ten minutes or fifteen minutes for the group counseling by the individual." *Id.* at 39.

---

[46] Dr. Adams testified that hiring physicians to work at the facility "has been a problem" because trained physicians who "believe in the procedure" do not "want to put up with the hassle, the picketing, the protesters, the picketing [at] their residence and things like that." Adams Dep. at 103-04. In addition, it has always been difficult to hire and retain staff given the nature of the work that they do. *See id.* Dr. Adams testified that he has received threatening letters and that protesters yell negative things outside of his office "on a daily basis." *Id.* at 104.

105

Before the statute was enacted, patients at Adams & Boyle would sometimes "change their mind, mostly teenagers being coerced by parents." *Id.* at 121. Dr. Adams has had patients take the first medication abortion pill but then decide not to take the second. *See id.* at 110. He indicated that "[a]s soon as we hear that someone doesn't want to do [the abortion], we tell them to leave immediately" and "come back when they [a]re more certain." *Id.* at 121-23.

After § 39-15-202(a)-(h) took effect, patients at their first appointment at the Nashville facility are counseled through a video[47] that they watch in a group (between three and twenty people) or individually. *See id.* at 37, 118-19. Physicians are not involved in presenting the video to patients and are not in the room during its viewing. *See id.* at 37, 118. Dr. Adams is not aware of any changes made to the video counseling after § 39-15-202(a)-(h)'s enactment. *See id.* at 39-40. After patients watch the video, they are counseled as a group by a physician, who uses an informed consent form. *See id.* at 38, 118. Patients have their own copy of the form that they use to follow along with the physician and that they sign. *See id.* at 38, 45, 118-19. After covering the information in the form, the physician answers questions individually. *See id.* at 119. The physician's group consultation lasts between ten and sixteen minutes. *See id.* Patients go through the informed consent process alone, i.e., unaccompanied by a partner or husband, unless the patient is a minor, in which case a parent or legal guardian is asked to be present. *See id.* at 122. Dr. Adams explained that for adults, "[i]t's strictly one on one, so there's no coercion." *Id.*

At the second appointment Dr. Adams asks patients if they have any questions and asks them about their certainty, their understanding of the procedure, and their feelings regarding coercion. *Id.* at 119-20. Dr. Adams and his staff will "stop everything immediately" and has

---

[47] Dr. Adams indicated that there is one video for medical abortion and another video for surgical abortion. *See* Adams Dep. at 145. If the patients in a group have the option to do either procedure, then the group will watch both videos. *See id.* at 145-46.

patients wait if they detect any ambivalence, conflict, or uncertainty.  *Id.* at 151-52.  Dr. Adams

will not perform a procedure for patients who are being coerced to have it done.  *See id.* at 152-

53.  This has been his practice for the last thirty years, and it is his current practice.  *See id.*  Adams

& Boyle does not follow up with patients who need more time to consider their options.  *See id.* at

123.  It also does not follow up with patients who attend a first appointment but do not return for

a second (after § 39-15-202(a)-(h) took effect) because that would be an invasion of their privacy.

*See id.* at 123-24.

   Following § 39-15-202(a)-(h)'s enactment, the only change Adams & Boyle made

to its informed consent form was to add a page that addressed the mandatory waiting period.  *See

id.* at 99, 101.  Dr. Adams stated, "We've had a multitude of patients ask us to and bribe us, beg,

plead.  'I'll do anything,' actually pull money out of their pocketbook.  'I've got to get this done,'

but we have not done that."  *Id.* at 106.  He testified that patients complain about having to wait

"every single day" and that the issue "comes up all day long," including in "a dozen phone calls a

day."  *Id.* at 126.  He elaborated on cross-examination that patients complain about it

> [e]very day.  They complain about it when they hear about it on the phone.
> They complain about it when they get there.  They verbalize having to pay
> extra money, extra distance, the extra time, and most importantly, they don't
> like the idea of someone else telling them how to manage their lives on
> something that they consider so personal.

*Id.* at 151.  Dr. Adams testified that abortion patients have "[n]ever" expressed to him or his staff

that the waiting period benefitted them.  *Id.*

   After § 39-15-202(a)-(h)'s enactment, a first visit at the Nashville facility took "as

long as three or four hours and sometimes . . . six hours."  *Id.* at 46.  Dr. Adams did not know the

duration of a second visit at the Nashville facility, but he indicated that a second visit at the Bristol

office lasts thirty to forty-five minutes.  *See id.* at 47-48.  The duration of the second visit depends

on the patient volume, the time it takes to do the paperwork, and the type of procedure. *See id.* at 53-54. Dr. Adams indicated that after the waiting period was implemented, he spends almost twice as much time with each individual abortion patient. *See id.* at 106. Prior to the statute's enactment, a medication abortion required two trips. *See id.* at 109-110. After its enactment, a medication abortion requires three trips. *See id.* at 110.

At the first visit, Adams & Boyle charges patients a counseling fee ($50) and an ultrasound fee ($150), and the latter is deducted from the cost of the procedure. *See id.* at 49. The counseling fee is refunded if the patient "is not pregnant based on the ultrasound, if she's too far along based on the ultrasound or if she changes her mind based on the ultrasound . . . because the counseling basically did not ever take place." *Id.* Dr. Adams indicated that financial aid to obtain an abortion was available to patients at the Nashville facility through the National Abortion Federation and is available to patients at the Bristol office through agencies from Virginia and Tennessee.[48] *See id.* at 50-52. The Nashville facility had a student discount, and the Bristol office has a student discount, a military discount, and a mileage discount "especially since the law went into effect." *Id.* at 146-47. The mileage discount was "[i]ndirectly" implemented in response to, or as a result of, § 39-15-202(a)-(h) "because people were driving further." *Id.* at 147. Dr. Adams stated that after the Nashville facility closed, its calls were forwarded to the Bristol office, which was then

> getting an average of 12, 15, 18 phone calls a day from a patient requesting services and actually finding out there's a long waiting period, days or weeks[,] in Nashville for Planned Parenthood.[49] So we're getting a not

---

[48] Dr. Adams explained that the Bristol office is not a member of the National Abortion Federation because it is smaller, has fewer employees, and has a lower patient volume, which do not "justify us jumping through hoops to become a member." Adams Dep. at 51, 141.

[49] Dr. Adams indicated that he has referred patients to Planned Parenthood of Nashville or PPMET, including after § 39-15-202(a)-(h) took effect. *See* Adams Dep. at 135.

insignificant number of patients driving four and a half hours each way times three to come to Bristol.

*Id.* at 136. He testified that "to be honest, we felt sorry that they were being inconvenienced, and we were trying to help them with their expenses. So the further they came, the more of a discount we offered." *Id.* at 147.

Before § 39-15-202(a)-(h) was enacted, appointments for abortion services at Adams & Boyle were made by telephone. *See id.* at 40. After its enactment, the process for scheduling appointments did not change; however, now a patient only schedules the first appointment by telephone because the second appointment depends on the type of procedure she is having, her availability, and the office's availability. *See id.* at 40-41. Dr. Adams indicated that the cancellation rate for the first appointment is "[a]nywhere from 20 to 40 percent." *Id.* at 42. Women who are further along based on the date they report over the telephone as their last menstrual period "would generally need to get in as soon as possible," *id.*, and are "encouraged to come in as soon as possible or . . . the next possible opening business day." *Id.* at 44. Dr. Adams stated that a woman seeking abortion care can be seen for her first appointment "within 24 hours unless we're closed or I'm out of town or at a meeting or a vacation." *Id.*

Dr. Adams "believe[s] nobody should have to wait [for an abortion], period." *Id.* at 56. He opined that waiting does not benefit a patient's decision-making process "because they've already waited before they came in, and they've already made their decision. I have not personally seen it benefit anybody." *Id.* He stated, "I think all patients experience some stress and anxiety just by being pregnant, whether they're going to continue the pregnancy or not, and those that are forced to wait should not be made to wait, period." *Id.* at 78. He stated that experiencing stress and anxiety could complicate a medical condition and risk causing substantial psychological harm. *See id.* at 78-79. He testified that "at essentially every visit" he sees "patients [who] are

109

visibly upset because they have to wait," and he believes being visibly upset is indicative of psychological harm. *Id.* at 79. He stated that patients who are pushed beyond the gestational age limit for a medication abortion because of the required waiting period and due to additional delays caused by weekends all suffer emotional distress from not being able to get the type of abortion they prefer. *See id.* at 80.

After § 39-15-202(a)-(h) was enacted, the Nashville facility increased its hours of operation to see more patients and to accommodate those affected by the mandatory 48-hour wait, but no changes were made to the Bristol office's hours. *See id.* at 44-45, 117-18, 126-27. Around the time that the waiting period was implemented, the prices at the Nashville facility were raised to cover the cost of hiring extra help to clean the office, the cost of hiring extra physicians to counsel patients, and the cost of seeing "extra patients . . . on . . . days they had not been seen on before." *Id.* at 127-28, 142.

The Court finds Dr. Adams' testimony to be fully credible and gives it great weight. He testified convincingly that Adams & Boyle made only minor changes to its informed consent process following § 39-15-202(a)-(h)'s enactment to address the mandatory waiting period. Otherwise, Adams & Boyle already covered the information that subsection (b) requires patients to receive. No abortions are performed by this provider for patients who are ambivalent, conflicted, uncertain, or being coerced to have the procedure. For patients who are already certain, and for patients who will be pushed beyond the gestational age limit for a medication abortion when they return for the procedure, the requirement to wait causes them to suffer psychological harm.

## IV.    Legal Standards and Conclusions of Law

### A.    Standing

The Supreme Court has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." *June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2118 (2020).  Moreover, the Supreme Court has "generally permitted plaintiffs to assert third-party rights in cases where the 'enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *Id.* at 2118-19 (emphasis in original) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)).  As the Supreme Court has explained, "[i]n such cases, . . . 'the obvious claimant' . . . is the party upon whom the challenged statute imposes 'legal duties and disabilities.'" *Id.* at 2119 (quoting *Craig v. Boren*, 429 U.S. 190, 196-97 (1976)) (internal citations omitted).

In light of Supreme Court precedent, plaintiffs in the instant matter have standing to challenge the constitutionality of § 39-15-202(a)-(h), an abortion regulation, on behalf of themselves and their patients.  The statute regulates plaintiffs' conduct, and subsection (h) subjects physicians to criminal and professional penalties for non-compliance, which "eliminates any risk that their claims are abstract or hypothetical." *Id.*  Plaintiffs may also seek relief on behalf of their patients who are plainly affected by the challenged statute as well.

### B.    The Law Applicable to Abortion Restrictions

The Supreme Court recently reiterated the legal standards courts must apply in a case such as this in which plaintiffs challenge the constitutionality of a legal restriction on a woman's right to have an abortion.  In *Russo*, 140 S. Ct. at 2112, the Court stated:

> In *Whole Woman's Health v. Hellerstedt*, 579 U.S. —, 136 S. Ct. 2292, 195 L.Ed.2d 665 (2016), we held that "'[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right'" and are therefore

111

"constitutionally invalid." *Id.*, at —, 136 S. Ct., at 2300 (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 878, 112 S. Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion); alteration in original). We explained that this standard requires courts independently to review the legislative findings upon which an abortion-related statute rests and to weigh the law's "asserted benefits against the burdens" it imposes on abortion access. 579 U.S., at —, 136 S. Ct., at 2310 (citing *Gonzales v. Carhart*, 550 U.S. 124, 165, 127 S. Ct. 1610, 167 L.Ed.2d 480 (2007)).

The Supreme Court "cautioned that courts must review legislative factfinding under a deferential standard" without "plac[ing] dispositive weight on those findings, for the courts retai[n] an independent constitutional duty to review factual findings where constitutional rights are at stake." *Id.* at 2120 (internal citations and quotation marks omitted). "The right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State" is weighed against the State's "legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Casey*, 505 U.S. at 846. *See also EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 795 (6th Cir. 2020) ("As explained by the Supreme Court in *Whole Woman's Health* . . . we answer this [undue burden] question by weighing 'the burdens a law imposes on abortion access together with the benefits those laws confer.'").

A challenged statute is unconstitutional if

"it will operate as a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction of the cases in which [it] is relevant." 505 U.S. at 895, 112 S. Ct. 2791 (majority opinion). In *Whole Woman's Health*, we reaffirmed that standard. We made clear that the phrase refers to a large fraction of "those women for whom the provision is an actual rather than an irrelevant restriction." 579 U.S., at — (slip op., at 39) (quoting *Casey*, 505 U.S. at 895, 112 S. Ct. 2791; brackets omitted).

*Russo*, 140 S. Ct. at 2132. The Sixth Circuit has held that the "large fraction" required by *Casey*, while "more conceptual than mathematical," means more than 12% of those affected by the statute in question. *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006).

112

In *Casey*, the Supreme Court considered a Pennsylvania statute that required a woman seeking an abortion to receive certain information from the abortion provider at least 24 hours beforehand, thereby requiring her to "make at least two visits to the doctor." *Casey*, 505 U.S. at 886. The Court found that "[i]n theory, at least, the waiting period is a reasonable measure to implement the State's interest in protecting the life of the unborn, a measure that does not amount to an undue burden." *Id.* at 885. However, the Court went on to say:

> Whether the mandatory 24-hour waiting period is nonetheless invalid because in practice it is a substantial obstacle to a woman's choice to terminate her pregnancy is a closer question. The findings of fact by the District Court indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor. The District Court also found that in many instances this will increase the exposure of women seeking abortions to "the harassment and hostility of anti-abortion protestors demonstrating outside a clinic." 744 F. Supp., at 1351. As a result, the District Court found that for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be "particularly burdensome." *Id.*, at 1352.
>
> These findings are troubling in some respects, but they do not demonstrate that the waiting period constitutes an undue burden. We do not doubt that, as the District Court held, the waiting period has the effect of "increasing the cost and risk of delay of abortions," *id.*, at 1378, but the District Court did not conclude that the increased costs and potential delays amount to substantial obstacles. Rather, applying the trimester framework's strict prohibition of all regulation designed to promote the State's interest in potential life before viability, *see id.*, at 1374, the District Court concluded that the waiting period does not further the state "interest in maternal health" and "infringes the physician's discretion to exercise sound medical judgment," *id.*, at 1378. Yet, as we have stated, under the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest. And while the waiting period does limit a physician's discretion, that is not, standing alone, a reason to invalidate it. In light of the construction given the statute's definition of medical emergency by the Court of Appeals, and the District Court's findings, we cannot say that the waiting period imposes a real health risk.

113

> We also disagree with the District Court's conclusion that the "particularly burdensome" effects of the waiting period on some women require its invalidation. A particular burden is not of necessity a substantial obstacle. Whether a burden falls on a particular group is a distinct inquiry from whether it is a substantial obstacle even as to the women in that group. And the District Court did not conclude that the waiting period is such an obstacle even for the women who are most burdened by it. Hence, on the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden.

*Id.* at 885-87. As the Sixth Circuit has noted, the record in *Casey* regarding the 24-hour waiting period "was sparse." *Taft*, 468 F.3d at 372.

### C.  Benefits of the Mandatory Waiting Period of § 39-15-202(a)-(h)

Defendants argue that the statute's mandatory waiting period furthers two state interests: (1) protecting fetal life "by offering prospective abortion patients an opportunity to make a different choice," and (2) benefitting women's mental and emotional health "by allowing for more . . . [decisional] certainty." Rieger, Tr. 9/23/19 (Vol. 1) pp. 29-30 (opening statement). For the reasons explained below, the Court finds that defendants have not shown that § 39-15-202(a)-(h) actually furthers either of these interests.

Defendants have not demonstrated that § 39-15-202(a)-(h) advances the asserted state interest of protecting fetal life. Defendants rely on data from plaintiffs' records and testimony from plaintiffs' experts showing that after the statute's enactment some patients who attended a first appointment with an abortion provider did not return for a second appointment with that provider. Defendants' calculation appears to be that "since the enactment of the waiting period, approximately 2,365 patients had a first appointment and received informed consent and then did not come back to have an abortion at that facility."[50] *Id.* at 28 (referencing a PPGMR interrogatory

---

[50] The record reflects that between July 1, 2015, and January 31, 2018, approximately 729 patients obtained an abortion-related ultrasound at PPGMR but did not obtain an abortion there,

114

response).

The evidence does not support defendants' argument that these abortions were not performed (and therefore fetal life was protected to this extent) because these women changed their minds after further reflecting for at least 48 hours. Plaintiffs do not track the reasons for "no-shows" or cancellations of appointments due to privacy concerns and because it is irrelevant to patients' medical care. Further, plaintiffs' experts testified that there are many possible reasons why a patient may not attend a second appointment. Reasons include seeking care elsewhere, no longer seeking abortion care, decisional uncertainty, an inability to return to the clinic because of logistics, a scheduling conflict, and ineligibility for abortion care (due to miscarriage, ectopic pregnancy, no pregnancy, or too advanced pregnancy). The Court accepts Dr. Wallett's testimony that "[i]t's impossible to know why patients no-show[]" for an appointment, Wallett, Tr. 9/23/19 (Vol. 1) pp. 85-86, and that there is not a direct correlation between the number of patients who express uncertainty at their first appointment but do not return for their second. *See id.* at 145-46. Defendants' expert Dr. Podraza agreed that a patient who consulted with him about a procedure but did not return to have the procedure may have sought care elsewhere. He agreed that there are "multiple reasons" such a patient might not return. Podraza, Tr. 9/26/19 (Vol. 4) pp. 48-49.

The evidence does not support defendants' argument that these "no-show" patients

---

*see* Wallett, Tr. 9/23/19 (Vol. 1) pp. 113-14; *see* JX53 at 2-3, 10; and that between August 1, 2018, and December 31, 2018, approximately 309 patients obtained an abortion-related ultrasound at PPGMR but did not obtain an abortion. *See* JX57 at 2-3, 9-10. Between December 1, 2017, and December 31, 2018, 277 patients "either no-showed, canceled, or didn't make a second day appointment after receiving informed consent" at Choices. Terrell, Tr. 9/24/19 (Vol. 2) pp. 12, 14-16; *see also* JX28 at 2; JX30 at 2; JX41; JX43; JX45. Between July 1, 2015, and January 31, 2018, approximately 982 patients who received an abortion-related ultrasound at PPMET did not return for an abortion. *See* Young, Tr. 9/24/19 (Vol. 2) pp. 134-35; *see also* JX54 at 2, 10. The evidence shows that approximately 2,297 patients did not return for a second appointment, approximately the number defendants state.

115

– or any of them – did not return for a second appointment because they changed their minds and did not obtain an abortion as a result of either the waiting period or the information required by § 39-15-202(a)-(h). The evidence shows, and the Court finds, that the vast majority of patients seeking an abortion are certain of their decisions by the time they first appear at a clinic, and therefore the most likely reason they do not appear for a second appointment is that they cannot overcome the financial and logistical barriers the 48-hour waiting period imposes. Defendants' evidence to the contrary is scant. They rely primarily on a paper by Roberts on Utah's 72-hour waiting period to show that the statute at issue in this case has caused women to change their minds to have an abortion. In the Roberts study, 8% of the 309 women (out of 500 participants recruited at the first appointment) who completed follow-up interviews by telephone three weeks after the first appointment "were no longer seeking an abortion," and 71% of the 34 women who were still pregnant at follow up (or 8% of the women overall) indicated that they had changed their minds. Biggs, Tr. 9/26/19 (Vol. 4) pp. 171-72, 176. The study noted that "change of mind," an answer to closed-ended questions, "may best describe" women who indicated at the first appointment that they preferred to have an abortion and were not conflicted but then decided to carry their pregnancies; however, "[s]ome women who reported changing their minds were conflicted at the information visit." The participants in this study reported numerous other reasons for not having the abortion. Answers to open-ended questions include "just couldn't do it"; financial reasons; "other people came through"; too far along, sometimes for their own comfort; and "logistics." Answers to closed-ended questions include the cost of the procedure; others opposed to the abortion; needing to keep the appointment secret from family, employers, or partners; travel costs; and difficulty arranging logistics. Those who reported they "just couldn't do it" tended to be "conflicted to begin with" before deciding not to have the abortion. Ultimately this study found

116

that "women reported little conflict about the abortion decision" and concluded that because "most women were not conflicted about their decision when they sought care, the 72-hour waiting period requirement seems to have been unnecessary."

Defendants have not shown that the percentages from this study of women who were no longer seeking an abortion or who changed their minds may be applied to the instant case, which involves a 48-hour waiting period in a different state. Even if the Court were to apply these percentages, defendants have not shown that the women who "were no longer seeking an abortion" changed their minds because of the mandatory waiting period. As noted, there are many other reasons why a woman may not appear for a second appointment following a mandatory waiting period. Dr. Biggs indicated, and the Court accepts, that the Roberts paper's findings relate largely to the numerous burdens imposed by the 72-hour waiting period and do not suggest that mandatory waiting periods cause patients to change their minds as a result of having been required to take additional time to reconsider their decisions.

Defendants have likewise failed to show that § 39-15-202(a)-(h) benefits women's mental and emotional health by affording them additional time to increase their decisional certainty and avoid feelings of regret later. The evidence clearly shows that almost all women are quite certain of their decisions by the time they appear for their first appointment and that they do not benefit, emotionally or otherwise, from being required to wait before undergoing the procedure. Defendants rely on another study by Roberts on Utah's 72-hour waiting period that found that "[c]hanges in certainty were primarily in the direction of increased certainty, with more women reporting an increase, 29 percent, than a decrease, 8 percent." *Id.* at 181. Again, defendants have not shown that these percentages may be applied to women in Tennessee, at least 95% of whom are sure of their decisions when they seek an abortion. Even if the percentages from the Roberts

study did apply, there is no indication that the women in the study who reported greater certainty previously experienced decisional uncertainty, as Dr. Biggs noted. *See id.* at 183. The Court agrees with Dr. Biggs that there is no benefit in making women who are already certain of their decision when they appear for their first appointment be even more certain some number of days or weeks later.

In a further effort to show that the challenged statute is beneficial to women's health, defendants point to Dr. Coleman's testimony that whether to have an abortion is a stressful and emotional decision; that stress and emotions compromise decision-making and result in more "emotionally based," "hurried," and "less rational" decisions; that short time limits hinder decision-making; and that abortion is associated with negative mental health outcomes. Dr. Coleman claims that between 25% and 75% of women "feel some level of guilt" after the procedure, which may lead to feelings of regret, *id.* at 52-53, and that between 25% and 50% of women experience decisional ambivalence or distress, *see id.* at 32-33, 45, which she identified as a risk factor for poor post-abortion adjustment. *See id.* at 57. She opined that the statute at issue is beneficial because giving women more time to evaluate the state-mandated information and to consider their options allows them to make "a good decision" and reduces the likelihood of adverse consequences. *Id.* at 43, 78.

The Court rejects these opinions because they are flatly contradicted by the credible record evidence and are supported only by studies (including her own) which, as plaintiffs' experts showed, are irrelevant or deeply flawed and deserve no serious consideration. Prior to the passage of the statute, all of plaintiffs' patients went through an extensive and individualized informed consent process. Patients did not have only five or ten minutes to make a decision, as Dr. Coleman contends, because they began considering their options long before they arrived at the clinic and

118

plaintiffs gave them as much time as they needed to make a decision (in addition to the numerous hours spent at the clinic). Plaintiffs' experts testified that based on their electronic health records, experience, and research, abortion patients had very high levels of decisional certainty both before and after § 39-15-202(a)-(h)'s enactment.[51] There is no indication in this record, or in the legislative history, that prior to § 39-15-202(a)-(h) taking effect abortion patients lacked the information or time necessary to make an informed, voluntary, and uncoerced decision. Requiring patients to take additional time confers no benefit because at least 95% of women are already confident in their decisions when they attend an appointment with an abortion provider. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 71 (stating that any delay is not medically necessary and has no medical benefit); Goodman, Tr. 9/23/19 (Vol. 1) p. 188 (stating that a delay has no benefit "that I can think of"); Terrell, Tr. 9/23/19 (Vol. 1) p. 292-93, 296-97 ("I don't know of any benefit."); Young, Tr. 9/24/19 (Vol. 2) p. 57 (stating that the statute at issue "does not provide any benefits to patients"); Huntsinger, Tr. 9/25/19 (Vol. 3-B) pp. 20-21 ("[F]orcing a person to think longer will provide no benefit."), and pp. 37-41; Adams Dep. at 56 [docket entry 216-1] ("I have not personally seen [waiting] benefit anybody.").

In addition, plaintiffs showed that post-abortion regret is uncommon. *See* Wallett,

---

[51] The evidence demonstrates that between November 2013 and December 2018, 97.4% to 99.9% of patients at PPGMR were certain of their decisions; and between October 2014 and May 2018, 96% to 99.8% of patients at PPMET were certain of their decisions. *See* PDX1 (referencing JX53 at 8, JX56 at 12, JX57 at 8); PDX17 (referencing JX54 at 8-9, JX56 at 12-13). *See also* Wallett, Tr. 9/23/19 (Vol. 1) pp. 52-53 (stating that most of the patients at the Memphis health centers "were very, very clear about their decision" when they arrived at the clinic), and p. 71 (stating that in her experience "most women are very confident of their decision when they come in to have an abortion"); Young, Tr. 9/24/19 (Vol. 2) pp. 57, 75 (stating that in her experience patients "were very certain" about their decisions prior to making an abortion appointment); Biggs, Tr. 9/26/19 (Vol. 4) p. 96 ("We have clear evidence that most women are very certain of their decisions."), and pp. 133-34 (citing studies that found that 95% of women were certain of their decisions upon arrival at the clinic and that "the vast majority" of women were certain at the time of accessing care).

119

Tr. 9/23/19 (Vol. 1) p. 57 (stating that she has treated thousands of abortion patients and none has expressed regret after the procedure); Young, Tr. 9/24/19 (Vol. 2) p. 169 (stating that studies show that regret "is not common after abortion"); Biggs, Tr. 9/26/19 (Vol. 4) p. 96 ("I definitely don't agree that most women regret their abortions."), and p. 134 (stating that data from the Turnaway Study indicates that 95% of women reported that abortion was the right decision), and pp. 138-39 (referencing papers that found that women in the Turnaway Study who had an abortion reported lower levels of regret than women who were turned away from the abortion and that "among the women who reported regret as an emotion that they were feeling, 89 percent of those women still stated that they felt that abortion was the right decision for them"), and pp. 202, 224 (stating that regret is not "a common experience"). Dr. Biggs testified that she sees no indication that a mandatory waiting period would benefit women "in any way" or prevent them from feeling regret. *Id.* at 95-96, 139. The Court fully credits plaintiffs' experts' testimony and rejects Dr. Coleman's contrary opinions.

As for Dr. Coleman's testimony that emotions interfere with decision-making, plaintiffs' expert Dr. Huntsinger persuasively discredited this view as well by showing that Dr. Coleman has no expertise in the area of judgment and decision-making and has misinterpreted and misrepresented the research on this topic. He further discredited her opinion about the benefits of § 39-15-202(a)-(h) because studies show that stress and emotions have a positive influence on decision-making and that people are generally good at determining how much time they need to make a decision. The influence of stress on decision-making is "varied" in the sense that whether it makes people think faster or more hurriedly "depends on the particular decision context." Huntsinger, Tr. 9/25/19 (Vol. 3-B) p. 26. Forcing people to think more about their decisions and to analyze their options "lead[s] them to make suboptimal decisions, decisions that won't make

120

them happy," or decisions they later regret. *Id.* at 20-21, 33. Dr. Huntsinger testified convincingly that a mandatory waiting period would not benefit people experiencing ambivalence or decisional distress, and Dr. Coleman conceded that she has not researched the psychology of decision-making generally (separate from the topic of abortion) or the amount of time it takes to make a stressful decision or to achieve decisional certainty. She also conceded that she is not an expert in the brain's physiological functions tied to decision-making. She acknowledged that the studies she identified on stress and decision-making do not "directly apply" and are not "directly analogous" to 48-hour waiting periods. Coleman, Tr. 9/25/19 (Vol. 3-A) pp. 107, 110-12.

Plaintiffs also thoroughly impeached Dr. Coleman regarding her opinions concerning abortion and mental health. Dr. Biggs testified that the data on this topic "clearly shows that abortion does not increase women's risk of . . . experienc[ing] negative mental health outcomes." Biggs, Tr. 9/26/19 (Vol. 4) pp. 95, 104. The "general consensus within the scientific community" among leading scientific, psychiatric, and mental health organizations is that abortion does not increase women's risk of negative mental health outcomes. *Id.* at 104-05. Dr. Biggs identified serious flaws in the studies Dr. Coleman relied on, and in her own meta-analysis, that concluded that women who obtain an abortion are at an increased risk of negative mental health outcomes. Dr. Biggs explained, and the Court finds, that the reliable research on this subject clearly demonstrates that undergoing an abortion does not increase the risk that patients will experience negative mental health consequences.

In sum, defendants have not demonstrated that § 39-15-202(a)-(h) advances the asserted state interests of protecting fetal life or benefitting women's mental and emotional health. Fetal life is not protected because there is no evidence that patients who do not return to an abortion provider for the second appointment (i.e., for the procedure) fail to do so because the challenged

121

statute causes them to change their minds about having an abortion. And women's mental and emotional health is not benefited because the mandatory waiting period does nothing to increase the decisional certainty among women contemplating having an abortion. Further, the evidence demonstrates that at least 95% of women are certain of their decisions, post-abortion regret is uncommon, and abortion does not increase women's risk of negative mental health outcomes.

### D. Burdens Imposed by the Mandatory Waiting Period of § 39-15-202(a)-(h)

The Court finds and concludes that the mandatory waiting period required by § 39-15-202(a)-(h) substantially burdens women seeking an abortion in Tennessee. Plaintiffs have demonstrated conclusively that the statute causes increased wait times, imposes logistical and financial burdens, subjects patients to increased medical risks, and stigmatizes and demeans women. These burdens are especially difficult, if not impossible, for low-income women to overcome, and the evidence clearly shows that the vast majority of women seeking abortions in Tennessee are low income. Further, plaintiffs have shown that the statute undermines the doctor-patient relationship and imposes operational and financial burdens on abortion providers.

Plaintiffs' experts Dr. Wallet, Ms. Terrell, and Dr. Young testified, and the Court finds, that since § 39-15-202(a)-(h) has been in effect, wait times for abortion appointments have increased significantly and are often much greater than 48 hours. Plaintiffs have presented clear evidence that patients in Tennessee must wait significantly longer than 48 hours between their first appointment and the day of the procedure. *See* Wallett, Tr. 9/23/19 (Vol. 1) p. 74 (stating patients wait one to two weeks between the first and second appointments); Terrell, Tr. 9/24/19 (Vol. 2) pp. 277-78, 281 (stating patients wait three days to more than fourteen days between appointments); Young, Tr. 9/24/19 (Vol. 2) pp. 97, 99 (stating patients who have attended a first appointment wait two to twenty-three days for a medication abortion, often over one week for a

surgical abortion, and in some cases patients wait two to four weeks for the second appointment).

Some patients must wait several days or weeks before the first appointment, and then another

several days or weeks between the first and second appointments. For obvious reasons, abortion

is a time-sensitive procedure, and the window during which it can be performed is narrow.

Increased wait times affect patients' eligibility for a medication abortion, the method strongly

preferred by a majority of patients and the medically preferred option in some cases. These

increased wait times can and do cause patients to miss the short cutoff date for a medication

abortion (10 weeks LMP), thereby requiring them to undergo a more invasive and undesirable

surgical abortion, or even to miss the cutoff date in Tennessee for the latter procedure (19 weeks

and 6 days LMP). As surgical abortions are available at only five providers in Memphis, Nashville,

Knoxville, and Bristol, patients who miss the cutoff date for a medication abortion also face the

increased costs and difficulties associated with traveling to these few and, for many patients,

distant locations. Of these providers, only two – one in Nashville and one in Memphis – provide

surgical abortions up to 19 weeks and 6 days LMP. The others have gestational age cutoffs

between 13 weeks and 6 days LMP and 15 weeks LMP. The testimony also shows that patients

who miss these time-sensitive deadlines may resort to illegal or unsafe abortions. Those who miss

the deadline for having an abortion, and therefore must carry their pregnancies to term, face the

risks attendant with pregnancy and childbirth (both of which are significantly riskier than

abortion), as well as financial instability after the baby is born.

Moreover, data from PPGMR, PPMET, and the TDOH show that after the statute's

enactment the gestational age at which abortions are performed has increased, including an

increase in second trimester abortions; since the statute's enactment, the number of medication

abortions has decreased. The Court finds that these changes are largely attributable to the increased

123

wait times caused by the mandatory 48-hour waiting period. As gestational age increases, an abortion becomes lengthier, more invasive, more painful, and riskier for the patient. Delays in abortion care negatively affect the health of patients with certain medical conditions and cause patients to suffer emotionally and psychologically. Victims of rape or incest, as well as women who have a fetal anomaly, find it particularly traumatizing that, because of the mandatory waiting period, they must remain pregnant for days or weeks longer than they wish. The medical emergency exception is exceedingly narrow and applies only to extreme medical emergencies, which, according to the undisputed record evidence, very rarely occur.

Plaintiffs proved that the statutory waiting period burdens the majority of abortion patients with significant, and often insurmountable, logistical and financial hurdles. Dr. Wallett, Ms. Terrell, and Dr. Young testified convincingly that by having to attend two in-person appointments at least 48 hours apart, patients must take time off from work, arrange childcare, and find transportation on two different occasions. These hurdles are exacerbated for those patients who must travel long distances, and the evidence shows that most patients must do so because of the small number and geographical distribution of abortion providers in the state. Dr. Young testified that Tennessee has just eight clinics in four cities: Memphis, Nashville, Knoxville, and Johnson City.[52] Ninety-six percent of Tennessee counties do not have an abortion clinic, and 63% of women live in a county without an abortion provider. As Terrell testified, long distances are "a huge barrier." Terrell, Tr. 9/23/19 (Vol. 1) p. 286. It is especially difficult for victims of intimate partner violence to attend two appointments and doing so jeopardizes their safety.

The evidence demonstrates conclusively that patients face significant financial

---

[52] The parties later stipulated that as of October 3, 2019, Tennessee has eight clinics in five cities: one in Bristol, one in Mount Juliet, two in Knoxville, three in Memphis (one of which was no longer providing abortions), and one in Nashville.

124

barriers to accessing care because the waiting period requires patients to visit a clinic twice and to therefore pay twice for travel and (for the two-thirds of patients who have at least one child already) childcare. The cost of an abortion has increased as a result of § 39-15-202(a)-(h)'s enactment, pushing the procedure further out of reach for low-income patients. In addition, the cost of an abortion increases as gestational age increases, and the large majority of patients do not have the funds or health insurance to cover the procedure. The evidence shows that women lose wages, and risk being discharged, when taking time off work to attend appointments because most work at low-wage, hourly jobs that do not allow for paid time off or time off on demand.

The evidence further shows that the logistical and financial obstacles caused by the mandatory waiting period are particularly burdensome for low-income women, who make up the majority of abortion patients in Tennessee. The large majority of plaintiffs' patients live in poverty. Dr. Young testified that "although nationally[] abortion trends are declining, over the past decade, abortion trends have increased for our lowest-income women." Young, Tr. 9/24/19 (Vol. 2) pp. 92, 94-95. Nationally, 75% of abortion patients have low or very low incomes, i.e., incomes under 200% of the federal poverty guideline. As of July 2014, 42% of women obtaining abortions had incomes below 100% of the federal poverty level and 27% of women obtaining abortions had incomes between 100% and 199% of the federal poverty level. *See* DX5 at 170. In Tennessee, "the overwhelming majority of women seeking an abortion . . . are already mothers and are either poor or near low-income." Katz, Tr. 9/24/19 (Vol. 2) p. 227. Dr. Katz testified persuasively that women living under 200% of the federal poverty guideline have great difficulty meeting their own basic needs and those of their household, and an unexpected expense "puts the family at grave risk" of these needs being unmet.

The evidence further shows that low-income women have difficulty accessing

abortion care because those with low-income jobs are considered expendable workers, are not given paid time off or paid sick leave, and have no control over their work schedules, which are unpredictable and irregular. Low-income people's access to resources such as a car, reliable public transportation, disposable income for gas or a bus ticket, or internet and a credit card to reserve a hotel room are scarce or nonexistent. Even patients who live in a county with an abortion provider face significant financial burdens involving transportation, childcare, lost wages, and raising the funds for the procedure. Tennessee's mandatory 48-hour waiting period is devastating for low-income patients because it requires them to travel to a clinic for a second appointment, thereby at least doubling these costs. These additional expenses, as the evidence demonstrates, place abortion beyond the reach of many low-income patients. Many of those who are able to make the arrangements and cover the expenses for a second appointment put themselves, and their families, at risk by spending money in this way, as many will go without basic necessities, take out predatory loans, or borrow money from abusive partners or ex-partners.

In addition to these significant logistical and financial burdens, the mandatory waiting period is also gratuitously demeaning to women who have decided to have an abortion. As Dr. Young testified, the waiting period – which Tennessee does not apply to any medical procedures men may undergo – demeans women by implicitly questioning their decision-making ability. Dr. McClelland testified similarly that this mandatory waiting period reinforces and perpetuates the stigmatizing stereotype that women are overly emotional and incapable of making rational decisions and must therefore be given an arbitrary "time out" or "cooling off period" to further consider the gravity of their situations. The Court accepts her testimony that the stigma flowing from such stereotypes has negative health implications and a detrimental effect on the physical and psychological health of those affected, namely, all women in Tennessee who seek

abortion care.

The Court further concludes, based primarily on the testimony of Drs. Goodman and Young, that the challenged statute undermines patient autonomy and self-determination, the doctor-patient relationship, and the informed consent process by interjecting an unnecessary waiting period and predetermining the information, which may or not be relevant in particular cases, that must be provided in all cases.

In addition to the burdens placed on patients, the evidence presented at trial clearly shows that the challenged statute also places significant burdens on the clinics themselves. Dr. Wallett, Ms. Terrell, Dr. Young, and Dr. Adams testified regarding their efforts to address operational difficulties caused by the statute's requirement that clinics must see patients twice (not once as was the case previously). As a consequence, plaintiffs have had to open an additional clinic, expand the clinics' schedules, modify the counseling and informed consent process, hire additional physicians and staff, increase gestational age cutoffs, and raise prices (which, in turn, further burdens low-income patients). Hiring additional physicians in Tennessee is difficult because local abortion providers face stigma and harassment at work and in their communities. Dr. Wallett, Ms. Terrell, and Dr. Young indicated that the operational changes made by PPGMR, Choices, and PPMET have not, despite their best efforts, restored wait times to pre-statute durations. Further, patients continue to miss the gestational age cutoffs despite the operational changes.

E. **The Burdens Imposed by the Mandatory Waiting Period of § 39-15-202(a)-(h) Outweigh its Benefits**

In analyzing the constitutionality of the mandatory waiting period required by § 39-15-202(a)-(h), the Court must determine whether it imposes an undue burden by weighing its "'asserted benefits against the burdens' it imposes on abortion access." *Russo*, 140 S. Ct. at 2112

(quoting *Whole Woman's Health*, 136 S. Ct. at 2310).  Having carefully considered the extensive evidence in the record, the Court concludes that the statutory waiting period provides no appreciable benefit to fetal life or women's mental and emotional health.  On the contrary, the statute imposes numerous burdens that, taken together, place women's physical and psychological health and well-being at risk.  The burdens especially affect low-income women, who comprise the vast majority of those seeking an abortion, and substantially limit their access to this medical service.  The mandatory waiting period is unconstitutional because it clearly imposes an undue burden on women's right to obtain a pre-viability abortion in Tennessee and has no countervailing benefit.

Defendants argue that "Tennessee's waiting period is not a sub[]stantial obstacle, and certainly not an undue burden," because plaintiffs "cannot demonstrate that patients are being denied abortions by the wait period[]" imposed by the statute.  Rieger, Tr. 9/23/19 (Vol. 1) pp. 26, 28-29 (opening statement).  This misstates the applicable legal test and misrepresents the record evidence.  The Supreme Court has "repeatedly reiterated [since *Casey*] that the plaintiff's burden in a challenge to an abortion regulation is to show that the regulation's 'purpose or effect' is to 'plac[e] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" *Russo*, 140 S. Ct. at 2133 (quoting *Casey*, 505 U.S. at 877).  Whether the abortion regulation makes it "nearly impossible" for a woman to obtain an abortion is irrelevant.  *Id.*  For the reasons explained above, plaintiffs have met their burden of showing that the "purpose or effect" of the statute is to place "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."

Defendants rely on *Casey* and *Taft*, cases in which the Supreme Court and the Sixth Circuit upheld 24-hour waiting periods, to support their contention that Tennessee's 48-hour

128

waiting period is constitutional.  As noted, the Supreme Court commented in *Casey* that "[i]n

theory, at least, the waiting period is a reasonable measure to implement the State's interest in

protecting the life of the unborn, a measure that does not amount to an undue burden.  Whether the

mandatory 24-hour waiting period is nonetheless invalid because in practice it is a substantial

obstacle to a woman's choice to terminate her pregnancy is a closer question."  *Casey*, 505 U.S. at

885.  The Sixth Circuit characterized the record in *Casey* as to the 24-hour waiting period as

"sparse."  *Taft*, 468 F.3d at 372.  The court of appeals also noted that

> [t]he sum of the evidence before the *Casey* Court concerning the twenty-
> four-hour notification requirement was as follows:
>
>> The findings of fact . . . indicate that because of the distances many
>> women must travel to reach an abortion provider, the practical
>> effect will often be a delay of much more than a day because the
>> waiting period requires that a woman seeking an abortion make at
>> least two visits to the doctor.  [I]n many instances this will increase
>> the exposure of women seeking abortions to "the harassment and
>> hostility of anti-abortion protestors demonstrating outside a
>> clinic."  As a result, . . . for those women who have the fewest
>> financial resources, those who must travel long distances, and
>> those who have difficulty explaining their whereabouts to
>> husbands, employers, or others, the 24-hour waiting period will be
>> "particularly burdensome."
>
> *Id.* at 885-86, 112 S. Ct. 2791.  On the basis of these facts, . . . the Supreme
> Court declined to find an undue burden.

*Id.*  In *Casey*, the Supreme Court did "not doubt that, as the District Court held, the waiting period

has the effect of 'increasing the cost and risk of delay of abortions,' . . . but the District Court did

not conclude that the increased costs and potential delays amount to substantial obstacles."  *Casey*,

505 U.S. at 886 (internal citation omitted).  It went on to state that "the District Court did not

conclude that the waiting period is [a substantial] obstacle even for the women who are most

burdened by it.  Hence, on the record before us, and in the context of this facial challenge, we are

not convinced that the 24-hour waiting period constitutes an undue burden."  *Id.* at 887.

The present case has what was lacking in *Casey*: a fully developed record that clearly shows the extent to which the mandatory waiting period places a substantial obstacle in the way of women who seek an abortion. Plaintiffs in the present case have proven with overwhelming evidence that the 48-hour waiting period (in addition to serving no legitimate purpose) severely burdens the majority of women seeking an abortion. As noted above, the waiting period has this effect because it significantly delays this time-sensitive medical procedure, and also makes it so time-consuming, costly, and inconvenient to obtain that the predominantly low-income population seeking the service must struggle to access it, if they can access it at all. Another important difference between *Casey* and the present case concerns the number of abortion providers. When *Casey* was decided, Pennsylvania had eighty-one such providers, fully ten times as many as Tennessee has currently. Obviously, this dramatic difference in two states of comparable size, *see supra* note 24, dramatically affects the extent to which the service was available to Pennsylvanians in 1992 as compared to Tennesseans in 2020.

### F. Large Fraction Test

Plaintiffs in this matter seek facial relief. "Facial relief is available when a challenged law places a substantial obstacle in the path of an individual's access to abortion prior to viability in 'a large fraction of cases in which [the provision at issue] is relevant.'" *Friedlander*, 960 F.3d at 808 (alteration in original) (quoting *Whole Woman's Health*, 136 S. Ct. at 2320). In making this determination, "the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" *Whole Woman's Health*, 136 S. Ct. at 2320 (alterations in original) (quoting *Casey*, 505 U.S. at 895). The relevant numerator is then "what portion of this population would be unduly burdened by [the provision]." *Friedlander*, 960 F.3d at 809 (alteration added). The Sixth Circuit has "explained that 'a challenged restriction need not

operate as a *de facto* ban for all or even most of the women actually affected,' but 'the term 'large fraction' which, in a way, is more conceptual than mathematical, envisions something more than . . . 12 out of 100 women . . . .'" *Id.* at 810 (quoting *Taft*, 468 F.3d at 374).

Plaintiffs have demonstrated that the large fraction test is met. The Court concludes that the mandatory 48-hour waiting period required by § 39-15-202(a)-(h) is an actual restriction for women in Tennessee who are certain of their decisions when they seek abortion services. The evidence clearly shows, and the Court finds, that at least 95% of women who attend an appointment at an abortion clinic fall within this category.

The challenged statute unduly burdens all women who are certain of their decisions at the time they access abortion care because all of these women are forced to wait much longer than 48 hours after the first appointment to obtain the procedure (between three days and four weeks). For these women, the additional wait has no benefit; rather, it subjects them to increased medical risks; lengthier, more painful, and more expensive procedures; and stigma, which has harmful health consequences.

Additionally, all low-income women who seek an abortion are unduly burdened by the mandatory waiting period because it requires them to make a second trip to a provider. As plaintiffs demonstrated, the costs and inconvenience of the second trip are, for the 60% to 80% of patients who are low-income, either insurmountable or surmounted with great difficulty. This plainly meets the large fraction test.

G.      **Requirements of § 39-15-202(a)-(h) Regarding State-Mandated Information and Delivery of that Information Only by a Physician**

In addition to the mandatory waiting period, plaintiffs challenge the provisions of § 39-15-202(a)-(h) that require the referring physician or the physician who intends to perform the abortion to provide every patient with a specified list of information. While defendants argue that

131

these provisions protect fetal life and benefit women's health, this is not supported by the evidence. The state-mandated information includes information regarding the availability of "public and private agencies and services" that can assist a woman during pregnancy and after the child is born "if she chooses not to have the abortion," the risks and benefits of an abortion and continuing the pregnancy to term, and a general description of the abortion method and instructions to follow after the procedure. *See* Tenn. Code Ann. § 39-15-202(b), (c). There is no indication in the record, however, that plaintiffs did not provide this information to patients prior to the statute's enactment.[53] Requiring that the specified information be given is, at best, a purposeless redundancy and, at worst, an interference with the informed consent process which, as the evidence also clearly shows, is best accomplished when tailored to the needs and circumstances of each individual patient.

Nor is there any evidence that patients are more likely to change their minds or

---

[53] Before § 39-15-202(a)-(h) took effect, PPGMR provided patients with information regarding abortion, options, and counseling and community resources. *See* Wallett, Tr. 9/23/19 (Vol. 1) pp. 48-49. Physicians ensured that patients "understood the risks, benefits, and all the alternatives of proceeding." *Id.* at 51. Patients received "an extensive packet" of written materials, which described medication and surgical abortions, addressed options besides abortion, and gave detailed instructions to follow before and after the procedure. *Id.* at 49; *see also* PX1. This packet contains a referral list with resources for prenatal care, adoption, and social services. *See* PX1. A one-page form entitled "Patient Acknowledgement of Physician Counseling" was the only addition to this packet of written materials after the statute took effect. *See* Wallett, Tr. 9/23/19 (Vol. 1) pp. 61-62, 70; *see also* PX1. Terrell testified that the only portion of the state-mandated information Choices did not provide to patients related to possible viability after a certain gestational age (22 weeks since conception or 24 weeks LMP). *See* Terrell, Tr. 9/23/19 (Vol. 1) p. 266; *see* Tenn. Code Ann. § 39-15-202(b)(3). This information is irrelevant to Choices' patients because of its 15-week LMP cutoff. *See* Terrell, Tr. 9/23/19 (Vol. 1) p. 266. Choices maintains a list of referrals and resources that it shares with patients. *See id.* at 259-60; *see also* PX10. Prior to the statute's enactment, PPMET discussed pregnancy options with patients and provided information to them on the procedures for which they were eligible and the risks and benefits of the procedures. *See* Young, Tr. 9/24/19 (Vol. 2) p. 69. Dr. Adams testified that prior to § 39-15-202(a)-(h) taking effect, Adams & Boyle's Tennessee facilities disclosed to patients the state-mandated information listed in subsection (b). Adams Dep. at 35-36.

132

make more thoughtful and informed decisions about having an abortion if the information is delivered to them during an in-person meeting with a physician instead of trained staff, as was plaintiffs' practice before the statute was enacted. The testimony from Drs. Goodman and Young was that all of the information provided to patients can be communicated effectively by means other than in person and by clinic personnel other than a physician. *See* Goodman, Tr. 9/23/19 (Vol. 1) pp. 183-87; Young, Tr. 9/24/19 (Vol. 2) p. 85; *see also* DX5 at 143 (Terrell's testimony before the legislature). Requiring that a physician do so, and in person, serves no purpose any witness could explain, but the harms it causes are plain: it drives up the clinics' costs, which must be passed on to their patients, by needlessly assigning to physicians a task others can perform. *See* Terrell, Tr. 9/23/19 (Vol. 1) pp. 274-75.

Nonetheless, while both of these requirements serve no legitimate purpose, the Court is unable to find that they unduly burden women's access to abortion. The trial evidence indicated that the state-mandated information requirement may confuse patients insofar as the required information does not pertain to them and that the "a physician must provide it" requirement is one reason why plaintiffs have had to hire more physicians, thereby driving up costs. *See* Wallett, Tr. 9/23/19 (Vol. 1) pp. 78, 80; Terrell, Tr. 9/23/19 (Vol. 1) pp. 265, 274-75. However, the evidence does not establish to the Court's satisfaction that either requirement has "the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion." *Russo*, 140 S. Ct. at 2112 (quoting *Whole Woman's Health*, 136 S. Ct. at 2300). The Court notes that in *Casey*, the Supreme Court upheld the portions of the statute at issue in that case requiring physicians to inform patients of specific information before performing an abortion.[54] *See Casey*,

---

[54] The Supreme Court upheld the state-mandated information requirement in *Casey* because it determined that

505 U.S. at 881-85.  Plaintiffs have not provided sufficient evidence in this matter for the Court to deviate from the Supreme Court's decision in *Casey* with respect to § 39-15-202(a)-(h)'s requirements that patients receive specific information and that the information be delivered only by a physician.

### H.    Equal Protection Claim

Plaintiffs' equal protection claim is that § 39-15-202(a)-(h) discriminates on the basis of sex by limiting women's, but not men's, ability to make medical decisions based on stereotypes about women's purported inability to make rational decisions.  The Court agrees that this difference in the treatment of men versus women in the context of medical decision-making is unjustifiable.  There is no evidence to suggest that women are any less capable than men of making rational decisions in this or any other context.  Nor is there any evidence to suggest that women make better decisions (i.e., ones they are less likely to regret) if required to hear state-mandated information from a physician and to wait for a required period of time before proceeding. Defendants' suggestion that women are overly emotional and must be required to cool off or calm down before having a medical procedure they have decided they want to have, and that they are constitutionally entitled to have, is highly insulting and paternalistic – and all the more so given

---

requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion.  This requirement cannot be considered a substantial obstacle to obtaining an abortion, and, it follows, there is no undue burden.

*Casey*, 505 U.S. at 883.  With respect to the requirement that the information be delivered by a physician, the Court concluded:  "Since there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion, we conclude that it is not an undue burden." *Id.* at 884-85.

that no such waiting periods apply to men.

Nonetheless, because the Court concludes that the statutory waiting period is unconstitutional under the undue burden standard, there is no need for the Court to address plaintiff's equal protection claim separately. Further, the Court is inclined to agree with the Eighth and Ninth Circuits' view, *see Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 464 (8th Cir. 1999); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544-45 (9th Cir. 2004), that all challenges to abortion restrictions are to be reviewed exclusively under the undue burden test articulated in *Casey*.

**V.    Conclusion**

Defendants in this matter rely largely on *Casey* to argue that § 39-15-202(a)-(h) is a valid restriction on women's constitutional right to obtain a pre-viability abortion. Defendants overlook that

> [i]n reaffirming *Roe*, the *Casey* Court described the centrality of "the decision whether to bear . . . a child," *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S. Ct. 1029, 31 L.Ed.2d 349 (1972), to a woman's "dignity and autonomy," her "personhood" and "destiny," her "conception of . . . her place in society." 505 U.S., at 851-852, 112 S. Ct. 2791. Of signal importance here, the *Casey* Court stated with unmistakable clarity that state regulation of access to abortion procedures, even after viability, must protect "the health of the woman." *Id.*, at 846, 112 S. Ct. 2791.

*Gonzales*, 550 U.S. at 170 (Ginsburg, J., dissenting). Defendants have failed to show that the challenged mandatory waiting period protects fetal life or the health of women in Tennessee. It is apparent that this waiting period unduly burdens women's right to an abortion and is an affront to their "dignity and autonomy," "personhood" and "destiny," and "conception of . . . [their] place in society."

Accordingly,

135

IT IS HEREBY DECLARED that the mandatory waiting period provision of Tenn. Code Ann. § 39-15-202(a)-(h) is unconstitutional because it violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

IT IS FURTHER ORDERED that defendants are permanently enjoined from enforcing Tenn. Code Ann. § 39-15-202(a)-(h) to the extent it imposes a mandatory 48- or 24-hour waiting period for those seeking abortion care.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE
SITTING BY SPECIAL DESIGNATION

Dated: October 14, 2020
Detroit, Michigan

136